## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRYSTAL GARRETT-EVANS, Individually and on Behalf of All Others Similarly Situated, : | Civil Action No. 1:20-cv-07277 |
| : | |
| : | CLASS ACTION |
| Plaintiff, : | |
| : | **AMENDED CLASS ACTION** |
| vs. : | **COMPLAINT FOR** |
| : | **VIOLATIONS OF THE** |
| COTY INC., LAMBERTUS "BART" : | **FEDERAL SECURITIES LAWS** |
| BECHT, CAMILLO PANE, PIERRE : | |
| LAUBIES, PATRICE DE TALHOUËT, and : | **JURY TRIAL DEMANDED** |
| PIERRE-ANDRE TERISSE, : | |
| : | |
| Defendants. : | |

Lead Plaintiff Susan Nock ("Plaintiff"), individually and on behalf of all others similarly situated, by their undersigned counsel, hereby brings this Amended Class Action Complaint ("Complaint") against Coty Inc. ("Coty" or "Company"), Lambertus "Bart" Becht ("Becht"), Camillo Pane ("Pane"), Pierre Laubies ("Laubies"), Patrice de Talhouët ("Talhouët"), and Pierre-Andre Terisse ("Terisse") (collectively, "Defendants"). The allegations herein are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public statements and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Coty, securities analysts' reports, news stories, and review of other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Coty's securities between November 9, 2016 and June 30, 2019, both dates inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      During the Class Period Defendants repeatedly misrepresented the extent of and lied about the material difficulties they encountered integrating Coty's $11.5 billion purchase of Proctor & Gamble Company's ("P&G") Beauty Business. Issues preventing integration of P&G's beauty business into Coty were intractable. Defendants, however, repeatedly described the P&G

integration issues as "temporary" or "short-term." Further, despite consistently touting Coty's digital and e-commerce marketing abilities as key to revitalizing the P&G beauty brands, the Company's digital and e-commerce marketing abilities were well below industry practices, insufficient to boost sales of the P&G brands materially. Ultimately, in 2019, the true extent of the intractable integration issues caused the Company to impair $4 billion in goodwill and intangible assets from the P&G beauty business. Defendants' false and misleading statements caused substantial investor losses.

3.      Coty is one of the world's largest beauty companies. Coty markets, sells, and distributes its products in over 150 countries, with dedicated sales forces in most of its significant markets. In fiscal year 2020,[1] Coty itself produced approximately 80% of its products. Coty currently has over 18,000 employees in 46 countries.

4.      On October 3, 2016, Coty completed the largest acquisition in its history, paying $11.5 billion for P&G's beauty business, more than doubling the Company's revenues. Immediately, Defendants faced critical integration and infrastructure issues. Eliminating duplication, inefficiencies, and supply challenges resulting from this enormous merger was vital to Coty's success. In addition, because many of the P&G brands were outdated and/or aging, Coty's ability to refresh and revitalize those brands—particularly through digital media—was also key to its success. As Defendant Pane himself stated early in the Class Period, "some of our brands have not played the right role in the social engagement," which was a problem because "[c]onsumers are truly spending a disproportionate amount of time on social media, on social platforms."

---

[1] Coty's fiscal year ends June 30.

5.      During the Class Period, Coty insisted, quarter after quarter, that any integration issues, including supply problems, were short term and would not lead to increased operating costs, and that Coty was successfully integrating P&G. Defendants further insisted, quarter after quarter, that Coty was stepping up its digital sales prowess when it was not. By July 1, 2019, however, it was clear that not only had Coty grossly overpaid for P&G, but that the integration had been far more complex than Defendants told the market, and the Company's digital and e-commerce marketing capabilities were much further behind its competitors than Coty ever told investors.

6.      For example, on February 9, 2017, just months after the merger, Coty disclosed "short-term" integration issues, but lied, insisting that the integration issues were not "major" and expressing surprise that P&G-related inventory was materially higher than expected. In addition, Coty assured the market that it did not need "to boost advertising spending" to "revitalize this [P&G] portfolio" because "when you start shifting the traditional media to digital, you actually have way more money to play with and to invest, to be able to reach more consumers" so "we have enough funds for future success and re-launches." On this news, Coty's stock price dropped nearly 9% over two days of trading on heavy volume.

7.      On August 22, 2017, Coty announced that its Consumer Beauty segment's revenue, including the P&G brands, was down 10%, but falsely insisted that the integration was "on track with the synergy delivery." On this news, Coty's stock price dropped nearly 17% over three days of trading on heavy volume.

8.      Coty revealed yet more "short-term" integration issues on November 7, 2018, attributing lower than expected sales to "several temporary supply-chain related headwinds," including "warehouse and planning center consolidat[ed] disruptions in Europe and North

America," *i.e.*, integration problems. Still, Coty insisted that despite the lower sales and continued "temporary" supply issues, the P&G integration was near completion, and Coty would realize the over $1 billion in working capital benefits it had touted in 2016. Unimpressed investors bid Coty's stock price down by nearly 26% over two days of trading on heavy volume.

9.      By 2019, Coty could no longer misrepresent the material integration issues as transitory. On February 8, 2019, even as it touted that the supply-chain issues had improved since the previous quarter, Defendants announced a nearly ***$1 billion*** impairment of goodwill and intangible assets attributable to Coty's Consumer Beauty division, and to the P&G assets. Three months later, on May 8, 2019, after Coty performed its annual impairment analysis on May 1, 2019, Coty assured investors that its supply issues were "largely resolved" across all divisions.

10.     Less than three months after Defendants disclosed that Coty had solved the integration issues, Coty announced a "Turnaround Plan" and impaired another nearly ***$3 billion*** in goodwill and intangible assets of the P&G brands. Defendants finally admitted that the extent of the P&G integration problems was materially more adverse than they had disclosed, that integration issues repeatedly labelled "short-term" had never been so, that the integration had been far harder than Defendants had been telling investors, and that their advertising efforts were still not "in line with industry practices." Defendants conceded that difficulties with the P&G merger were "at the heart" of Coty's problems since the merger, that the P&G assets had "weak performance" since their acquisition, and that Coty had "identified what we need to change in our company to be lasting and sustainable performance." On this news, Coty's stock price dropped over 14% on heavy volume.

11.     Defendants explained their breach of the duty to have impaired the full $4 billion in February 2019 by claiming that their brand new "Turnaround Plan" required the impairment.

The impairment, however, is simply an admission that the P&G business had been overvalued throughout the Class Period, and Coty should have taken the full $4 billion impairment in February of 2019.

12.     In violation of Generally Accepted Accounting Principles ("GAAP") and SEC regulations, Coty's failure to take the full $4 billion impairment in February 2019 caused Coty to knowingly or recklessly misrepresent the Company's goodwill and intangible assets. As a direct result, in further violation of GAAP, Defendants caused Coty to materially overstate its operating income, net income, and earnings per share in the financial statements for the second and third quarters of fiscal year 2019. Further, Coty violated GAAP by not revealing in May 2019 the "subsequent event" that Coty would need another major impairment.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's stock on four separate occasions, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial District, and Coty's headquarters are in this judicial District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

19.     Plaintiff Susan Nock, as set forth in the certification previously provided (ECF No. 26-2), and incorporated by reference herein, purchased Coty common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and material omissions alleged herein.

20.     Defendant Coty is incorporated in Maryland, with its headquarters located are 350 5th Avenue, New York, New York 10118. The Company's securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "COTY."

21.     Defendant Becht served as the Chairman of Coty's Board from October 2011 to November 2018, and served on the Board until January 2019. From September 2014 to September 2016, he served as Interim Chief Executive Officer ("CEO"), overseeing Coty's operations and mergers and acquisitions agenda, including the acquisition of the P&G Specialty Beauty Business. Mr. Becht holds a Bachelor of Arts degree in Economics from the University of Groningen and an MBA from the University of Chicago, Booth School of Business.

22.     Defendant Pane served as Coty's CEO and a member of its Board from September 2016 to November 2018. He had joined Coty's Executive Committee in July 2015 as the Executive Vice President ("EVP") of Category Development. Prior to joining Coty, he spent nearly 20 years at Reckitt Benckiser in various roles, including Senior Vice President, Global Category Officer Consumer Health. Mr. Pane holds a degree in Business Administration from Bocconi University.

23.     Defendant Laubies served as Coty's CEO, a member of the Board, and a member of the Executive Committee from November of 2018 to May 2020. In January 2019, he also assumed the leadership for formulating and implementing the strategic vision for the Consumer Beauty division as its President. Prior to joining Coty, he served as the CEO of Jacobs Douwe Egberts BV from September 2013 to March 2018. Mr. Laubies holds a master's degree in Economics from Sciences Politiques de Paris, Université Sorbonne and a law degree from the Université Paris 2 Pantheon-Assas.

24.     Defendant Talhouët served as the Chief Financial Officer ("CFO") of Coty from December 2013 to September 2018, joining the Executive Committee in January 2014. Prior to joining Coty, he was the Corporate Finance Officer Americas and a member of the finance executive committee for Mars Unisabi. Mr. Talhouët holds a bachelor's degree from the Paris Nanterre University and a master's degree from the National Conservatory of Arts & Crafts.

25.     Defendant Terisse has served as Coty's CFO a member of its Executive Committee since February 2019, and as its Chief Operating Officer ("COO") since February 2020. Prior to joining Coty, he spent the majority of his career at Danone, notably as Group CFO from 2008 to 2015 and EVP for Danone Africa Division from 2015 to 2017. Terisse holds a

bachelor's degree in Business and Management from IAE Lyon III and a master's degree in Finance from EM Lyon Business School, France.

26.     Defendants Becht, Pane, Laubies, Talhouët, and Terisse are collectively referred to herein as the "Individual Defendants."

27.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

28.     The Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     participated in and oversaw the day-to-day operations of the Company at the highest levels;

(c)     were privy to confidential, proprietary information concerning the Company and its business and operations;

(d)     were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     were aware of or recklessly disregarded that the Company was issuing false and misleading statements; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

29.     In each SOX Certification referenced in this Amended Complaint the signatory certified that:

1.     I have reviewed this [Quarterly or Annual] Report on Form [10-Q or 10-K] of [Defendant Coty Inc.];

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]

30.     In addition, for each periodic report Coty filed with the SEC, it included a

Certification of Periodic Financial Report Pursuant to 18 U.S.C. § 1350, stating:

    The [annual/quarterly] report on Form 10-[K/Q] for the [year/quarter] ended _____ of the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (15 U.S.C. 78m or 78o(d), and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

31.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

32.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

33.     According to its Annual Report on Form 10-K for the fiscal year ended June 30, 2019 ("2019 10-K"), Coty is one of the world's largest beauty companies, the "global leader in fragrance, a strong number two in professional salon hair color & styling, and number three in color cosmetics." Coty operates three product category focused segments: (1) Consumer Beauty which focuses on color cosmetics, retail hair coloring and styling products, body care and mass fragrances sold primarily in the mass retail channels ("Consumer Beauty"); (2) Luxury which focuses on prestige fragrances and skincare brands ("Luxury"); and (3) Professional Beauty which focuses on servicing nail salon owners and stores selling to nail supply owners and salons.

34.     Coty itself manufactures approximately 80% of its products, with a dedicated marketing and sales force in most of its significant markets. Consumer Beauty has historically accounted for approximately 50% of Coty's revenues. Coty's top retailer is Walmart, which in fiscal year 2019 accounted for approximately 6% of Coty's net revenues. Coty's sales generally increase during the holiday season, its second fiscal quarter.

### Coty Acquires the P&G Specialty Beauty Business

35.     On July 9, 2015, Coty announced a definitive agreement to acquire the P&G beauty business.

36.     On October 3, 2016, Coty issued a press release, announcing that on October 1, 2019 it had completed its acquisition of the P&G Specialty Beauty Business for $11.5 billion. In the press release, Defendant Becht, Chairman of Coty's Board of Directors, confirmed that "we now have a much improved team, structure and culture to make the vision of this merger a reality." With the completion of the acquisition, Defendant Pane became Coty's CEO.

**Coty Repeatedly Misleads About its Struggles in Integrating P&G**

37.     On November 9, 2016, the first day of the Class Period, Coty issued a press release, attached as an exhibit to a Form 8-K, reporting financial results for the first quarter fiscal of 2017, ending September 30, 2016, entitled "Results for the stand-alone Coty business prior to the completion of the merger with P&G" ("Q1 2017 Press Release"). In the press release, Defendant Becht declared that for the combined company, "[w]e continue to target the total four-year synergies and working capital benefits of $750 million and $500 million, respectively, with no change to the operating costs to realize both," assuring investors that "while there may be challenges as we integrate and rebuild the businesses, we are firmly committed to realizing the ambitions we have and delivering value for all our shareholders."

38.     That same day, Coty filed its Form 10-Q for the quarter ended September 30, 2016 ("Q1 2017 10-Q"), signed by and with SOX certifications from Defendants Pane and Talhouët.

39.     Coty did not disclose on November 9, 2016 in either its SEC filings or in its November 9, 2016 earnings conference call ("November 9, 2016 Call"), however, that material integration issues had already materialized before November 9, 2016, but three months later they would state that integration problems had been present "in the first semester," *i.e.*, before November 9, 2016.

40.     On February 9, 2017, Coty filed a Form 10-Q for the second quarter of 2017 ("Q2 2017 10-Q"), signed by and with SOX certifications from Defendants Pane and Talhouët. Defendants further issued that same day a press release entitled "Coty Inc. Reports Second Fiscal Quarter 2017 Results, the First Quarter After Successful Completion of the Merger with P&G Beauty Business" ("Q2 2017 Press Release"). In the press release, for the first time, Defendants acknowledged difficulties with the integration of P&G but downplayed their true extent. Coty disclosed "negative transitional impacts[,] especially including significant trade inventory build in the first quarter of fiscal 2017 in parts of the P&G business," on the Combined Company's net revenues. It assured investors, however, that those impacts were "short-term." Defendant Pane stated that "[t]he business was impacted by significantly higher-than-anticipated inventory levels in the market on the acquired P&G Beauty Business, competitive pressure in the Consumer Beauty division and the distraction associated with the merger integration efforts." He described the impacts, however, as "short term challenges like the ones we faced in the first semester." Pane added that "[o]n the P&G Beauty Business merger, we are reiterating our previously communicated $750 million synergy target by fiscal 2020. The integration is progressing as expected, with no major issues to date."

41.     In the Q2 2017 10-Q, Defendants also touted their progress in recognizing the need to improve their digital marketing and sales, with Pane stating that Coty was "accelerating our end-to-end digital transformation including e-commerce."

42.     That same day, Coty held an earnings conference call ("February 9, 2017 Call"). In prepared remarks, Defendant Pane repeated that "[t]he business was impacted by significantly higher than anticipated inventory levels in the market, on the acquired P&G Beauty Business, competitive pressure in the Consumer Beauty division, and the distraction associated with the

integration efforts." Pane further repeated that "the integration is progressing as expected with no major issues to date and we are reiterating our previously communicated $750 million synergy target by FY20."

43.    On May 10, 2017, Coty filed a Form 10-Q for the third quarter of 2017 ("Q3 2017 10-Q"), signed by and with SOX certifications from Defendants Pane and Talhouët. That same day Defendants issued a press release, attached as an exhibit to a Form 8-K, entitled "Coty Inc. Reports Third Quarter Fiscal 2017 Results" ("Q3 2017 Press Release"). Eschewing mention of any integration problems, including supply issues, Defendant Pane stated that "[o]n the integration of the P&G Beauty Business, we are making good progress," leaving investors with the false impression that the February 2017 integration issues had indeed been "short-term."

44.    In the Q3 2017 10-Q, Defendants again touted their progress in improving their digital marketing and sales, with Pane stating that Coty was "accelerating our end-to-end digital transformation including e-commerce."

45.    That same day, Coty held an earnings conference call ("May 10, 2017 Call"). In prepared remarks, Defendant Talhouët touted the successes integrating P&G, stating that "we have [ ] now fully integrated the legacy P&G Beauty Business into Coty's system," calling it a "tremendous achievement."

46.    On August 22, 2017, Defendants issued a press release entitled "Coty Inc. Reports Fiscal 2017 Fourth Quarter and Full Year Results; Improved Fourth Quarter Underlying Net Revenue Trend; Integration Progressing Well" ("FY 2017 Press Release"). Though Defendant Pane conceded that "our Consumer Beauty division remains under pressure and its recovery is a key priority for us," Pane assured investors that Coty was successfully meeting P&G Beauty Business integration targets, stating, "[w]e completed the incredibly complex acquisition of the

P&G Beauty Business, fully reorganized into a product and customer focused organizational structure, successfully reached significant milestones in our integration efforts, and boosted our brand portfolio[.]" Pane further assured that "[r]egarding the P&G Beauty Business, our integration efforts are proceeding well and we remain on track with the synergy delivery."

47.     That same day, Coty held an earnings conference call ("August 22, 2017 Call"). With regards to integrating P&G, Pane boasted that "we reached significant milestones in out integration efforts." Defendant Talhouët added that the integration of the two businesses was 'well underway and on track." There was no discussion of the previous quarter's integration issues, or of any integration problems.

48.     During the August 22, 2017 Call, in prepared remarks, Defendant Pane touted Coty's market innovation, stating that the Company had "continued success … both on our digital communication and e-commerce expansion," and that the "digital engagement results" for Coty's CoverGirl campaign "significantly exceeded our expectations."

49.     The next day, August 23, 2017, Coty filed a Form 10-K, reporting financial results for the fourth quarter and fiscal year ended June 30, 2017 ("2017 10-K"), signed by Defendants Pane, Talhouët, and Becht, and with SOX certifications signed by Defendants Pane and Talhouët. Even as Defendants announced a 10% organic revenue decline in Consumer Beauty, a division that historically accounted for approximately half of Coty's revenue, they touted achievements in integrating P&G. Defendants further stated that they were focused on taking advantage of their "end-to-end digital capabilities."

50.     Analysts conveyed how important successful integration of P&G was to Coty's success. Morgan Stanley analyst Dean Mohsenian noted that the key to the earnings call would be learning "how PG integration is progressing execution wise."

51.     On November 9, 2017, Coty filed a Form 10-Q for the first quarter of 2018 ("Q1 2017 10-Q"), signed by and with SOX certifications from Defendants Pane and Talhouët. Defendants again stated that they were focused on taking advantage of their "end-to-end digital capabilities." Also on November 9, 2017, Coty issued a press release entitled "Coty Inc. Reports First Quarter Fiscal 2018 Results" ("Q1 2018 Press Release"). Defendant Pane again bragged about the successful integration of P&G, stating that Coty now had "control of processes, systems and data across the new Coty."

52.     That same day, Coty held an earnings conference call ("November 9, 2017 Call"). In prepared remarks, Defendant Pane linked Coty's positive results to "end-to-end digital transformation, including e-commerce." Defendant Talhouët celebrated integration progress, stating that Coty now had "control of our data, processes and systems."

53.     On February 8, 2018, Coty filed a Form 10-Q for the second quarter of 2018 ("Q2 2018 10-Q"), signed by and with SOX certifications from Defendants Pane and Talhouët. Defendants again stated that they were focused on taking advantage of their "end-to-end digital capabilities." During the earnings conference call held that same day ("February 8, 2018 Call"), Defendant Pane, in scripted remarks, stated that Coty was "accelerat[ing] our end-to-end digital transformation, including e-commerce," and that Coty was "putting a lot of focus [on]" and "working very hard on digital innovation."

54.     On May 9, 2018, Defendants filed a Form 10-Q for the second quarter of 2018 ("Q3 2018 10-Q"), signed by and with SOX certifications from Defendants Pane and Talhouët. That same day, Defendants issued a press release entitled "Coty Inc. Reports Third Quarter Fiscal 2018 Results" ("Q3 2018 Press Release"). Defendants continued to materially underrepresent the extent of the issues with the P&G integration into Consumer Beauty, with Defendant Pane quoted

as saying that "[t]he Consumer Beauty division continue[d] its uneven performance but with encouraging signs of stability," and that with regard to "adjusted operating margin, we continue to aim for a healthy improvement in the second half of the year versus the prior year, with most of the impact coming in Q4, as we continue to deliver on our merger synergies."

55.    During the earnings call on the same day ("May 9, 2018 Call"), Defendant Pane repeated that "[t]he Consumer Beauty division continued its uneven performance, but with encouraging signs of stability and some bright spots."

56.    Pane further touted Coty's e-commerce efforts as a "big focus." Defendant Talhouët lauded progress in integrating P&G, stating that it was "progressing in line with our timetable," and stated that Coty had "broadened the scope, including further go-to-market changes, systems enhancements and more complete one order, one shipment, one invoice."

57.    On June 12, 2018, Defendant Talhouët represented Coty at the "Deutsche Bank dbAccess Global Consumer Conference." During the question-and-answer session, Talhouët stated that Coty was putting "much more focus on the digital transformation of the company," and on e-commerce, and that Defendant Pane was a "very strong advocate on that."

58.    On August 21, 2018, Defendants filed a Form 10-K for the fiscal year ended June 30, 2018 ("2018 10-K"), signed by Defendants Pane, Talhouët, and Becht, and with SOX certifications from Defendants Pane and Talhouët. With regards to Coty's digital capabilities, the Company stated that it was "advancing our end-to-end digital transformation and e-commerce efforts."

59.    On August 21, 2018, Coty announced that Defendant Talhouët had resigned.

60.    Also on August 21, 2018, Defendants issued a press release entitled "Coty Inc. Reports Fiscal 2018 Fourth Quarter and Full Year Results; Strong FY18 progress on operating

performance and business integration" ("FY 2018 Press Release"). Coty disclosed "short term supply chain disruptions resulting from the consolidation of warehouses and planning centers in North America and Europe, as the ex P&G business is integrated into Coty." Defendant Pane reassured, however, that "[t]he peak of the impact of the supply chain disruptions due to our logistics and manufacturing consolidation will come in 1Q19, with a smaller tail end in 2Q19. . . . we do expect that these business integration related impacts will be largely over by the end of first half 2019 and our FY19 targets take these disruptions into consideration." Pane also touted that "[t]he first half of our synergies commitment has been delivered as planned by FY18." Defendants also continued touting Coty's "end-to-end digital transformation."

61.     On November 7, 2018, Coty filed a Form 10-Q for the first quarter of 2019 ("Q1 2019 10-Q"), signed by and with SOX certifications from Defendant Pane and Interim CFO Ayesha Zafar. Defendants noted continuing "[s]upply [c]hain [d]isruptions [that] arose in connection with the consolidation of warehouses and planning centers in North America and Europe which have negatively impacted our results. Coty told investors that the supply chain issues would "resolve in the third quarter of fiscal 2019." Coty further emphasized that it was "advancing our end-to-end digital transformation."

62.     That same day, November 7, 2018, Defendants issued a press release entitled "Coty Inc. Reports First Quarter Fiscal 2019 Results ("Q1 2019 Press Release"). Coty announced a bigger than expected decline in first quarter fiscal year 2019 sales due to "several temporary supply-chain related headwinds" which included "[w]arehouse and planning center consolidate[ed] disruptions in Europe and the U.S." Defendant Pane also conceded "the increased scope of the disruptions [in the first quarter from warehousing and planning consolidation] resulted in much weaker results than previously expected," reflecting the internal challenges in

integrating P&G's beauty business into Coty's infrastructure. Defendant Pane again indicated, however, that the challenges would be short-lived, stating "[a]s a result of these disruptions, we have decided to modify our distribution center consolidation plan for the remainder of the year to minimize business impact. With a healthy synergy delivery already in 1Q19, these modifications should have no impact to our commitment of $225 million of synergies in FY19 and $750 million total by the end of FY20. . . . With the P&G Beauty integration near completion, and after we have overcome the internal challenges, we will be better equipped to focus more externally, so that we can fully capitalize on the exciting and dynamic changes in the beauty industry." Answering, Defendant Pane again denied the seriousness of the continuing integration issues.

63.     Analysts were no kinder in their reports after the earnings call. J.P. Morgan analyst Andrea Teixera called a sharp recovery "wishful thinking" because of the "extremely challenging acquisition integration," attributing the supply chain issues at least in part to Coty's "missteps."

64.     On November 12, 2018, Coty announced the resignation of Defendant Pane "for family reasons," and his replacement by Defendant Laubies.

65.     On February 7, 2019, Coty filed a Form 8-K stating that Laurent Kleitman, President, Consumer Beauty, was separating from the Company.

66.     The scope of Defendants' fraudulent behavior with respect to the problems caused by the P&G acquisition started coming into focus in February 2019. On February 8, 2019, Coty filed a Form 10-Q for the second quarter of 2019 ("Q2 2019 10-Q"), signed by and with SOX certifications from Defendant Laubies and CFO Defendant Terisse. Coty announced a $965.1 million non-cash impairment charge, $832.5 million of which was a goodwill impairment related to Consumer Beauty, $90.8 million related to intangible assets in Consumer Beauty, mainly the Clairol and CoverGirl trademarks, and $7 million related to other intangible assets. This was not

the required annual goodwill and intangible assets test, which Coty performs on May 1. Rather,

Coty conducted the impairment test earlier than May 1 because:

> In the course of evaluating the results for the second quarter of fiscal 2019, we noted that since the most recent impairment test, the cash flows associated with our Consumer Beauty reporting unit were adversely impacted by negative category trends and market share losses in the color cosmetics, hair color and mass fragrance categories; additional shelf-space losses for CoverGirl, Clairol, and Max Factor; expected increased costs in the short-term to offset the lower service levels caused by supply chain disruptions; and lower than expected net revenues and profitability for Younique. Additionally, we considered the impact of a 75 basis point increase in the discount rate, due to changes in the market assumptions, which adversely affected the fair value of the reporting unit. We concluded that these factors represented indicators of impairment that warranted an interim impairment test for goodwill and certain other intangible assets in the Consumer Beauty reporting unit.

67.     On February 8, 2019, Defendants issued a press release entitled "Coty Inc. Reports

Second Quarter Fiscal 2019 Results" ("Q2 2019 Press Release"). Coty announced a $965.1

million non-cash impairment charge, $832.5 million of which was a goodwill impairment related

to Consumer Beauty, $90.8 million related to intangible assets in Consumer Beauty, mainly the

Clairol and CoverGirl trademarks, and $7 million related to other intangible assets. Contradicting

many of the Company's previous rosy statements, Defendant Laubies stated that the Luxury and

Professional Beauty divisions "cannot compensate … for the difficult trajectory of our Consumer

Beauty division." While expressing confidence that Coty could eventually return to "a path of

sustainable growth," Coty was "realistic that it will take time to achieve this outcome." The

Company explained that:

> The Consumer Beauty division has experienced increased competitive and market pressure throughout the first half of fiscal 2019, which has resulted in lower than expected revenues and earnings. Additionally, the discount rate used in the impairment review associated with the division has also increased in the quarter. Based on these adverse factors, management determined that there were indications that the goodwill of the division as well

as certain trademark intangible assets may be impaired and accordingly interim intangible asset and goodwill impairment tests were performed as of December 31, 2018.

Coty further noted that the supply-chain related headwinds continued, which continued to affect Consumer Beauty, though there was "some moderation." Defendant Laubies also touted that "the management team we have put into place is the right one to develop this plan, and that together with the broader Coty organization, we will be able to meet the objectives of driving gross margin improvement," which "means managing revenue and costs, improving product mix and range, simplifying our portfolio and formulations, and systemically deploying lean-inspired methodologies in our manufacturing and logistics operations."

68.     Defendants held an earnings conference call on February 8, 2019 ("February 8, 2019 Call"). Defendant Terisse boasted that Coty "continue[s] to see strong e-commerce momentum in the [Consumer Beauty] division" and that e-commerce was a "bright spot in Consumer Beauty." Addressing the nearly $1 billion impairment, Defendant Terisse explained that the problems were in Consumer Beauty. Responding to an analyst's question, Coty finally admitted that it had not achieved the synergies from the P&G acquisition that the Company had touted for several years, and so had not realized the savings the integration was supposed to bring.

69.     On May 8, 2019, Coty filed a Form 10-Q for the second quarter of 2019 ("Q3 2019 10-Q"), signed by and with SOX certifications from Defendant Laubies and Defendant Terisse. The Company did not take further goodwill or intangible asset impairments. Note 19 to the financial statements was entitled "Subsequent Events," but Coty did not disclose in that Note that a further material impairment was necessary, even though it had just a week earlier, on May 1, 2019, performed its annual impairment test, which three months later would result in Defendants announcing an additional $3 billion impairment.

70.     On May 8, 2019, Defendants issued a press release entitled "Coty Inc. Reports Fiscal Third Quarter 2019 Results" ("Q3 2019 Press Release"). Defendant Laubies stated that the supply issues were "largely resolved."

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

71.     On the first day of the Class Period, November 9, 2016 Coty issued the Q1 2017 Press Release, reporting financial results for the first quarter fiscal of 2017, ending September 30, 2016, entitled "Results for the stand-alone Coty business prior to the completion of the merger with P&G." In the press release, Defendant Becht declared that for the combined company, "*[w]e continue to target the total four-year synergies and working capital benefits of $750 million and $500 million, respectively, with no change to the operating costs to realize both*," assuring investors that "while there may be challenges as we integrate and rebuild the businesses, we are firmly committed to realizing the ambitions we have and delivering value for all our shareholders."

72.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate P&G's Beauty Business, including an adequate supply chain;

(b)     Failed to disclose that the integration issues, including supply chain issues, were pervasive, already existing, and continuing, and not "short-term;"

(c)     Having discussed generally the risk that "there may be challenges as we integrate and rebuild the businesses," Defendants were duty bound to disclose that integration issues had already arisen before November 9, 2016, as Defendants admitted in February of 2017.

73.     On February 9, 2017, Defendants filed their Q2 2017 Press Release, attached as an exhibit to a Form 8-K, entitled "Coty Inc. Reports Second Fiscal Quarter 2017 Results, the

First Quarter After Successful Completion of the Merger with P&G Beauty Business." In the press release Defendants stated that "negative *transitional* impacts especially including significant trade inventory build in the first quarter of fiscal 2017 in parts of the P&G business" on the Combined Company's net revenues, but those impacts were "*short-term*." Defendant Pane stated that "[t]he business was impacted by significantly higher-than-anticipated inventory levels in the market on the acquired P&G Beauty Business, competitive pressure in the Consumer Beauty division and the distraction associated with the merger integration efforts," but that the impacts were "*short term challenges like the ones we faced in the first semester*." Pane added that "[o]n the P&G Beauty Business merger, *we are reiterating our previously communicated $750 million synergy target by fiscal 2020. The integration is progressing as expected, with no major issues to date*."

74.     During the February 9, 2017 Call Defendant Pane stated that "the *integration is progressing as expected with no major issues to date and we are reiterating our previously communicated $750 million synergy target by FY20*."

75.     In the same press release, Defendant Pane stated that, with respect to using/developing digital marketing and sales, Coty was "*accelerating our end-to-end digital transformation including e-commerce*."

76.     During the February 9, 2017 Call, Defendants engaged in the following exchange with Morgan Stanley analyst Dana Mohsenian regarding Coty's digital/e-commerce capabilities:

> Mohsenian
> And with those relaunches and some of those plans, I'm still surprised you aren't planning to boost advertising spending, and obviously you touched on it earlier in this call. But can you take me through your thought process there, and what gives you confidence that you really can revitalize this portfolio without spending more?

<u>Defendant Pane</u>
Regarding on your question on spending more overall, I want to go back to my previous answer, which is that when you start shifting the traditional media to digital you actually have way more money to play with, and to invest to be able to reach more consumers. Consumers are truly spending a disproportionate amount of time on social media, on social platforms, and, I believe that some of our brands have not played the right role in the social engagement. And *by shifting the investment actually, we will achieve not only the consumers that we want to achieve but also in the right place and the right time. And the overall connection with the brand will improve*. And this is clearly part of the logic of why I answered before that we believe *we have enough funds for our future success and re-launches*.

<u>Defendant Talhouët</u>
And to build on that, Dara, the other point is that when you look at our Q2 results, our operating margin has been impacted by all the level of the A&CP pre-commitment that we receive, and as a result, once again *it's not a question of size of the bucket, it's a question of how would you use the bucket in a much more efficient way which is exactly what Camillo has emphasized*.

77.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(b)     Failed to disclose that the integration issues, including supply chain issues, were pervasive and continuing, and not "short-term;"

(c)     Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

78.     On May 10, 2017, Defendants filed their Q3 2017 Press Release, attached as an exhibit to a Form 8-K, entitled "Coty Inc. Reports Third Fiscal Quarter 2017 Results." Eschewing mention of any integration problems, Defendant Pane stated that "[o]n the integration of the P&G Beauty Business, *we are making good progress*." Defendants again touted their progress in recognizing the need to improve their digital marketing and sales, with Pane stating that Coty was "*accelerating our end-to-end digital transformation including e-commerce*."

79.     That same day, Coty held an earnings conference call ("May 10, 2017 Call"). In prepared remarks, Defendant Talhouët touted the successes in integrating P&G, stating that "*[we] have now fully integrated the legacy P&G Beauty Business into Coty's system*," calling it a "tremendous achievement."

80.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain, and that Coty would not be able to successfully integrate and deliver synergies from the acquisition;

(b)     Having discussed positively the integration of P&G, including "we are making good progress," Defendants were duty bound to disclose that integration issues existed, including supply chain issues, that they were pervasive and continuing, and not "short-term;"

(c)     Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions,

and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

81.     On August 22, 2017, Defendants filed their FY 2017 Press Release, attached as an exhibit to a Form 8-K, entitled "Coty Inc. Reports Fiscal 2017 Fourth Quarter and Full Year Results.; Improved Fourth Quarter Underlying Net Revenue Trend; Integration Progressing Well." Defendant Pane assured investors that the integration of P&G was succeeding, stating that "*[w]e completed the incredibly complex acquisition of the P&G Beauty Business*, fully reorganized into a product and customer focused organizational structure, *successfully reached significant milestones in our integration efforts*, and *boosted our brand portfolio*…" Pane further assured that "[r]egarding the P&G Beauty Business, *our integration efforts are proceeding well and we remain on track with the synergy delivery*."

82.     During the August 22, 2017 Call, Defendant Pane touted Coty's market innovation, stating that the Company had "*continued success … both on our digital communication and e-commerce expansion*," and that the "*digital engagement results*" for Coty's CoverGirl campaign "*significantly exceeded our expectations*." With regards to integrating P&G, Pane boasted that "*we reached significant milestones in out integration efforts*." Defendant Talhouët added that *the integration of the two businesses was 'well underway and on track*."

83.     In the August 22, 2017, 2017 10-K, Defendants touted Coty's success in integrating the P&G business, stating that they were focused on taking advantage of their "end-to-end digital capabilities."

84.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(b)     Having discussed that the integration of P&G was "going well," Defendants were duty bound to disclose that integration issues existed, including supply chain issues, that they were pervasive and continuing, and not "short-term";

(c)     Failed to disclose that Coty was not presently "on track" with the P&G integration process;

(d)     Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

85.     In Coty's November 9, 2017, Q1 2018 10-Q, Defendants stated that they were focused on taking advantage of their "***end-to-end digital capabilities***."

86.     During the November 9, 2017 Call, Defendant Pane linked Coty's positive results to "***end-to-end digital transformation, including e-commerce***."

87.     During the November 9, 2017 Call, Defendant Talhouët celebrated integration progress, stating that Coty now had "***control of our data, processes and systems***."

88.     In a November 9, 2017, press release, Defendant Pane bragged about the successful integration of P&G, stating that Coty now had "***control of processes, systems and data across the new Coty***."

89.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(b)     Having discussed in positive terms the integration of P&G, Defendants were duty bound to disclose that integration issues existed, including supply chain issues, that they were pervasive and continuing, and not "short-term";

(c)     Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

90.     In the February 8, 2018, Q2 2018 10-Q, signed by Defendants Pane and Talhouët. Defendants again stated that they were focused on taking advantage of their "***end-to-end digital capabilities***." During the February 8, 2018 Call, Defendant Pane, in scripted remarks, stated that Coty was "***accelerat[ing] … our end-to-end digital transformation, including e-commerce***," and that Coty was "***putting a lot of focus on***" and "***working very hard on digital innovation***."

91.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions,

and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

92.     In the May 9, 2018, Q3 2018 Press Release, with respect to the P&G integration into Consumer Beauty, Defendant Pane stated that "[t]he Consumer Beauty division continued its uneven performance, but with ***encouraging signs of stability***," and that with regard to "adjusted operating margin, we continue to aim for a healthy improvement in the second half of the year versus the prior year, with most of the impact coming in Q4, as ***we continue to deliver on our merger synergies***."

93.     During the May 9, 2018 Call, Defendant Talhouët stated that the P&G integration was "***progressing in line with our timetable***," and stated that Coty had "***broadened the scope, including further go-to-market changes, systems enhancements and more complete one order, one shipment, one invoice***."

94.     During the May 9, 2018 Call, Defendant Pane repeated that "[t]he Consumer Beauty division continued its uneven performance, but with ***encouraging signs of stability*** and some bright spots." Pane further touted Coty's e-commerce efforts as a "***big focus***."

95.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(b)     Having discussed the integration of P&G positively, Defendants were duty bound to disclose that integration issues existed, including supply chain issues, that they were pervasive and continuing, and not "short-term";

(c)     Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

96.     On June 12, 2018, Defendant Talhouët represented Coty at the "Deutsche Bank dbAccess Global Consumer Conference." During the question and answer session, Talhouët stated that Coty was putting "***much more focus on the digital transformation of the company***" and e-commerce, and that Defendant Pane was a "***very strong advocate on tha***t."

97.     The foregoing was materially false and/or misleading because Defendants knowingly or recklessly failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

98.     In the August 21, 2018, 2018 10-K, discussing Coty's digital capabilities, the Company stated that it was "***advancing our end-to-end digital transformation and e-commerce efforts***."

99.     Defendants also continued touting Coty's "***end-to-end digital transformation***."

100.     In the August 21, 2018, FY 2018 Press Release, Defendants touted Coty's "***end-to-end digital transformation***."

101.     In the August 21, 2018, FY 2018 Press Release, Coty disclosed "***short term*** supply chain disruptions resulting from the consolidation of warehouses and planning centers in North

America and Europe, as the ex P&G business is integrated into Coty." Defendant Pane assured, however, that "*[t]he peak of the impact of the supply chain disruptions due to our logistics and manufacturing consolidation will come in 1Q19, with a smaller tail end in 2Q19*. . . . we do expect that *these business integration related impacts will be largely over by the end of first half 2019* and our FY19 targets take these disruptions into consideration." Pane also touted that "*[t]he first half of our synergies commitment has been delivered as planned by FY18*."

102.    The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)    Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(b)    Failed to disclose that the integration issues, including supply chain issues, were pervasive and continuing, and not "short-term";

(c)    Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

103.    In the November 7, 2018, Q1 2019 10-Q, Defendants noted continuing "supply chain disruptions [that] arose in connection with the consolidation of warehouses and planning centers in North America and Europe which have negatively impacted our results. Coty told investors that the supply chain issues would "*resolve in the third quarter of fiscal 2019*."

104.    In the November 7, 2018, Q1 2019 Press Release, Coty announced "several *temporary* supply-chain related headwinds" which included "[w]arehouse and planning center consolidated disruptions in Europe and the U.S." Defendant Pane indicated that the challenges would be short-lived and the integration was going as expected, stating that "*[w]ith a healthy synergy delivery already in 1Q19, these modifications should have no impact to our commitment of $225 million of synergies in FY19 and $750 million total by the end of FY20*. . . . With *the P&G Beauty integration near completion*, and after we have overcome the internal challenges, we will be better equipped to focus more externally, so that we can fully capitalize on the exciting and dynamic changes in the beauty industry."

105.    During the November 7, 2018 Call, Defendant Pane repeatedly downplayed the severity and long-term negative impact of the supply challenges, stating that they would be resolved by the third quarter of 2019. Pane further denied that there were systemic integration issues following the P&G acquisition, stating that "*we really did a lot of complex integration things without having any issue*."

106.    In the November 7, 2018, Q1 2019 10-Q, Coty emphasized that it was "*advancing our end-to-end digital transformation*."

107.    The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)    Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(b)    Failed to disclose that the integration issues, including supply chain issues, were pervasive and continuing, and not "short-term";

(c)     Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

108.    In the February 8, 2019, Q2 2019 10-Q, Coty announced a $965.1 million non-cash impairment charge, $832.5 million of which was a goodwill impairment related to Consumer Beauty, $90.8 million related to intangible assets in Consumer Beauty, mainly the Clairol and CoverGirl trademarks, and $7 million related to other intangible assets. Coty decided to perform the impairment test because:

> In the course of evaluating the results for the second quarter of fiscal 2019, we noted that *since the most recent impairment test, the cash flows associated with our Consumer Beauty reporting unit were adversely impacted by negative category trends and market share losses in the color cosmetics, hair color and mass fragrance categories; additional shelf-space losses for CoverGirl, Clairol, and Max Factor; expected increased costs in the short-term to offset the lower service levels caused by supply chain disruptions; and lower than expected net revenues and profitability for Younique*. Additionally, we considered *the impact of a 75 basis point increase in the discount rate, due to changes in the market assumptions, which adversely affected the fair value of the reporting unit*. We concluded that *these factors represented indicators of impairment that warranted an interim impairment test for goodwill and certain other intangible assets in the Consumer Beauty reporting unit*.

109.    In the February 8, 2019, Q2 2019 Press Release, Coty announced a $965.1 million non-cash impairment charge, $832.5 million of which was a goodwill impairment related to Consumer Beauty, $90.8 million related to intangible assets in Consumer Beauty, mainly the Clairol and CoverGirl trademarks, and $7 million related to other intangible assets. Contradicting many of the Company's previous rosy statements, Defendant Laubies stated that the Luxury and

Professional Beauty divisions "cannot compensate … for the difficult trajectory of our Consumer Beauty division. While expressing confidence that Coty could eventually return to "a path of sustainable growth," Coty was 'realistic that it will take time to achieve this outcome." The Company explained that:

> *The Consumer Beauty division has experienced increased competitive and market pressure throughout the first half of fiscal 2019*, which has resulted in lower than expected revenues and earnings. Additionally, *the discount rate used in the impairment review associated with the division has also increased in the quarter*. Based on these adverse factors, management determined that there were indications that *the goodwill of the division as well as certain trademark intangible assets may be impaired and accordingly interim intangible asset and goodwill impairment tests were performed as of December 31, 2018*.

Coty further noted that the supply-chain related headwinds continued, which continued to affect Consumer Beauty, though there was "some moderation." Defendant Laubies also touted that "*the management team we have put into place is the right one to develop this plan*, and that together with the broader Coty organization, *we will be able to meet the objectives of driving gross margin improvement*," which "means managing revenue and costs, improving product mix and range, simplifying our portfolio and formulations, and *systemically deploying lean-inspired methodologies in our manufacturing and logistics operations*."

110. During the February 8, 2019 Call, Defendant Terisse boasted that Coty "*continue[s] to see strong e-commerce momentum in the [Consumer Beauty] division*." Addressing the nearly $1 billion impairment, Defendant Terisse explained that the problems were in Consumer Beauty. Responding to an analyst's question, Coty finally admitted that it had not achieved the synergies from the P&G acquisition that the Company had touted for several years, and so had not realized the savings the integration was supposed to bring. Finally, Coty claimed that e-commerce was a "*bright spot in Consumer Beauty*."

111.    The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)    In violation of GAAP and SEC Rules, failed to impair the nearly $3 billion in goodwill and intangible assets that the Company belatedly impaired in July 2019;

(b)    Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(c)    Failed to disclose that the integration issues, including supply chain issues, were pervasive and continuing, and not "short-term";

(d)    Failed to disclose that Coty's digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

112.    In the February 8, 2019 Press Release, Coty disclosed a Q2 2019 operating loss of $804.6 million, net loss of $956.0 million, and loss per share of $1.28, reflecting a $965.1 million impairment charge primarily connected to Consumer Beauty and select brand trademarks. Coty disclosed the following in connection with the $965.1 million impairment charge:

> … non-cash impairment charges of $832.5 million to the Consumer Beauty goodwill and $97.8 million to the trademarks of CoverGirl, Clairol, and two small regional brands. ***The Consumer Beauty division has experienced increased competitive and market pressure throughout the first half of fiscal 2019***, which has resulted in lower than expected revenues and earnings. Additionally, ***the discount rate used in the impairment review associated with the division has also increased in the quarter***. Based on these adverse factors, management determined that ***there were indications that the goodwill of the division as well as certain trademark intangible assets may be impaired and accordingly***

> ***interim intangible asset and goodwill impairment tests were performed as of December 31, 2018***

113.    In the February 8, 2019, Q2 2019 Press Release, Coty also reported a goodwill balance of $7.67 billion, other intangible assets balance of $7.93 billion, total assets of $21.27 billion, and total equity of $7.61 billion as of December 31, 2018.

114.    The February 8, 2019, 2Q 2019 10-Q included financial statements for the second quarter of fiscal year 2019 disclosing the same financial results as the for February 8, 2019 Press Release. In the 10-Q Coty disclosed the following in connection with the $965.1 million impairment charge:

> In the course of evaluating the results for the second quarter of fiscal 2019, the Company noted ***the cash flows associated with its Consumer Beauty reporting unit were adversely impacted by negative category trends and market share losses in the color cosmetics, hair color and mass fragrance categories mainly impacting the CoverGirl, Rimmel, Max Factor, Bourjois and Clairol trademarks; additional shelf-spaces losses for CoverGirl, Clairol, and Max Factor; expected increased costs in the short-term to offset the lower service levels caused by supply chain disruptions; and lower than expected net revenues and profitability for Younique***. Additionally, ***the Company considered the impact of a 75 basis point increase in the discount rate, which adversely affected the fair value of the reporting unit***. Management concluded that ***these adverse factors represented indicators of impairment that warranted an interim impairment test for goodwill and certain other intangible assets in the Consumer Beauty reporting unit***. As a result, in the three and six months ended December 31, 2018, the Company recognized asset impairment charges of $930.3, of which $832.5 related to goodwill, $90.8 related to indefinite-lived other intangible assets (mainly related to the CoverGirl and Clairol trademarks) and $7.0 related to finite-lived other intangible assets, as described below and recorded in Asset impairment charges in the Condensed Consolidated Statements of Operations.
>
> Additionally, the Company identified indicators of impairment related to the philosophy trademark that is part of the Luxury reporting unit and recorded an asset impairment charge of $22.8 for the three and six months ended December 31, 2018. In addition to

- 35 -

the impact of a 75 basis point increase in the discount rate for the trademark, the Company considered the impact of the business indicators of lower than expected net revenue growth in the U.S. and a decrease in the level of expected profitability of the trademark.

115.    The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     In violation of GAAP provisions Accounting Standards Codification ("ASC") 350 and ASC 360, failed to record an additional $2.56 billion impairment of its Consumer Beauty goodwill and $315.6 million impairment of its other intangible assets related primarily to its Consumer Beauty trademarks.

(b)     As a direct result of its failure to record additional impairment of goodwill and intangible assets, on its income statement, Coty understated both its operating loss and net loss by $2.87 billion, and understated its loss per share by $3.83;

(c)     Materially overstated goodwill on its balance sheet by $2.56 billion, and other intangible assets by $315.6 million.

116.    In the May 8, 2019, Q3 2019 10-Q, Coty did not take further goodwill or intangible asset impairments. Note 19 to the financial statements is entitled "Subsequent Events," but Coty does not state in that Note that a further material impairment is necessary, even though it had just a week earlier, on May 1, 2019, performed its annual impairment test, which three months later would result in Defendants announcing an additional almost $3 billion impairment.

117.    In the May 8, 2019, Q3 2019 Press Release, Coty stated that its supply issues were "*largely resolved*."

118.    The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     In violation of GAAP provisions ASC 850, failed to impair the nearly $3 billion in goodwill and intangible assets that the Company belatedly impaired in July 2019, even though its annual impairment testing was performed on May 1, and less than two months later it would impair an additional $3 billion in goodwill and intangible assets related to Consumer Beauty;

(b)     Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain;

(c)     Failed to disclose that the integration issues, including supply chain issues, were pervasive and continuing, and not "short-term";

(d)     Failed to disclose that Coty's digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

119.    In the May 8, 2019, Q3 2019 Press Release, Coty disclosed a Q3 2019 operating loss of $85.5 million, a net loss of $12.1 million, and a loss per share of $0.02. The press release also reported a goodwill balance of $7.62 billion, an other intangible assets balance of $7.79 billion, total assets of $20.76 billion, and total equity of $7.5 billion, all as of March 31, 2019.

120.    The May 8, 2019, Q3 2019 10-Q, included financial statements for the third quarter of fiscal year 2019 disclosing the same financial results as were disclosed in the May 8, 2019, Q3 2019 Press Release filed the same day.

121.    The foregoing was materially false and/or misleading because Defendants knowingly or recklessly:

(a)     In violation of GAAP provisions ASC 350 and ASC 360, failed to record an additional $2.56 billion impairment of its Consumer Beauty goodwill, and $315.6 million impairment of its other intangible assets related primarily to its Consumer Beauty trademarks.

(b)     As a direct result of its failure to record additional impairment of its goodwill and intangible assets, on its income statement, Coty understated both its operating loss and net loss by $2.87 billion, and understated its loss per share by $3.83;

(c)     On its balance sheet, materially overstated goodwill by $2.56 billion, and other intangible assets by $315.6 million.

(d)     In violation of GAAP provision ASC 855, failed in its duty to disclose in the "Subsequent Events" Note to its financial statements that a further material impairment would be necessary, even though it had just a week earlier, on May 1, 2019, performed its annual impairment test, which three months later would result in Defendants announcing an additional almost $3 billion impairment.

122.     Coty's financial statements for the second and third quarter of fiscal year 2019, filed on February 8, 2019, and May 8, 2019, were materially false because in each quarter Coty failed to take the $3 billion impairment it would eventually announce on July 1, 2019. The following charts summarize the effects of the falsity on the Q2 2019 and Q3 2019 financial statements caused by the failure to take the $3 billion impairment to goodwill and intangible assets related to Consumer Beauty earlier:

| (In millions, except per share amounts) | 2Q FY2019 Dec 31, 2018 | | 3Q FY2019 Mar 31, 2019 | |
|---|---|---|---|---|
| **Operating income (loss)** | | | | |
| As reported | $ | (804.6) | $ | 85.5 |
| Required goodwill impairment | | (2,558.6) | | (2,558.6) |
| Required other intangible assets impairment | | (315.6) | | (315.6) |
| Adjusted | $ | (3,678.8) | $ | (2,788.7) |
| *(Understated loss) overstated income $* | *$* | *(2,874.2)* | *$* | *2,874.2* |
| *Understated loss %* | | *78.1%* | | *NM* |
| | | | | |
| **Net loss** | | | | |
| As reported | $ | (956.0) | $ | (12.1) |
| Required goodwill impairment | | (2,558.6) | | (2,558.6) |
| Required other intangible assets impairment | | (315.6) | | (315.6) |
| Adjusted | $ | (3,830.2) | $ | (2,886.3) |
| *Understated loss $* | *$* | *2,874.2* | *$* | *2,874.2* |
| *Understated loss %* | | *75.0%* | | *99.6%* |
| | | | | |
| **Diluted loss per share** | | | | |
| As reported | $ | (1.28) | $ | (0.02) |
| Required goodwill impairment | | (3.41) | | (3.41) |
| Required other intangible assets impairment | | (0.42) | | (0.42) |
| Adjusted | $ | (5.11) | $ | (3.85) |
| *Understated loss $* | *$* | *3.83* | *$* | *3.83* |
| *Understated loss %* | | *74.9%* | | *99.5%* |
| | | | | |
| *NM* - not meaningful | | | | |

| (In millions, except per share amounts) | 2Q FY2019 | | 3Q FY2019 | |
|---|---|---|---|---|
| | Dec 31, 2018 | | Mar 31, 2019 | |
| **Goodwill** | | | | |
| As reported | $ | 7,665.0 | $ | 7,618.8 |
| Required impairment | | (2,558.6) | | (2,558.6) |
| Adjusted | $ | 5,106.4 | $ | 5,060.2 |
| *Overstated %* | | *50.1%* | | *50.6%* |
| | | | | |
| **Other intangible assets, net** | | | | |
| As reported | $ | 7,929.4 | $ | 7,791.3 |
| Required impairment | | (315.6) | | (315.6) |
| Adjusted | $ | 7,613.8 | $ | 7,475.7 |
| *Overstated %* | | *4.1%* | | *4.2%* |
| | | | | |
| **Total assets** | | | | |
| As reported | $ | 21,270.7 | $ | 20,756.6 |
| Required goodwill impairment | | (2,558.6) | | (2,558.6) |
| Required other intangible assets impairment | | (315.6) | | (315.6) |
| Adjusted | $ | 18,396.5 | $ | 17,882.4 |
| *Overstated $* | *$* | *2,874.2* | *$* | *2,874.2* |
| *Overstated %* | | *15.6%* | | *16.1%* |
| | | | | |
| **Total equity** | | | | |
| As reported | $ | 7,611.3 | $ | 7,502.5 |
| Required goodwill impairment | | (2,558.6) | | (2,558.6) |
| Required other intangible assets impairment | | (315.6) | | (315.6) |
| Adjusted | $ | 4,737.1 | $ | 4,628.3 |
| *Overstated $* | *$* | *2,874.2* | *$* | *2,874.2* |
| *Overstated %* | | *60.7%* | | *62.1%* |

123.    The November 9, 2016, Q1 2017 10-Q contained the following risk warning about

the P&G integration:

> We give no assurance that we will be able to successfully manage
> integration and operation of the P&G Beauty Brands business
> thereafter, either of which could increase costs and management
> distraction. The amount and timing of this charge and management
> distraction could adversely affect our liquidity, cash flows and
> period-to-period operating results, which could result in a reduction
> in the market price of shares of our common stock.

124.    The February 9, 2017, Q2 2017 10-Q included the following risk warnings about the P&G integration:

> If our management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, our business, prospects, financial condition and results of operations may be materially adversely affected …. We can provide no assurances that we will be able to successfully manage integration and operation of the P&G Beauty Business thereafter, which could increase costs and management distraction. The amount and timing of the above-referenced charges and management distraction could further adversely affect our business, prospects, financial condition and results of operations.

125.    The May 10, 2017, Q3 2017 10-Q incorporated the risk warnings from the Q2 2017 10-Q.

126.    The August 17, 2017, 2017 10-K included the following risk warnings about the P&G integration:

> If our management is not able to effectively manage the integration process, address fixed and other costs, or if any significant business activities are interrupted as a result of the integration process, our business, prospects, financial condition, results of operations, cash flows, as well as the trading price of our securities may be materially adversely affected.

127.    The November 9, 2017, Q1 2018 10-Q, and the February 8, 2018, Q2 2018 10-Q each incorporated the risk warnings from the 2017 10-K.

128.    The May 9, 2018, Q3 2018 10-Q included the following risk warnings about the P&G integration:

> As we continue to integrate the P&G Beauty Business and our other recent acquisitions, we have approved additional initiatives, and are continuing to evaluate further initiatives, designed to simplify processes, reduce costs and improve organizational agility. Our management has been, and will continue to be, required to devote a substantial amount of time and attention to the process of integrating the P&G Beauty Business with our business operations and further simplifying our processes in the combined company,

which has diverted attention from ongoing operations of both our legacy Coty business and the P&G Beauty Business and has affected our period-to-period operating results. If our management is not able to effectively manage these initiatives, address fixed and other costs, we incur additional operating expenses or capital expenditures to realize these synergies, simplifications and cost savings, or if any significant business activities are interrupted as a result of these initiatives, our business, prospects, financial condition, results of operations, cash flows, as well as the trading price of our securities may be materially adversely affected. The amount and timing of the above-referenced charges and management distraction could further adversely affect our business, prospects, financial condition, results of operations, cash flows, as well as the trading price of our securities.

129.   The August 21, 2018, 2018 10-K included the following risk warnings about the P&G integration:

> If our management is required to devote a substantial amount of time and attention to this cost restructuring program, its implementation could divert attention from ongoing operations and affect our period-to-period operating results. If our management is not able to effectively manage these initiatives, address fixed and other costs, we incur additional operating expenses or capital expenditures to realize these synergies, simplifications and cost savings, or if any significant business activities are interrupted as a result of these initiatives, our business, prospects, financial condition, results of operations, cash flows, as well as the trading price of our securities may be materially adversely affected.

130.   The November 7, 2018, Q1 2019 10-Q incorporated the risk warnings from the 2018 10-K.

131.   The risk factors in the February 8, 2019, Q2 2019 10-Q, and in the May 8, 2019, Q3 2019 10-Q, do not mention P&G or integration, but refer readers to risk factors "in other filings."

132.   The November 9, 2016, Q1 2017 Press Release incorporates the risk factors in the 2016 10-K.

133.    The February 9, 2017, Q2 2017 Press Release, and the May 10, 2017, Q3 2017

Press Release, each incorporate the risk factors in the 2016 10-K, and refer to the following risk:

> These statements are based on certain assumptions and estimates
> that the Company considers reasonable and are subject to a number
> of risks and uncertainties, many of which are beyond the
> Company's control, which could cause actual events or results to
> differ materially from such statements, including …. the integration
> of the P&G Beauty Business with Legacy-Coty business,
> operations, systems, financial data and culture and the ability to
> realize synergies and other potential benefits within the time frames
> currently contemplated.

134.    The August 22, 2017, FY 2017 Press release incorporates the risk factors in the

2016 10-K, and refers to the following risk:

> These statements are based on certain assumptions and estimates
> that the Company considers reasonable and are subject to a number
> of risks and uncertainties, many of which are beyond the
> Company's control, which could cause actual events or results to
> differ materially from such statements, including …. the integration
> of the P&G Beauty Business with Legacy-Coty business,
> operations, systems, financial data and culture (including the recent
> exits and anticipated future exit of the Transition Services
> Agreement and implementation of the Company's Global
> Integration Activities) and the ability to realize synergies, reduce
> costs and other potential efficiencies and benefits at the levels and
> at the costs and within the time frames currently contemplated or at
> all.

135.    The November 9, 2017, Q1 2018 Press Release, and the May 9, 2018, Q3 2018

Press Release, each incorporate the risk factors in the 2017 10-K, and refer to the following risk:

> These statements are based on certain assumptions and estimates
> that the Company considers reasonable and are subject to a number
> of risks and uncertainties, many of which are beyond the
> Company's control, which could cause actual events or results to
> differ materially from such statements, including …. the continued
> integration of the P&G Beauty Business with the Legacy-Coty
> business, operations, systems, financial data and culture and the
> ability to realize synergies, reduce costs and realize other potential
> efficiencies and benefits (including through the Company's
> restructuring and business realignment programs) at the levels and

- 43 -

at the costs and within the time frames currently contemplated or at all.

136. The May 9, 2018, Q3 2018 Press Release, and the August 21, 2018, FY 2018 Press Release, each incorporate the risk factors in the 2017 10-K, and refer to the following risk:

> These statements are based on certain assumptions and estimates that the Company considers reasonable and are subject to a number of risks and uncertainties, many of which are beyond the Company's control, which could cause actual events or results to differ materially from such statements, including …. the continued integration of the P&G Beauty Business and other recent acquisitions with the Company's business, operations, systems, financial data and culture and the ability to realize synergies, reduce costs and realize other potential efficiencies and benefits (including through the Company's restructuring and business realignment programs to simplify processes and improve organizational agility) at the levels and at the costs and within the time frames currently contemplated or at all …. Any failure to implement the integration and other initiatives in accordance with our expectations could adversely affect our business, prospects, financial condition, results of operations, cash flows, as well as the trading price of our securities.

137. The November 7, 2018, Q1 2019 Press Release, the February 8, 2019, Q2 2019 Press Release, and the May 8, 2019, Q3 2019 Press Release, each incorporate the risk factors in the 2018 10-K, and refer to the following risk:

> These statements are based on certain assumptions and estimates that the Company considers reasonable and are subject to a number of risks and uncertainties, many of which are beyond the Company's control, which could cause actual events or results to differ materially from such statements, including …. the continued integration of the P&G Beauty Business and other recent acquisitions with the Company's business, operations, systems, financial data and culture and the ability to realize synergies, avoid future supply chain and other business disruptions, reduce costs (including through the Company's cash efficiency initiatives) and realize other potential efficiencies and benefits (including through the Company's restructuring initiatives) at the levels and at the costs and within the time frames contemplated or at all.

- 44 -

138.     The August 29, 2019, FY 2019 Press Release incorporates the risk factors in the 2018 10-K.

139.     The November 6, 2019, Q1 2020 Press Release incorporates the risk factors in the 2019 10-K.

140.     At the start of each earnings conference call referenced herein, Coty incorporated the risk factors in "our press releases and our reports filed with the SEC."

141.     The foregoing annual statements, quarterly statements, and earnings conference calls were materially false and/or misleading because, having warned generally about potential problems with integrating P&G, Defendants were duty bound to disclose that the specific risk had materialized, and that pervasive integration issues, including but not limited to supply chain and marketing issues, arose from the time the P&G acquisition was completed, and eventually caused Defendants to impair $4 billion in goodwill and intangible assets impairments, related to Consumer Beauty and the P&G assets.

## THE TRUTH EMERGES

142.     On February 9, 2017, before the market opened, Coty reported its first quarter fiscal year 2017 results after its completion of the P&G merger. Coty disclosed what it characterized as "short-term negative transitional impacts especially including significant trade inventory build in the first quarter of fiscal 2017 in parts of the P&G business," indicating that the P&G Specialty Beauty Business may have been overvalued. At the same time, Defendant Pane assured the market that "[o]n the P&G Beauty Business merger, we are reiterating our previously communicated $750 million synergy target by fiscal 2020. The integration is progressing as expected, with no major issues to date."

143.    On this news, Coty's stock price dropped $1.76 per share, or nearly 9%, from a close of $20.04 per share on February 8, 2017 to close at $18.28 per share on February 10, 2017 after two days of trading on heavy volume.

144.    On August 22, 2017, before the market opened, Coty surprised investors, announcing disappointing financial results for the fourth quarter and fiscal year ended June 30, 2017 including a 10% organic revenue decline in Consumer Beauty – which historically accounted for nearly half of Coty's revenue – signaling that the integration of P&G's over 40 beauty business was still not proceeding well. Defendant Pane admitted that "our Consumer Beauty division remains under pressure," but assured investors that "[w]e completed the incredibly complex acquisition of the P&G Beauty Business, fully reorganized into a product and customer focused organizational structure, successfully reached significant milestones in our integration efforts, and boosted our brand portfolio…" and that "[r]egarding the P&G Beauty Business, our integration efforts are proceeding well and we remain on track with the synergy delivery."

145.    On this news, Coty's stock price dropped $3.31 per share, or nearly 17%, from a close of $19.55 per share on August 21, 2017 to close at $16.24 per share on August 24, 2017 after three days of trading on heavy volume.

146.    On November 7, 2018, before the market opened, Coty announced a bigger than expected decline in first quarter sales due to "several temporary supply-chain related headwinds" which included "[w]arehouse and planning center consolidated disruptions in Europe and the U.S." While conceding that the internal challenges in integrating P&G's beauty business into Coty's structure, Defendant Pane indicated that the challenges would be short-lived: "With the

P&G Beauty integration near completion, and after we have overcome the internal challenges, we will be better equipped to focus more externally."

147.    On this news, Coty's stock price dropped $2.88 per share, or nearly 26%, from a close of $11.18 per share on November 6, 2018 to a close of $8.30 per share on November 8, 2018 after two days of trading on heavy volume.

148.    On July 1, 2019, Coty's years-long misrepresentations of the progress and success of the integration efforts expected, and the synergies realized from the P&G acquisition, as well as the strength of Coty's conversion to digital/e-commerce sales, were revealed as false. On July 1, 2019, before the market opened, Coty filed as exhibit to a Form 8-K a press release entitled "Coty Announces Turnaround Plan to Better Leverage its Platform and Step Up Performance" ("July 1, 2019 Press Release").

149.    In the July 1, 2019 Press Release, Coty announced a new four-year "Turnaround Plan" to "rediscover growth," "regain operational leadership," and "build a culture of pride and performance." After attempting to wow investors with jargon likely tested in focus groups and cooked up by a public relations team, Coty dropped a bombshell announcement: it expected to take an additional $3 billion goodwill and intangible asset impairment, related to Consumer Beauty and the P&G assets, confirming that the P&G Specialty Beauty Business had been overvalued.

150.    In addition, on July 1, 2019, Coty held an investor call to discuss the Turnaround Plan ("July 1, 2019 Call"). Discussing the changes Coty intended to make, Defendant Terisse highlighted that Coty's A&CP (advertising and consumer promotion) had for years been at a level below industry practices, and that the Company intended to raise that investment to industry levels. Crucially, Terisse emphasized that the spending would also shift to working media, "both

- 47 -

digital and conventional." This goal revealed the falsity of Coty's pronouncements, throughout the Class Period, that Coty had been focused on taking advantage of their "end-to-end digital capabilities," that digital/e-commerce had not been a material Company weakness.

151.    During the July 1, 2019 Call, Defendant Laubies admitted that Coty had misrepresented the success of the P&G integration throughout the Class Period, stating "it is clear that the difficulty of th[e P&G] merger lies at the heart of many of the issues that Coty has faced since then" because the "integration took longer and was more complex than originally envisioned," "many parts of the acquired business had weak performance since the merger," and "the sustained commitment to meeting the financial targets set at the start of the deal limited the organization's ability to address some of the underlying trends." Laubies further admitted that it was "very true that the P&G Beauty merger has led to value separation and financial setbacks for Coty." At the same time, Laubies assured investors that "we have now identified what we need to change in our company to be lasting and sustainable performance with the focus initially building a better business before we build a significantly bigger one."

152.    During the July 1, 2019 Call, Defendant Terisse tied the $3 billion impairment to the costs of and provisions of the Turnaround Plan itself, in an attempt to explain away Coty's failure to take the $3 billion impairment on February 8, 2019, or on May 8, 2019. At no point did Defendants discuss changes in fair value, or why the $3 billion impairment, primarily in Consumer Beauty, should not have been taken in February, when Coty took the $1 billion impairment also related to Consumer Beauty, and if not in February then in May 2019, when, despite having begun the annual impairment analysis that would lead to the $3 billion impairment, Coty neither took the impairment nor disclosed in "subsequent events" that it would have to take another massive impairment.

153.     Analysts were unimpressed. J.P. Morgan analyst Andrea Teixeira, referencing the "botched [P&G] supply chain integration in 2018 that left retailers short on inventory," believed that Coty's Consumer Beauty would continue to "lose significant shelf space." Deutsche Bank analyst Faiza Alwy was "skeptical," noted that the market viewed the Turnaround Plan as "underwhelming," and that it was "not clear how the company will stem the decline in [Consumer Beauty]."

154.     On news of the $3 billion impairment, Coty's stock price dropped $1.94, or over 14%, from an opening price of $13.53 per share on July 1, 2019 to a closing price of $11.59 per share that day on heavy volume.

155.     On August 28, 2019, Coty issued a press release entitled "Coty Inc. Reports Fourth Quarter and Full Year Results, In-Line with Guidance." In the press release, Coty announced that it had taken the $2.9 billion impairment first announced on July 1, 2019, bringing the total 2019 impairment to $3.9 billion, almost entirely related to Consumer Beauty and the P&G acquisition. Of the $3.9 billion, $3.4 billion was impairment of Consumer Beauty goodwill, and $0.4 billion impairment of intangible assets, with the majority trademark impairment of Consumer Beauty brands.

156.     In addition, on August 28, 2019, Coty held an investor call to discuss the Company's fourth quarter and full year financial results ("August 29, 2018 Call"). Defendant Terisse stated that "[t]he percentage of A&CP being digital is now close to that of our peers and maybe a more significant as evidenced on this slide is the growth of our e-commerce business and the proportion of our revenues it now represents." Defendant Terisse further stated in response to Barclays analyst Lauren Lieberman's question regarding the Company's "planned reduction in promotions" that "we are increasing meaningfully the level of A&CP...to support

the brands and therefore to avoid having to use so much the promotions."  In response to BofA

Merrill Lynch analyst Olivia Tong's request to "dive a little but deeper into the A&CP,"

Defendant Terisse stated:

> [o]n A&CP, we definitely aim at stepping up our level and ***start closing the gap we have
> with competition***. And it will take time before we can do that, but we are definitely on
> that path. We started as soon as Q1. . . . But Q1 is going to be an important start, and it
> shows gross margin improvement -- this is actually first, but it shows as well a very, very
> meaningful step-up in terms of A&CP. . .

## DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES AND REGULATIONS

### GAAP and SEC Rules and Regulations - Generally

157.    GAAP constitute those standards recognized by the accounting profession as the

conventions, rules, and procedures necessary to define accepted accounting practices at a

particular time, and are the common set of accounting principles, standards, and procedures that

companies in the United States use to compile their financial statements.

158.    The SEC has the statutory authority for the promulgation of GAAP for public

companies and has delegated that authority to the Financial Accounting Standards Board

("FASB").

159.    The SEC Rules and interpretive releases and the FASB Accounting Standards

Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-

05-1.

160.    SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements

filed with the SEC which are not prepared in compliance with GAAP are presumed to be

misleading and inaccurate. Regulation S-X requires that interim financial statements must also

comply with GAAP, with the exception that interim financial statements need not include

disclosures which would be duplicative of those accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

161.    SEC rules and regulations require that publicly traded companies such as Coty include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. See Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X.

### **Coty Violated SEC Regulations and GAAP by Failing to Impair Goodwill**

162.    Defendants violated GAAP in the Q2 2019 10-Q and Q3 2019 10-Q quarterly filings by knowingly or recklessly failing to impair Consumer Beauty goodwill.

163.    GAAP provision ASC 350-20 applies to accounting and financial reporting for goodwill. Goodwill is defined as "an asset representing the future economic benefits arising from other assets acquired in a business combination … that are not individually identified and separately recognized." ASC 350-20-20.

164.    Goodwill is created in an acquisition and is initially measured as the excess of the purchase price over the value of identifiable assets acquired and liabilities assumed in a business combination. ASC 805-30-30-1. Over 60% (or $5.56 billion) of Coty's total goodwill at the start of fiscal year 2019 related to the October 2016 P&G acquisition.

165.    According to Coty, goodwill from the P&G acquisition "is primarily attributable to the anticipated company-specific synergies and economies of scale expected from the operations of the combined company. The synergies include certain cost savings, operating efficiencies, and leverage of the acquired brand recognition to be achieved as a result of the P&G Beauty Business acquisition." Coty allocated most of the goodwill from the P&G acquisition

($3.19 billion) to Consumer Beauty "based on the relative fair values of expected future cash flows."

166.    Goodwill is tested for impairment at the reporting unit level, which for Coty is the same level as its reportable divisions (Luxury, Consumer Beauty and Professional Beauty). ASC 350-20-35-1. "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value." ASC 350-20-35-2.

167.    Once a year, at the same time each year, a company must evaluate goodwill for impairment. ASC 350-20-35-28. It was Coty's policy to perform this evaluation as of May 1 of each year, during its fourth fiscal quarter.

168.    However, "goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30. A company must assess "qualitative factors," known as triggering events, to determine if it should perform an interim analysis. ASC 350-20-35-30 and ASC 350-20-35-3C. The "totality" of events and circumstances, including a non-exclusive list of factors included in GAAP, must be evaluated. ASC 350-20-35-3C, ASC 350-20-35-3E.

169.    GAAP provisions ASC 350-20-35-3C contains a non-exclusive list of examples of events and circumstances which could trigger an interim goodwill impairment test:

    (a)    Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

    (b)    Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (considered in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;

(c)      Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

(d)      Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

(e)      Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

(f)      Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit;

(g)      If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

170.    Once a goodwill impairment test is triggered, the Company first performs a qualitative assessment test to determine if it needs to perform a quantitative impairment test. ASC 350-20-35-3–3B. In its filings, Coty disclosed that in performing its qualitative assessment, it "considers the extent to which unfavorable events or circumstances identified, such as changes in economic conditions, industry and market conditions or company specific events, could affect the comparison of the reporting unit's fair value with its carrying amount."

171.    If necessary, the quantitative impairment test is performed to identify and measure goodwill impairment. ASC 350-20-35-3. The quantitative test compares the fair value of a reporting unit with its carrying amount, also known as the net book value (i.e., the amount recorded on the books), including goodwill. ASC 350-20-35-4. If the carrying amount of a reporting unit exceeds its fair value, then goodwill is considered impaired and an impairment loss is recognized in an amount equal to the difference between the fair value and carrying value, up

to the amount of goodwill allocated to that reporting unit. ASC 350-20-35-6 and ASC 350-20-35-8.

172.    Coty disclosed that it used a combination of the income and market approaches to determine the fair value of its reporting units:

> We believe the blended use of both models compensates for the inherent risk associated with either model if used on a stand-alone basis, and this combination is indicative of the factors a market participant would consider when performing a similar valuation.
>
> Under the income approach, we determine fair value using a discounted cash flow method, projecting future cash flows of each reporting unit, as well as a terminal value, and discounting such cash flows at a rate of return that reflects the relative risk of the cash flows. Under the market approach, we utilize information from comparable publicly traded companies with similar operating and investment characteristics as the reporting units, which creates valuation multiples that are applied to the operating performance of the reporting units being tested, to value the reporting unit.
>
> The key estimates and factors used in these approaches include revenue growth rates and profit margins based on our internal forecasts, our specific weighted-average cost of capital used to discount future cash flows, and comparable market multiples for the industry segment as well as our historical operating trends. Certain future events and circumstances, including deterioration of market conditions, higher cost of capital, a decline in actual and expected consumer consumption and demands, could result in changes to these assumptions and judgments. A revision of these assumptions could cause the fair values of the reporting units to fall below their respective carrying values, resulting in a non-cash impairment charge. Such charge could have a material effect on the Consolidated Statements of Operations and Balance Sheets.

173.    On February 8, 2019, the Company announced a $965.1 million impairment charge reported in its Q2 2019 10-Q. The impairment charge consisted of $832.5 million for the Consumer Beauty goodwill, $97.8 million for Consumer Beauty trademarks and licenses (CoverGirl, Clairol trademarks, a regional Brazilian skin care trademark, and a regional hair

license agreement), $22.8 million for the philosophy trademark (part of Luxury), and $12.0 million for a corporate equity security investment.

174.    In its Q2 2019 10-Q, the Company disclosed the following adverse conditions which contributed to a decline in its quarterly revenues:

(a)    Negative market share trends in the color cosmetics, hair color and mass fragrance categories as a result of shelf-space losses in North America and Europe for *CoverGirl*, *Rimmel* and *Clairol*;

(b)    The Supply Chain Disruptions which resulted in lower net revenues mainly in the color cosmetics category, namely the *Rimmel*, *Max Factor* and *Bourjois* brands;

(c)    Reduced net revenues for *Max Factor*, *Bourjois*, *Adidas* and the retail hair line of *Wella* hair products due to decreased sales volume to improve retailer trade inventory levels;

(d)    Negative overall category trends in the color cosmetics and mass fragrance categories;

(e)    Reduced net revenues from *Younique* due to a decline in product sales and presenter sponsorship as we continue to refine our product offerings and compensation plan structure to drive improvements in presenter sales activity, recruitment and retention.

(f)    Indicators of impairment related to the philosophy trademark that is part of the Luxury reporting unit. In addition to the impact of a 75 basis point increase in the discount rate, we considered the impact of lower than expected net

revenue growth in the U.S. during the quarter, shelf space losses at key retailers and

a decrease in the level of expected profitability of the trademark.

175.    On May 8, 2019, one week *after* its annual goodwill impairment test date, the

Company filed its Q3 2019 10-Q in which it disclosed the following adverse conditions that

contributed to a decline in its quarterly revenues:

(a)    Shelf-space losses primarily impacting *CoverGirl*, *Rimmel* and

*Clairol* which have contributed to the negative share trends in the color cosmetics

and hair color categories in North America;

(b)    Performance challenges in our brands across Europe which have

contributed to the region's negative market share trends in the color cosmetics

category;

(c)    Reduced net revenues from *Younique* due to a decline in product

sales and presenter sponsorship as we continue to refine our product offerings to

drive improvements in presenter sales activity, recruitment and retention;

(d)    Reduced net revenues in North America due to the adoption of the

New Revenue Standard primarily impacting *CoverGirl* and *Sally Hansen*; and

(e)    The negative impact of foreign currency exchange translation.

176.    However, the Company failed to appropriately evaluate these conditions or take

into consideration the results of its annual May 1st impairment test, erroneously concluding that

an interim goodwill impairment test was not required:

> During the three months ended March 31, 2019, we assessed
> whether there were any newly arisen impairment indicators and
> determined that no such indicators were present. Accordingly, no
> additional fair value assessments were required.

177.    Just two months later, on July 1, 2019, Coty announced an additional $2.87 billion impairment charge which, as was the case in Q2 2019, for Consumer Beauty goodwill and other intangible assets related primarily to Consumer Beauty:

> (a)    $2,558.6 million for Consumer Beauty goodwill;

> (b)    $201.8 million for Consumer Beauty trademarks (CoverGirl, Max Factor, Sally Hansen, Bourjois, Clairol, two regional Brazilian trademarks and an undisclosed trademark);

> (c)    $27.0 million for Wella trademark (Consumer Beauty);

> (d)    $86.8 million for philosophy trademark (Luxury).

178.    Coty disclosed the following in its August 28, 2019, 2019 10-K related to the $2.87 billion additional impairment recorded in the fourth fiscal quarter:

> The cash flows associated with our Consumer Beauty reporting unit were adversely affected by factors that developed during the fourth quarter of fiscal 2019 including fourth quarter net revenue results and market share trends that were below expectations, continued net revenue and profitability declines for Younique in excess of management's expectations, and the development of our Turnaround Plan to stabilize operations and improve profitability. The Turnaround Plan impacted the projected cash flows associated with the Consumer Beauty reporting unit by lowering revenue growth and, in the near term, margin expectations. Such changes in our estimated forecasts were based on a top down review of the business which resulted in decisions to simplify the product range as well as identify priority brand-country combinations and invest behind such combinations at scale, which will initially lower net revenues and profits. The Turnaround Plan also considered the latest market data including continued negative category trends in the color cosmetics, hair color and mass fragrance categories that were below expectations and indicated a longer required recovery period. Additionally, the forecast was updated to include the costs of the Turnaround Plan. Overall, these factors negatively impacted the cash flows of the Consumer Beauty reporting unit and resulted in a decrease in our assumed terminal growth rate, which also adversely affected the fair values.

To determine the fair value of our Consumer Beauty reporting unit, we used an updated average annual revenue growth rate of (5.9)% for fiscal 2019 to fiscal 2023, a 1.0% decrease in the terminal growth rate since the second quarter of fiscal 2019, and a discount rate of 8.0%. As the Consumer Beauty reporting unit was impaired, it has a 0% excess and as such, further material negative trends in its actual and expected business performance or an increase in the discount rate may result in further impairments. If the average annual revenue growth rate for fiscal 2019 to fiscal 2023 declined by 1% it may cause an additional impairment of $214.0. If the discount rate increased by 0.5%, it may cause an additional impairment of $195.5.

179.     Although, according to Coty, the $2.87 billion additional impairment was caused by factors which developed during the fourth quarter of fiscal 2019, including the development of its turnaround plan, an analysis of the Company's disclosures reveals that these factors existed as early as the second fiscal quarter of 2019, ending on December 31, 2018. A review of Coty's SEC filings and public statements reveals that Coty recognized the need for, and was engaged in, turnaround efforts during the earlier periods, but that the projections it utilized during its Q2 2019 interim impairment test did not adequately reflect the costs of these turnaround efforts or their impact on the Consumer Beauty reporting unit projected cash flows, namely lowered revenue growth and reduced margin expectations.

180.     In November 2018, during the second quarter of fiscal year 2019, Coty announced the abrupt departure of its chief executive Camillo Pane and appointment of Pierre Laubies as its new CEO. Laubies began work on a turnaround plan as soon as he joined Coty. Laubies described himself as someone whose "first experience of business transformation occurred in Russia 23 years ago, and it feels like I have been doing little else since that time." Three months later, during the February 8, 2019 earnings call, Laubies, disclosed that since joining the Company, he has been "discovering each part of our business, aiming to assess what is and what is not working and where the opportunities lie" and was concluding "our assessment and finalize our strategic plan."

He acknowledged that "it will take some time" to "return Coty to a path for growth" given "the difficult trajectory of our Consumer Beauty division" where "we will need to earn our right to grow again." Pierre-André Terisse, Coty's CFO, also noted that the Company still had "much work to do to achieve stabilization" in Consumer Beauty.

181.    On the February 8, 2019 earnings call, Terisse disclosed that "competitive and market pressure throughout the first half of fiscal 2019 [ending on December 31, 2018], which resulted in weaker-than-expected revenues and earnings" in Consumer Beauty, combined with an increase in the discount rate associated with the division, caused management to determine "that there were indications that the goodwill of this division, as well as certain trademark intangible assets, may be impaired and accordingly an interim goodwill impairment test was performed as of December 31, 2018."

182.    In its Q2 2019 10-Q the Company disclosed the following additional details related to its determination that an interim impairment test was required as of December 31, 2018:

> In the course of evaluating the results for the second quarter of fiscal 2019, the Company noted the cash flows associated with its Consumer Beauty reporting unit were adversely impacted by negative category trends and market share losses in the color cosmetics, hair color and mass fragrance categories mainly impacting the CoverGirl, Rimmel, Max Factor, Bourjois and Clairol trademarks; additional shelf-spaces losses for CoverGirl, Clairol, and Max Factor; expected increased costs in the short-term to offset the lower service levels caused by supply chain disruptions; and lower than expected net revenues and profitability for Younique. Additionally, the Company considered the impact of a 75 basis point increase in the discount rate, which adversely affected the fair value of the reporting unit. Management concluded that these adverse factors represented indicators of impairment that warranted an interim impairment test for goodwill and certain other intangible assets in the Consumer Beauty reporting unit. …
> Additionally, the Company identified indicators of impairment related to the philosophy trademark that is part of the Luxury reporting unit … .

183.    The above disclosures show that the same conditions, which according to Coty itself, caused it to record a $2.87 billion impairment in the fourth fiscal quarter of 2019, existed during the second fiscal quarter of 2019:

(a)    75 basis point increase (from 7.25% to 8.0%) in the discount rate for the Consumer Brands division;

(b)    Negative trends and expectations related to *CoverGirl, Max Factor, Clairol, Younique,* and *Wella* hair products trademarks;

(c)    Supply chain disruptions which resulted in lower net revenues mainly in the color cosmetics category, namely the *Rimmel*, *Max Factor* and *Bourjois* brands;

(d)    Indicators of impairment related to the *philosophy* trademark that is part of the Luxury reporting unit; and

(e)    Increased costs and reduced cash flows from turnaround efforts.

184.    Coty violated GAAP by failing to record an additional $2.87 billion impairment in its Q2 2019 10-Q. Moreover, having failed to record the appropriate impairment in its Q2 2019 10-Q, Coty also failed to perform an interim goodwill impairment test and record an additional $2.87 billion impairment in its Q3 2019 10-Q.

## Coty Violated SEC Regulations and GAAP by Failing to Impair Indefinite-Lived Intangible Assets

185.    Defendants violated GAAP in their February 8, 2019, Q2 2019 10-Q, and in their May 8, 2019, Q3 2019 10-Q quarterly filings, by knowingly or recklessly failing to impair Coty's Consumer Beauty trademarks.

186.    GAAP provision ASC 350-30 applies to accounting and financial reporting for intangibles other than goodwill. Coty classified as indefinite-lived intangible assets its Consumer

Beauty trademarks, such as for CoverGirl, Max Factor, Sally Hansen, Bourjois, Clairol, Wella, and regional Brazilian trademarks.

187.   GAAP requires indefinite-lived intangible assets to be tested for impairment once a year, at the same time each year, or more frequently if events or changes in circumstances (referred to as "triggering events") indicate that it is more likely than not that the asset is impaired. ASC 350-30-35-18. Coty tested its trademarks for impairment on a brand level basis as of May 1 of each year, during its fourth fiscal quarter, at the same time as it tested goodwill for impairment.

1.   A company must assess the "totality" of events and circumstances to determine whether it is more likely than not that an indefinite-lived intangible asset is impaired and an interim impairment test is triggered. GAAP includes a non-exclusive list of factors to consider:

a.   Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on future expected earnings and cash flows that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset.

b.   Financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset.

c.   Legal, regulatory, contractual, political, business, or other factors, including asset-specific factors that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset.

d.   Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset.

e.   Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers), or a change in the market for an entity's products or services due to the effects of obsolescence, demand, competition, or other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing business environment, and expected

changes in distribution channels) that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset.

f.       Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset. ASC 350-30-35-18B – 18F.

188.    Testing an asset for impairment requires a company to perform a qualitative assessment, using the qualitative factors discussed above, among others. If the qualitative assessment reveals that it is more likely than not (a likelihood of more than 50 percent) that an indefinite-lived intangible asset is impaired, a quantitative test is required. ASC 350-30-35-18A – 18F.

189.    When necessary, the quantitative impairment test is performed to identify and measure indefinite-lived intangible asset impairment. ASC 350-30-35-18A–18F. The quantitative test compares the fair value of an indefinite-lived intangible asset with its carrying amount, also known as the net book value. If the carrying value of an indefinite-lived intangible asset (*i.e.*, the amount recorded on the books) exceeds its fair value, then the asset is considered impaired, and an impairment loss is recognized in an amount equal to the difference between the fair value and carrying value. ASC 350-30-35-19.

190.    Coty disclosed that it valued its trademarks using the income approach, primarily utilizing the relief from royalty methodology:

> The trademarks' fair values are based upon the income approach, primarily utilizing the relief from royalty methodology. This methodology assumes that, in lieu of ownership, a third party would be willing to pay a royalty in order to obtain the rights to use the comparable asset. An impairment loss is recognized when the estimated fair value of the intangible asset is less than the carrying value. Fair value calculation requires significant judgments in determining both the assets' estimated cash flows as well as the appropriate discount and royalty rates applied to those cash flows

to determine fair value. Variations in the economic conditions or a change in general consumer demands, operating results estimates or the application of alternative assumptions could produce significantly different results.

191.    On February 8, 2019, the Company announced a $965.1 million impairment charge reported in its Q2 2019 10-Q. The impairment charge consisted of $832.5 million for the Consumer Beauty goodwill, $90.8 million for Consumer Beauty trademarks (CoverGirl, Clairol trademarks, and a regional Brazilian skin care trademark), $7.0 million for a regional hair license agreement, $22.8 million for the philosophy trademark (part of the Luxury), and $12.0 million for a corporate equity security investment.

192.    In its Q2 2019 10-Q, the Company disclosed the following adverse conditions which contributed to a decline in its quarterly revenues:

(a)    Negative market share trends in the color cosmetics, hair color and mass fragrance categories as a result of shelf-space losses in North America and Europe for *CoverGirl*, *Rimmel* and *Clairol*;

(b)    The Supply Chain Disruptions which resulted in lower net revenues mainly in the color cosmetics category, namely the *Rimmel*, *Max Factor* and *Bourjois* brands;

(c)    Reduced net revenues for *Max Factor*, *Bourjois*, *Adidas* and the retail hair line of *Wella* hair products due to decreased sales volume to improve retailer trade inventory levels;

(d)    Negative overall category trends in the color cosmetics and mass fragrance categories;

(e)    Reduced net revenues from *Younique* due to a decline in product sales and presenter sponsorship as we continue to refine our product offerings and

compensation plan structure to drive improvements in presenter sales activity, recruitment and retention.

(f)     Indicators of impairment related to the philosophy trademark that is part of the Luxury reporting unit. In addition to the impact of a 75 basis point increase in the discount rate, we considered the impact of lower than expected net revenue growth in the U.S. during the quarter, shelf space losses at key retailers and a decrease in the level of expected profitability of the trademark.

193.    On May 8, 2019, one week after its annual goodwill and intangible asset impairment test date, the Company filed its Q3 2019 10-Q, in which it disclosed the following adverse conditions that contributed to a decline in its quarterly revenues:

(a)     Shelf-space losses primarily impacting *CoverGirl*, *Rimmel* and *Clairol* which have contributed to the negative share trends in the color cosmetics and hair color categories in North America;

(b)     Performance challenges in our brands across Europe which have contributed to the region's negative market share trends in the color cosmetics category;

(c)     Reduced net revenues from *Younique* due to a decline in product sales and presenter sponsorship as we continue to refine our product offerings to drive improvements in presenter sales activity, recruitment and retention;

(d)     Reduced net revenues in North America due to the adoption of the New Revenue Standard primarily impacting *CoverGirl* and *Sally Hansen*; and

(e)     The negative impact of foreign currency exchange translation.

194.    Coty, however, failed to appropriately evaluate these conditions or take into consideration the results of its annual May 1st impairment test, erroneously concluding that an interim impairment test of its intangible assets was not required:

> During the three months ended March 31, 2019, we assessed whether there were any newly arisen impairment indicators and determined that no such indicators were present. Accordingly, no additional fair value assessments were required.

195.    Just two months later, on July 1, 2019, Coty announced an additional $2.87 billion impairment charge which, as was the case in Q2 2019, was for Consumer Beauty goodwill and other intangible assets related primarily to Consumer Beauty:

(a)     $2,558.6 million for Consumer Beauty goodwill;

(b)     $201.8 million for Consumer Beauty trademarks (CoverGirl, Max Factor, Sally Hansen, Bourjois, Clairol, two regional Brazilian trademarks and an undisclosed trademark);

(c)     $27.0 million for Wella trademark (Consumer Beauty);

(d)     $86.8 million for philosophy trademark (Luxury).

196.    Impairments of intangible assets, other than goodwill, totaled $315.6 million in the fourth quarter of fiscal 2019. Coty disclosed the following in its 2019 10-K related to this additional impairment:

> As part of the May 1, 2019 annual impairment test, we considered the impact of the certain factors on the cash flows of the indefinite-lived other intangible assets associated with the Consumer Beauty reporting unit that developed during the fourth quarter of fiscal 2019. This resulted in asset impairment charges of $201.7 related to indefinite-lived other intangible assets for our CoverGirl, Max Factor, Sally Hansen, Bourjois, Clairol and two regional Brazilian trademarks. These factors included fourth quarter net revenue results below expectations, and the development of our Turnaround Plan to stabilize operations and improve profitability. The Turnaround Plan impacted the projected cash flows associated with

our indefinite-lived other intangible assets by lowering revenue growth and, in the near term, margin expectations. Such changes in our estimated forecasts were based on a top down review of the business which resulted in decisions to simplify the product range as well as identify priority brand-country combinations and invest behind such combinations at scale, which will initially lower net revenues and profits. The Turnaround Plan also considered the latest market data including continued negative category trends in the color cosmetics, hair color and mass fragrance categories that were below expectations and indicated a longer required recovery period. Overall, these factors negatively impacted the cash flows of our indefinite-lived other intangible assets and resulted in a decrease in their assumed terminal growth rates, which also adversely affected their fair values. Additionally we noted the fair values of the indefinite-lived other intangible assets were adversely impacted by an additional 25 basis point increase to the discount rate due to changes in market assumptions. Based on results of the test, the fair value of the Max Factor trademark fell below its carrying value using projections that assumed an average annual growth rate of (4.8)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.75%. The fair value of the Bourjois trademark fell below its carrying value using projections that assumed an average annual growth rate of (14.9)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.75%. The fair value of the CoverGirl trademark fell below its carrying value using projections that assumed an average annual growth rate of (2.2)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.75%. The fair value of the Sally Hansen trademark fell below its carrying value using projections that assumed an average annual growth rate of (4.9)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.75%. The fair value of the Clairol trademark fell below its carrying value using projections that assumed an average annual growth rate of (5.7)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.75%.

We also noted during the annual impairment test that the cash flows related to the philosophy trademark decreased since the second quarter of fiscal 2019 mainly due to updated projections as a result of a revised strategy for the business developed as part of the Turnaround Plan in the fourth quarter of fiscal 2019 to simplify the product range. The fair value of the philosophy trademark was also adversely affected by a 25 basis point increase in the discount rate for trademarks, since the second quarter of fiscal 2019. This caused the fair value of the philosophy trademark to fall below its carrying value using projections that assumed an average annual growth rate of (6.1)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.75%. This resulted in an asset impairment charge of $86.8.

> Further, we noted during the annual impairment test that the cash
> flows related to the professional product line of Wella trademark
> were adversely impacted by lower than expected revenue in the
> U.S. in the fourth quarter of fiscal 2019 and the impact of a 100
> basis point increase in the discount rate for the trademark since the
> fiscal 2018 annual impairment test. This caused the fair value of
> the professional product line of Wella trademark to fall below its
> carrying value using projections that assumed an average annual
> growth rate of (1.0)% for fiscal 2019 to fiscal 2023 and a discount
> rate of 8.75%. This resulted in an asset impairment charge of $27.0.

197.    Coty incorrectly stated that the $2.87 billion additional impairment was caused by factors, including the development of its turnaround plan, which only developed during the fourth quarter of fiscal year 2019. An analysis of the Company's disclosures, however, reveals that these factors existed as early as December 31, 2018, the end of the second quarter of 2019. For example, it appears Coty recognized the need for, and was engaged in, turnaround efforts before the end of Q2 2019, but the projections it utilized during its Q2 2019 interim impairment test did not adequately reflect the costs of these turnaround efforts or their impact on the projected cash flows, namely lowered revenue growth and reduced margin expectations.

198.    In November 2018, during the second quarter of fiscal year 2019, Coty announced the abrupt departure of its chief executive Camillo Pane and appointment of Pierre Laubies as its new CEO. Laubies described himself as someone whose "first experience of business transformation occurred in Russia 23 years ago, and it feels like I have been doing little else since that time." Three months later, during the February 8, 2019 earnings conference call, Laubies disclosed that since joining the Company, he has been "discovering each part of our business, aiming to assess what is and what is not working and where the opportunities lie" and was concluding "our assessment and finaliz[ing] our strategic plan." Laubies acknowledged that "it will take some time" to "return Coty to a path for growth" given "the difficult trajectory of our

Consumer Beauty division" where "we will need to earn our right to grow again." Pierre-André

Terisse, Coty's CFO, also noted that the Company still had "much work to do to achieve

stabilization" in Consumer Beauty.

199.    On the February 8, 2019 earnings call, Terisse disclosed that "competitive and

market pressure throughout the first half of fiscal 2019, which resulted in weaker-than-expected

revenues and earnings" in the Consumer Beauty division, combined with an increase in the

discount rate associated with the division, caused management to determine "that there were

indications that the goodwill of this division, as well as certain trademark intangible assets, may

be impaired and accordingly an interim goodwill impairment test was performed as of December

31, 2018."

200.    In its February 8, 2019, Q2 2019 10-Q, the Company disclosed additional details

related to its determination that an interim impairment test was required as of December 31, 2018:

> [I]n the course of evaluating the results for the second quarter of
> fiscal 2019, the cash flows associated with the Consumer Beauty
> reporting unit were adversely impacted during the quarter which
> warranted an interim impairment test for goodwill and certain other
> intangible assets in the Consumer Beauty reporting unit.
> Accordingly, we also re-evaluated future cash flows of intangible
> assets and the impact of a 75 basis point increase to the discount
> rate. This resulted in asset impairment charges of $90.8 related to
> indefinite-lived other intangible assets for our CoverGirl, Clairol
> and a regional Brazilian skin care trademark, and $7.0 related to a
> finite lived other intangible asset for a regional hair license
> agreement.
> The fair value of the CoverGirl trademark fell below its carrying
> value using projections that assumed an average annual growth rate
> of (3.3)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.5%.
> The fair value of the Clairol trademark fell below its carrying value
> using projections that assumed an average annual growth rate of
> (6.1)% for fiscal 2019 to fiscal 2023 and a discount rate of 8.5%.
> The fair value of the regional Brazilian skin care trademark fell
> below its carrying value using projections that assumed an annual
> growth rate of 7.7% for fiscal 2019 to fiscal 2023 and a discount

rate of 13.0%. The regional hair license agreement was concluded to be fully impaired due to on-going shelf space losses.

In addition to the Consumer Beauty reporting unit, we also identified indicators of impairment related to the philosophy trademark that is part of the Luxury reporting unit. In addition to the impact of a 75 basis point increase in the discount rate, we considered the impact of lower than expected net revenue growth in the U.S. during the quarter, shelf space losses at key retailers and a decrease in the level of expected profitability of the trademark. We concluded that the fair value of the philosophy trademark fell below its carrying value using projections that assumed an average annual growth rate of 1.2% for fiscal 2019 to fiscal 2023 and a discount rate of 8.5%. This resulted in an asset impairment charge of $22.8.

201.   The above disclosures show that the same conditions which, according to Coty, caused it to record a $2.87 billion impairment in the fourth fiscal quarter of 2019, existed during the second quarter of fiscal 2019:

(a)     75 basis point increase in the discount rate for the Consumer Brands division;

(b)     Negative trends and expectations related to *CoverGirl, Max Factor, Clairol, Younique,* and *Wella* hair products trademarks;

(c)     Supply chain disruptions which resulted in lower net revenues mainly in the color cosmetics category, namely the *Rimmel*, *Max Factor* and *Bourjois* brands;

(d)     Indicators of impairment related to the *philosophy* trademark that is part of the Luxury reporting unit; and

(e)     Increased costs and reduced cash flows from turnaround efforts.

202.   Defendants violated GAAP, knowingly or recklessly, by failing to record an additional $315.6 million impairment of indefinite-lived intangible assets in its Q2 2019 10-Q. Moreover, having failed to record the appropriate impairment in its Q2 2019 10-Q, Coty also

failed to perform an interim impairment test of its indefinite-lived intangible assets and record an additional $315.6 million impairment in its Q3 2019 10-Q.

**Coty Violated GAAP by Failing to Disclose the $3 Billion Impairment in the "Subsequent Events" Note in the May 8, 2019, Q3 2019 10-Q Financial Statements**

203.    GAAP defines subsequent events as "[e]vents or transactions that occur after the balance sheet date but before financial statements are issued" and classifies them into two categories:

(a)    Events or transactions that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing financial statements (recognized subsequent events);

(b)    Events that provide evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to that date (nonrecognized subsequent events). ASC 855-10-20.

204.    ASC 855, the authoritative standard for accounting and disclosure of subsequent events, states that "[s]ome nonrecognized subsequent events may be of such nature that they must be disclosed to keep the financial statements from being misleading." For such events, ASC 850 requires a company to disclose (a) the nature of the event and (b) an estimate of its financial effect, or a statement that such an estimate cannot be made. ASC 855-10-50-2.

205.    ASC 855 provides a non-exclusive list of nonrecognized subsequent events, one of which is "[c]hanges in the fair value of assets or liabilities (financial or nonfinancial) or foreign exchange rates after the balance sheet date but before financial statements are issued." ASC 855-10-55-2.

206.    Coty performs its required annual impairment test for goodwill and intangible assets as of May 1 of every year. Coty filed its Q3 2019 10-Q on May 8, 2019, one week *after* the date of its annual goodwill and intangible assets impairment test which resulted in a $2.87 billion impairment charge that was only announced in the fourth quarter 2019 financial statements. Even though Coty filed its third quarter 2019 financial statements after May 1, Coty did not disclose in "subsequent events" "the nature of the" impairment, or any "estimate of its financial effect." The only subsequent events Coty disclosed in its May 8, 2019, Q3 2019 10-Q related to quarterly dividends and the quarterly dividend reinvestment program.

207.    Impairment tests require gathering of significant amounts of information and analysis ahead of time, and generally follow similar methodology from year-to-year. Given the magnitude of the impairment Coty announced on July 1, 2019, and recorded in the 2019 10-K, Coty knew that its goodwill and intangible assets became impaired subsequent to March 31, 2019, the end of the third quarter, and was therefore required to treat such impairment as a nonrecognized subsequent event and disclose the nature of this event and an estimate of its financial effect, or included a statement that such an estimate could not be made.

208.    Coty violated GAAP, knowingly or recklessly, by failing to disclose the May 1, 2019 goodwill and intangible asset impairment as a subsequent event in its May 8, 2019, Q3 2019 10-Q, rendering the Q3 2019 10-Q financial statements false and misleading.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

209.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Coty during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

210.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock traded actively on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

212.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class. In addition, Lead Counsel satisfy the standards for appointment as class counsel and will fairly and adequately represent the interests of the Class.

213.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Coty;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused Coty to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of Coty's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

214.    Common questions of law and fact predominate over any questions affecting only individual Class members. Because the common stock of Coty traded in an efficient market and Defendants false and misleading statements had impacted the price of Coty common stock, Plaintiff will establish reliance for herself and the Class through the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NYSE, and was covered by multiple analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

215.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market, establishing predominance.

216.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

217.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

218.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Coty who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

219.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

220.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Coty's securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

221.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Coty's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

222.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Coty's financial well-being and prospects, as specified herein.

223.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Coty's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Coty and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

224.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

225.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Coty's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

226.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Coty's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Coty's securities during the Class Period at artificially high prices and were damaged thereby.

227.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Coty was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Coty securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

228.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

229.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

230.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

231.    Individual Defendants acted as controlling persons of Coty within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

232.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of Coty and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

233.    As set forth above, Coty and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demand a trial by jury.

Dated: January 22, 2021                      Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             /s/ Jacob A. Goldberg
                                             Jacob A. Goldberg
                                             Gonen Haklay
                                             101 Greenwood Avenue, Suite 440
                                             Jenkintown, PA 19046
                                             Telephone: (215) 600-2817
                                             Fax: (212) 202-3827
                                             Email: jgoldberg@rosenlegal.com
                                             Email: ghaklay@rosenlegal.com

                                             and

Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Putative Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2021, I electronically filed the foregoing ***Amended Class Action Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Email: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***