**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CRYSTAL GARRETT-EVANS, Individually, :
and on Behalf of All Others Similarly Situated, :
                                         :
                      Plaintiff, :
                                          :
                 v.                     :      20-cv-07277 (LLS)
                                          :
COTY INC., LAMBERTUS "BART" BECHT, :
CAMILLO PANE, PIERRE LAUBIES, :
PATRICE DE TALHOUËT, and :
PIERRE-ANDRE TERISSE, :
                                          :
                   Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF CERTAIN DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Jay B. Kasner
Scott D. Musoff
Thania Charmani
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants Coty Inc.,*
*Lambertus Becht, Patrice de Talhouët and*
*Pierre-André Terisse*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 4

    A.    The Parties ............................................................................................ 4

    B.    The P&G Beauty Business Acquisition ................................................. 4

    C.    Coty Reported Its Preliminary Estimated Value of Goodwill and
Intangible Assets From the P&G Beauty Business Acquisition and
Promptly Reduced the Estimated Value for the Consumer Beauty Segment
During the GAAP Measurement Period ................................................. 5

    D.    Throughout the Class Period, Coty Repeatedly Disclosed the Risks
Associated With Its Use of Estimates, Its Impairment Tests for Goodwill
and Other Intangible Assets, Its Integration of the P&G Beauty Business,
and Its Digital Marketing and Sales Efforts ........................................... 6

    E.    Throughout the Class Period, Coty Updated Shareholders About Its
Challenges Integrating P&G and Its Difficulties in Consumer Beauty ..... 9

    F.    Coty Performed an Interim Impairment Test and Recorded Impairment
Charges in the Second Quarter of 2019, and Continued to Update
Investors on Its Financial Performance ............................................... 15

    G.    Coty Updated Investors on Its Recovery Efforts in the Third Quarter of
2019 .................................................................................................... 16

    H.    Coty Performed an Annual Impairment Test and Recorded Impairment
Charges in the Fourth Quarter of 2019 ................................................ 17

    I.    Plaintiff's Amended Complaint ........................................................... 18

ARGUMENT .......................................................................................................... 18

I.    PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE FALSE OR
MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5 ..... 19

    A.    Plaintiff Has Not Identified Any False or Misleading Statement ......... 19

        1.    Statements Concerning the Integration of the P&G Beauty
Business Were Not False or Misleading ................................... 19

2.   Statements Concerning Coty's Digital Marketing Efforts Were Not False or Misleading ..................................................................................26

3.   Coty's Estimates of Impairment of Goodwill and Intangible Assets Were Not False or Misleading .................................................................28

4.   Coty's Goodwill and Intangible Assets Disclosures Did Not Violate GAAP or SEC rules ....................................................................31

B.   Numerous Challenged Statements Are Not Actionable Because They Are Protected Forward-Looking Statements ................................................33

C.   Many of the Challenged Statements Are Nonactionable Puffery ........................39

D.   Many of the Challenged Statements are Nonactionable Because They Constitute Sincerely Held Statements of Opinion ..................................41

E.   Plaintiff Has Not Identified Any Actionable Omissions .......................................42

II.   PLAINTIFF FAILS TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER ................................................................................44

III.   PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE AN UNDERLYING SECTION 10(b) CLAIM ..........................49

CONCLUSION..................................................................................................................49

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                     **PAGE(S)**

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d. Cir. 1995).................................................................................................3

*In re Adient plc Securities Litigation*,
    No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ...................... passim

*In re Aratana Therapeutics Inc. Securities Litigation*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018)...............................................................................42

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    477 F. Supp. 3d 88 (S.D.N.Y. 2020)..................................................................................27

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................................4

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020)................30

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998)..............................................................................................49

*City of Omaha, Neb. Civilian Employees' Retirement System v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012)................................................................................................31

*City of Omaha, Neb. Civilian Employees' Retirement System v. CBS Corp.*, No. 08 CIV.
    10816 PKC,
    2011 WL 2119734 (S.D.N.Y. May 24, 2011) ..................................................................31

*City of Warwick Municipal Employees Pension Fund v. Rackspace Hosting, Inc.*,
    No. 17 Civ. 3501 (JFK), 2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)................................40

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................................................45

*In re Express Scripts Holding Co. Securities Litigation*,
    No. 16 Civ. 3338 (ER), 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ..............................28

*In re Express Scripts Holding Co. Securities Litigation*,
    No. 16 Civ. 3338 (ER), 2018 WL 2324065 (S.D.N.Y. May 22, 2018) ............................31

*In re Express Scripts Holdings Co. Securities Litigation*,
    773 F. App'x 9 (2d Cir. 2019) ..............................................................................20, 31, 47

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011)............................................................................................2, 28

*In re Fed Ex Corp. Securities Litigation*,
No. 1:19-cv-05990 (RA), 2021 WL 396423 (S.D.N.Y. Feb. 4, 2021) ..................... passim

*In re Ferrellgas Partners, L.P., Securities Litigation*,
No. 16 Civ. 7840 (RJS), 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ..............35, 39, 41

*Finger v. Pearson PLC*,
No. 17 Civ. 1422 (RJS), 2019 WL 10632904 n.2 (S.D.N.Y. Sept. 16, 2019).......... passim

*Frankfurt-Trust Investment Luxemburg AG v. United Technologies Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)...................................................................................42

*Friedman v. Endo International PLC*,
No. 16-CV-3912 (JMF), 2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ............................28

*In re General Electric Securities Litigation*,
No. 19cv1013 (DLC), 2020 WL 2306434 (S.D.N.Y. May 7, 2020), *aff'd*, No. 20-
1741, 2021 WL 357756 (2d Cir. Feb. 3, 2021)................................................25, 31, 42, 49

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................................47

*Hammer v. Reetz*,
No. 16 Civ. 6590 (LLS), 2017 WL 946336 (S.D.N.Y. Feb. 27, 2017) ............................45

*In re Iconix Brand Group, Inc.*,
No. 15 Civ. 4860 (PGG), 2017 WL 4898228 (S.D.N.Y. Oct. 24, 2017)....................39, 47

*Intel Corp. Investment Policy Committee v. Sulyma*,
140 S. Ct. 768 (2020)...........................................................................................................38

*International Association of Heat v. International Businesss Machines Corp.*,
205 F. Supp. 3d 527 (S.D.N.Y. 2016)..................................................................................46

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)...................................................................................................47

*Jackson v. Halyard Health, Inc.*,
No. 16-CV-05093-LTS, 2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018)...........................47

*Johnson v. Sequans Communications S.A.*,
No. 11 Civ. 6341(PAC), 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ............................20

*In re Jumei International Holding Ltd. Securities Litigation*,
No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)...................................................1

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001).................................................................................................45

iv

*Karolyi v. Loma Negra Compania Industrial Argentina Sociedad Anonima*,
    No. 18 Civ. 11323 (LLS), 2020 WL 1989423 (S.D.N.Y. Apr. 27, 2020) ........................36

*Kinsey v. Cendant Corp.*,
    No. 04 Civ.0582 RWS, 2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005)...........................46

*Lachman v. Revlon, Inc.*,
    No. 19-cv-2859 (RPK) (RER), 2020 WL 5577406 (E.D.N.Y. Sept. 17, 2020) ...............49

*Lefkowitz v. Synacor, Inc.,*
    No. 18 Civ. 2979 (LGS), 2019 WL 4053956 (S.D.N.Y. Aug. 28, 2019) .........................42

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................................18

*Leykin v. AT & T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007)............18, 19

*Lighthouse Financial Group v. Royal Bank of Scottish Group*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012)...........................................................................41

*Lloyd v. CVB Financial Corp.*,
    No. CV-10-06256 MMM (PJWx), 2012 WL 12883517 (C.D. Cal. Aug. 21, 2012)..........4

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American
    Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)...........................................................................47

*In re Loral Space & Communications Ltd. Securities Litigation*,
    No. 01 Civ.4388(JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ........................48, 49

*Lucescu v. Zafirovski*,
    No. 09cv4691 (DLC), 2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018) .................29, 30. 33

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) .....................................................................................20

*In re Molycorp, Inc. Securities Litigation*,
    No. 13 Civ. 5697(PAC), 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) .........................46

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)...........................................................................25

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)...........................................................................................2, 3, 20, 29

*In re Optionable Securities Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008)...........................................................................43

*In re Philip Morris International Inc. Securities Litigation*,
　　437 F. Supp. 3d 329 (S.D.N.Y. 2020).....................................................................4, 34, 38

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
　　Commerce*,
　　694 F. Supp. 2d 287 (S.D.N.Y. 2010).............................................................................48

*Pope Investments II LLC v. Deheng Law Firm*,
　　No. 10 Civ. 6608(LLS), 2011 WL 5837818 (S.D.N.Y. Nov. 21, 2011) ..........................48

*Pope Investments II, LLC v. Deheng Law Firm*,
　　No. 10 Civ. 6608(LLS), 2013 WL 3946126 (S.D.N.Y. July 31, 2013), *aff'd*, 586
　　F. App'x 1 (2d Cir. 2014) ................................................................................................44

*Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies Inc.*,
　　548 F. App'x 16 (2d Cir. 2013) .......................................................................................35

*In re Razorfish, Inc. Securities Litigation*,
　　No. 00 CIV. 9474 (JSR), 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001).........................22

*In re Rockwell Medical, Inc. Securities Litigation*,
　　No. 16 Civ. 1691 (RJS), 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ..........................46

*Rombach v. Chang*,
　　355 F.3d 164 (2d Cir. 2004)......................................................................................19, 39

*Ross v. Lloyds Banking Group, PLC*,
　　No. 11 Civ. 8530(PKC), 2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012).........................22

*In re Royal Bank of Scotland Group PLC Securities Litigation*,
　　No. 09 Civ. 300(DAB), 2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012)............................41

*Ruskin v. TIG Holdings, Inc.*,
　　No. 98 Civ. 1068 LLS, 1999 WL 756466 (S.D.N.Y. Sept. 24, 1999)..............................32

*S.C. Retirement Systems Group Trust v. Eaton Corp. PLC*,
　　791 F. App'x 230 (2d Cir. 2019) .....................................................................................22

*Schiro v. Cemex, S.A.B. de C.V.*,
　　396 F. Supp. 3d 283 (S.D.N.Y. 2019)..............................................................................47

*Shemian v. Research in Motion Ltd.*,
　　No. 11 Civ. 4068(RJS), 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .....................43, 44

*Shields v. Citytrust Bancorp, Inc.*,
　　25 F.3d 1124 (2d Cir. 1994)............................................................................................48

*Sjunde AP-Fonden v. General Electric Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) ...................................................................33

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................................34

*Steamfitters' Industry Pension Fund v. Endo International PLC*,
    771 F. App'x 494 (2d Cir. 2019) ...........................................................................28

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) .....................................................................................43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..........................................................................................4, 44

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ...................................................................................29

*In re Vale S.A. Securities Litigation*,
    No. 1:15-cv-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .................40

*In re WebMD Health Corp. Securities Litigation*,
    No. 11 Civ 5382(JFK), 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ........................46

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) ...................................................................................49

*Woolgar v. Kingstone Companies, Inc.*,
    477 F. Supp. 3d 193, at 240 (S.D.N.Y. 2020) .......................................................46

*In re Xinhua Finance Media, Ltd. Securities Litigation*,
    No. 07 Civ. 3994(LTS)(AJP), 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) .................40

*Yung v. Lee*,
    160 F. App'x 37 (2d Cir. 2005) ...............................................................................4

## STATUTES

15 U.S.C. § 78u-4(b)(1) ..................................................................................1, 19

15 U.S.C. § 78u–4(b)(2)(A) ...................................................................................44

15 U.S.C. § 78u-5(c)(1) ...................................................................................33, 35

15 U.S.C. § 78u-5(i)(1) ...........................................................................................34

15 U.S.C. §§ 78j(b) and 78t(a) ...............................................................................18

**RULES**

Federal Rules of Civil Procedure 9(b), 12(b)(6) ..............................................................1

**REGULATIONS**

17 C.F.R. § 240.10b-5........................................................................................18, 19

Defendants Coty Inc. ("Coty" or the "Company"), Lambertus Becht, Patrice de Talhouët and Pierre-André Terisse ("Served Defendants," and together with Coty, "Defendants")[1] respectfully submit this memorandum of law in support of their motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and Section 21D(b)(1) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), to dismiss the Amended Class Action Complaint (the "Complaint" or "AC") (ECF No. 37) in its entirety with prejudice.

## PRELIMINARY STATEMENT

Based solely on hindsight, Plaintiff brought this action because, in February and July of 2019, Coty announced impairments to goodwill[2] and other intangible assets related to its acquisition of the Beauty Business of Procter & Gamble Company (the "P&G Beauty Business"), the "largest acquisition in [Coty's] history." (AC ¶ 4). The Complaint attempts to misuse these announcements as a springboard for its theory that Coty allegedly had previously concealed the challenges of integrating the P&G Beauty Business. The theory underlying Plaintiff's claims is essentially that, in light of the July 2019 impairment, Coty must have failed to earlier account for the adverse conditions that led to it. These "fraud-by-hindsight" allegations do not state a securities fraud claim.

First, the Complaint fails to identify the reasons why any of Coty's statements were false, let alone with the particularity required by Rule 9(b) and the PSLRA. Nor could it. Coty's disclosures show precisely the opposite of an effort to conceal the challenges of integrating the

---

[1]  In addition to the Served Defendants, the Complaint names defendants Camillo Pane and Pierre Laubies (together with the Served Defendants, the "Individual Defendants"). Although Plaintiff has not served Mr. Pane and Mr. Laubies, the Court may still dismiss the Complaint against all Individual Defendants. *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL 95176, at *1 & n.1, *6 (S.D.N.Y. Jan. 10, 2017).

[2]  "Goodwill 'is an intangible asset generated by the acquisition of a business for a price greater than the value of the business's net identifiable assets . . . .'" *Finger v. Pearson PLC*, No. 17 Civ. 1422 (RJS), 2019 WL 10632904, at *2 n.2 (S.D.N.Y. Sept. 16, 2019) (citation omitted).

P&G Beauty Business.  From the date of the acquisition announcement, Coty disclosed that there were "challenges as we integrate and rebuild the businesses."  (AC ¶¶ 37, 71.)  Likewise, throughout the Class Period,[3] Coty disclosed the integration's ongoing impact on its operation and finances due to the "complexity of the merger, the sheer magnitude of this integration and simultaneous reorganization of [the] total company."  (Ex. A, Q2 2017 Earnings Call Tr., at 4.)  Far from "assuring" investors about the success of the integration (AC ¶¶ 37, 71), Coty cautioned investors: "We give no assurance that we will be able to successfully manage integration and operation of the P&G Beauty Brands business."  (*Id.* ¶ 123.)

Similarly, throughout the Class Period, Coty kept investors informed regarding its digital marketing efforts and made clear that Coty's shift from traditional media to digital was an ongoing effort.  The Company's disclosures also discussed the spending amounts allocated to these efforts and related risks, including that Coty might not be "successful" in its "digital transformation efforts," which would affect the Company's ability to "compete effectively."  (*Infra* pp. 9, 11-13, 26-28.)

Second, impairments to goodwill and other intangible assets "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact."  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).  As such, estimating the value of those assets is a quintessential matter of opinion for which Plaintiff must satisfy the stringent pleading standards articulated in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).  Plaintiff must allege facts demonstrating either that these subjective estimates were not honestly believed when made or that Defendants omitted material facts regarding the basis for their estimates that would mislead a reasonable investor.  *Id.*

---

[3] The Complaint defines the class period as the period between November 9, 2016, and June 30, 2019.  (AC ¶ 1.)

at 186, 189.  Instead of doing so, Plaintiff engages in "Monday morning quarterback[ing]," attempting to "second-guess [the] inherently subjective and uncertain assessments" of management. *Id.* at 186.  Plaintiff relies almost exclusively on conclusory allegations that the Company should have recorded the totality of the impairment to goodwill and other intangible assets in February 2019.  But "after-the-fact 'allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'"  *Finger*, 2019 WL 10632904, at \*12 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d. Cir. 1995)).  Plaintiff fails to offer any particularized facts to support its conclusion regarding the Company's subjective accounting judgments—that such judgments were subjectively and objectively false when made.

Finally, the Complaint fails to plead a strong inference of scienter.  (*Infra* pp. 44-49.) Plaintiff does not even attempt to allege that Defendants had any motive to engage in fraud.  Instead, Plaintiff rests her claims on the entirely unsupported allegation that "Defendants had actual knowledge of the [alleged] misrepresentations and/or omissions of material facts . . . or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them."  (AC ¶ 225; *see also id.* ¶¶ 28, 224.)  The Complaint refers to the Individual Defendants' corporate positions and participation in day-to-day operations without even attempting to link these generic allegations to the purported misstatements.  Courts in this Circuit have consistently rejected such allegations as insufficient to "raise a strong inference of scienter."  *See, e.g.*,  *In re FedEx Corp. Sec. Litig.*, No. 19-cv-05990 (RA), 2021 WL 396423, at \*15 (S.D.N.Y. Feb. 4, 2021).

## BACKGROUND[4]

### A.    The Parties

Defendant Coty is one of the world's largest beauty companies.  (AC ¶ 3.)  Coty markets,

sells, and distributes beauty products in over 150 countries with a portfolio of several dozen brands.

(*Id.* ¶¶ 3, 33.)  During the relevant period at issue in this action, Coty had over 18,000 employees

and operated through three divisions: Consumer Beauty, Luxury and Professional Beauty.  (*Id.*)  On

December 1, 2021, Coty announced the sale of its Professional Beauty Division, though it maintains

a 40% ownership interest in the successor entity now known as the Wella Company.  (Ex. B,

December 1, 2020 8-K, at 1.)  The Individual Defendants occupied various executive positions at

Coty during the Class Period.  (AC ¶¶ 21-26.)

### B.    The P&G Beauty Business Acquisition

In July 2015, Coty announced its plans to acquire the Procter & Gamble Company's fine

fragrance, color cosmetics, salon professional and hair color and certain styling businesses.   In

October 2016, Coty reported that the transaction closed.  (AC ¶¶ 35-36.)  On November 9, 2016,

Coty issued a press release reporting the financial results for the first quarter of its 2017 fiscal year.

(AC ¶ 37; Ex. C, Q1 2017 8-K.)  In the press release, Board Chairman Lambertus "Bart" Becht

---

[4] The facts, which are accepted as true for the purposes of this motion only, are drawn from the Complaint and "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Court may also consider "any documents not so incorporated but nevertheless 'integral' to the complaint," *Yung v. Lee*, 160 F. App'x 37, 41 (2d Cir. 2005) (citation omitted), as well as "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Similarly, the Court may consider "information in the public domain" even if it is not referenced in the Complaint.  *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 344 n.3 (S.D.N.Y. 2020); *cf. Lloyd v. CVB Fin. Corp.*, No. CV-10-06256 MMM (PJWx), 2012 WL 12883517, at *8 (C.D. Cal. Aug. 21, 2012) (taking judicial notice of Generally Accepted Accounting Principles ("GAAP") requirements that are publicly available online).

explained that "closing the transaction and merging the two businesses has come at a cost," requiring "extensive work" and "resources which normally work on the [existing Coty] business," and that the "distraction" of "closing the transaction[] and setting up and preparing for the future of the combined company," along with recent management changes, "have contributed to a decline in Coty stand-alone revenues and profits." (*Id.* at 2.) Mr. Becht noted that despite these challenges, "we are committed . . . to achieving further improvement for the combined company" and "target . . . total four-year synergies and working capital benefits of $750 million and $500 million, respectively" for the combined company, along with an earnings-per-share target "of at least $1.53 for fiscal 2020." (*Id.*)

The press release explained that Coty's views with respect to future operations and financial performance were forward-looking statements under the securities laws and "are based on certain assumptions and estimates." (*Id.* at 8.) It further explained that "reported results should not be considered an indication of future performance, and actual results may differ materially from the results predicted due to risks and uncertainties including . . . risks associated with . . . difficulties in integrating acquired businesses or implementing strategic transactions generally and risks associated." (*Id.*)

### C.     Coty Reported Its Preliminary Estimated Value of Goodwill and Intangible Assets From the P&G Beauty Business Acquisition and Promptly Reduced the Estimated Value for the Consumer Beauty Segment During the GAAP Measurement Period

On February 9, 2017, Coty filed its Form 10-Q for the second quarter of its 2017 fiscal year. (Ex. D, Q2 2017 10-Q.) It reported that as of October 1, 2016, the date it acquired the P&G Beauty Business, Coty estimated a preliminary fair value of $5.08 billion in goodwill for the "anticipated company-specific synergies and economies of scale expected from the operations of the combined company," including "certain cost savings, operating efficiencies, and leverage of

the acquired brand recognition to be achieved as a result of the [the acquisition]." (*Id.* at 11.)  It specified that of the $5.08 billion, $4.19 billion was allocated to the Consumer Beauty segment. (*Id.*)  However, it noted that Coty was still evaluating the fair value of the assets assumed in the P&G acquisition, and that as it finalized its fair value estimates, additional adjustments may be recorded during the GAAP measurement period.[5]  (*Id.*)

During the following measurement period, Coty increased its estimated goodwill from the P&G acquisition to $5.56 billion but *lowered* its estimate for acquired Consumer Beauty goodwill to $3.19 billion—instead increasing its allocation to the Luxury segment by $1.55 billion. (*Compare id.*, *with* Ex. E, Q1 2018 10-Q, at 10-11.)  At the close of the measurement period, Coty's first quarter 2018 10-Q reported Coty's total net goodwill as of September 30, 2017, as $8.74 billion, with $4.81 billion allocated to the Consumer Beauty Segment, and reported Coty's other indefinite-lived intangible assets as $3.21 billion, with $1.63 billion allocated to the Consumer Beauty segment.  (*Id.* at 16-17.)

**D.     Throughout the Class Period, Coty Repeatedly Disclosed the Risks Associated With Its Use of Estimates, Its Impairment Tests for Goodwill and Other Intangible Assets, Its Integration of the P&G Beauty Business, and Its Digital Marketing and Sales Efforts**

Throughout the Class Period, in each of its quarterly and annual financial statements, Coty warned investors of the risks associated with estimating the value of its acquisitions, goodwill and

---

[5] GAAP provides that "[i]f the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the acquirer shall report in its financial statements provisional amounts for the items for which the accounting is incomplete." Fin. Acct. Standards Bd., *Business Combinations (Topic 805)*, *Simplifying the Accounting for Measurement-Period Adjustments*, FASB Accounting Standards Update No. 2015-16, at 3 (2015) (ASC 805-10-25-13), https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=117616 6411212&acceptedDisclaimer=true.  The company must adjust its provisional estimates during the subsequent measurement period when it obtains the necessary information to adequately measure the value of the acquired assets. *Id.*  The measurement period ends as soon as the company receives the information it was seeking and shall not exceed one year. *Id.* (ASC 805-10-25-14).

other intangible assets:

> *Use of Estimates*
>
> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions . . . Significant accounting policies that contain subjective management estimates and assumptions include those related to . . . the fair value of acquired assets and liabilities associated with acquisitions, . . . [and] the assessment of goodwill, other intangible assets and long-lived assets for impairment . . . . As future events and their effects cannot be determined with precision, actual results could differ significantly from those estimates and assumptions.

(Ex. F, Q1 2017 10-Q, at 7-8.)[6]

Coty's annual Form 10-Ks from the Class Period explained the factors that it uses in evaluating goodwill and other intangible assets for impairment and further warned investors of the risks that these assets could be impaired:

> **Goodwill, Other Intangible Assets and Long-Lived Assets**
>
> Testing goodwill for impairment requires us to estimate fair values of reporting units using significant estimates and assumptions. The assumptions made will impact the outcome and ultimate results of the testing.
>
> . . .
>
> We believe the assumptions used in calculating the estimated fair value of the reporting units are reasonable. However, ***we can provide no assurances that we will achieve such projected results.*** Further, ***we can provide no assurances that we will not have to recognize additional impairment of goodwill in the future*** due to other market conditions or changes in our interest rates. Recognition of additional impairment of a significant portion of our goodwill would negatively affect our reported results of our operations and total capitalization.
>
> *Other Intangible Assets*
>
> An impairment loss is recognized when the estimated fair value of the intangible asset is less than the carrying value. Fair value calculation requires significant judgments . . .

---

[6] *See also* Ex. D, Q2 2017 10-Q, at 9; Ex. G, Q3 2017 10-Q, at 9; Ex. H, 2017 10-K, at F-9; Ex. E, Q1 2018 10-Q, at 7; Ex. I, Q2 2018 10-Q, at 8; Ex. J, Q3 2018 10-Q, at 8; Ex. K, 2018 10-K, at F-9; Ex. L, Q1 2019 10-Q, at 7; Ex. M, Q2 2019 10-Q, at 7; Ex. N, Q3 2019 10-Q, at 9.

. . .

We believe the assumptions used in calculating the estimated fair value of the trademarks are reasonable and attainable. However, *we can provide no assurances that we will not have to recognize additional impairment of indefinite-lived intangible assets in the future* due to other market conditions or changes in our interest rates.

(Ex. H, 2017 10-K, at 54-55; Ex. K, 2018 10-K, at 57-59 (emphasis added).)

Similarly, throughout the Class Period, Coty specifically warned investors of the risks associated with its integration of the P&G Beauty Business.  For example, Coty cautioned investors:

If our management is not able to effectively manage the [P&G] integration process . . . or if any significant business activities are interrupted as a result of the integration process, our business, prospects, financial condition and results of operations, cash flows, as well as the trading price of our securities may be materially adversely affected. . . . *We can provide no assurances that we will be able to successfully manage integration and operation of the P&G Beauty Business* thereafter, which could increase costs and management distraction. The amount and timing of the above-referenced charges and management distraction could further adversely affect our business, prospects, financial condition, results of operations, cash flows, as well as the trading price of our securities.

(Ex. H, 2017 10-K, at 8 (emphasis added); *see also* Ex. F, Q1 2017 10-Q, at 60; Ex. D, Q2 2017 10-Q, at 63; *see also* AC ¶¶ 124-30.)  Coty also warned investors:

Certain statements in this Form 10-K are "forward-looking statements" within the meaning of the [PSLRA]. These forward-looking statements reflect our current views with respect to, among other things, . . . synergies, savings, performance, cost, timing and integration relating to our recent acquisitions . . . (including the P&G Beauty Business).

. . .

These statements are based on certain *assumptions and estimates* that we consider reasonable, but are *subject to a number of risks and uncertainties, many of which are beyond our control*, which could cause actual events or results (including our financial condition, results of operations, cash flows and prospects) to differ materially from such statements, including risks and uncertainties relating to . . . the continued integration of the P&G Beauty Business and other recent acquisitions with our business, operations, systems, financial data and culture and *the ability to realize synergies*, *avoid future supply chain and other business disruptions*, reduce costs and realize other potential efficiencies and benefits (including through our restructuring initiatives) at the levels and at the costs and *within the time frames*

8

***contemplated or at all***[.]

(Ex. K, 2018 10-K, at i (emphasis added).)[7]

Finally, throughout the Class Period, Coty specifically warned investors of risks associated with its digital marketing and sales efforts:

> If we are not successful in ***our digital transformation efforts or otherwise increase digital presence and grow our e-commerce activities***, we will not be able to compete effectively.

(Ex. K, 2018 10-K, at 6; Ex. M, Q2 2019 10-Q at 63.)[8]

### E.   Throughout the Class Period, Coty Updated Shareholders About Its Challenges Integrating P&G and Its Difficulties in Consumer Beauty

Throughout the Class Period, Coty continued to keep shareholders informed of the challenges it faced with respect to integrating the P&G Beauty Business.

First Quarter 2017.  Coty disclosed that, while "we anticipated that we would incur charges of an aggregate of approximately $500 million and capital expenditures of approximately $400 million" when the P&G acquisition was first announced, "[w]e currently anticipate that we will incur a total of approximately $1.2 billion of operating expenses and capital expenditures of approximately $500 million."  (Ex. F, Q1 2017 10-Q, at 60.)  During the quarterly investor earnings call, then-chief financial officer ("CFO") Patrice de Talhouët explained that, with respect to synergies from the P&G acquisition, the "amount that has been transferred to us is lower because P&G had actually anticipated . . . [and] made some cost savings already on their structure."  (Ex. S, Q1 2017 Earnings Call Tr., at 17.)

---

[7] *See also* Ex. D, Q2 2017 10-Q, at 59; Ex. G, Q3 2017 10-Q, at 62; Ex. H, 2017 10-K, at i; Ex. E, Q1 2018 10-Q, at 44-45; Ex. I, Q2 2018 10-Q, at 30; Ex. J, Q3 2018 10-Q, at 35; Ex. L, Q1 2019 10-Q, at 28; Ex. M, Q2 2019 10-Q, at 30; Ex. N, Q3 2019 10-Q, at 33; Ex. O, Q4 2017 8-K, at 7; Ex. P, Q4 2018 8-K, at 9-10; *see also* AC ¶¶ 133-38.

[8] *See also* Ex. K, 2018 10-K, at i; Ex. L, Q1 2019 10-Q, at 28; Ex. P, Q4 2018 8-K, at 9; Ex. Q, Q1 2019 8-K, at 6-7.; Ex. J, Q3 2018 10-Q at 35; Ex. R, Q3 2018 8-K, at 6.

Mr. Becht explained that the P&G integration had "caused distraction and ha[d] caused us to lose momentum," and further noted that because "18 months prior to the announcement of the transaction, it was known internally that this business would be divested" from Procter & Gamble Company, "there has been a material level of neglect from this businesses [sic], which we are trying to understand."  (*Id.* at 8, 10.)  Finally, he explained that the Cover Girl, Max Factor and Sally Hansen brands "are key," but that "improving the[ir] momentum," would "take a bit longer than the . . . luxury [trademarks]."  (*Id.* at 14.)

Second Quarter 2017.  Coty reported that Consumer Beauty net revenues declined 11% compared to combined Coty and P&G Beauty Business net revenues in the prior-year period.  (Ex. T, Q2 2017 8-K, at 5.)  Camillo Pane, then-chief executive officer ("CEO"), explained that "Q2 was a challenging quarter" because "[t]he business was impacted by significantly higher-than-anticipated inventory levels in the market on the acquired P&G Beauty Business, competitive pressure in the Consumer Beauty Division and the distraction associated with integration efforts."  (*Id.* at 2; Ex. A, Q2 2017 Earnings Call Tr., at 4; AC ¶¶ 40, 42, 73.)  He further explained that "I have initiated additional changes as I'm not satisfied with the underlying performance of several parts of the business" and that "fiscal 2017 is a transitional year" but "we've already started to tackle the growth challenges of our business."  (Ex. T, Q2 2017 8-K, at 2.)

Third Quarter 2017.  Mr. Pane reported "continued negative performance" and "continued underlying challenges" in Consumer Beauty and reiterated that "fiscal '17 will be a transitional year, the path to recovery will take some time and will not be a straight line."  (Ex. U, Q3 2017 Earnings Call Tr., at 4-5; *see also* Ex. V, Q3 2017 8-K, at 2 (similar language).)  He explained that "[t]he divisions are in different states" and that while he expected improvement in Luxury and positive performance in Professional, "Consumer Beauty will take time."  (Ex. U, Q3 2017 Earnings Call

Tr., at 10-11.)  He also discussed a loss of shelf space for the Covergirl, Clairol, and Max Factor brands, which he said "will last for a while" and "certainly . . . for a few more quarters."  (*Id.* at 9.) And with respect to e-commerce, Mr. Pane explained that "we are now in the range of 30% in terms of digital spending as a percentage of total media."  (*Id.* at 13.)

Mr. Talhouët explained that Coty "completed the first stage of our 3-stage exit from the Transitional Service Agreement or TSA with P&G" for North America and that "work is still underway to prepare for the Stage 2 exit, TSA, in Europe."  (*Id.* at 7.)  "With regard to the synergies," he explained, "we have now realized close to $100 million in synergies in fiscal '17 year-to-date versus the full year estimate of approximately $350 million."  (*Id.* at 8.)

Fourth Quarter and Full Year 2017.  Mr. Pane announced that Q4 revenues declined 3%, reflecting "very good growth in both Luxury and Professional Beauty, but continued weakness in Consumer Beauty."  (Ex. W, Q4 2017 Earnings Call Tr., at 4.)  He explained that the global consumer beauty industry was in decline and "[a]gainst this weak market backdrop, Coty Consumer Beauty net revenue are being furthered pressure [sic] by the shelf space losses in the U.S. and Europe."  (*Id.* at 5.)  Mr. Talhouët described Coty's financial performance as a "journey towards growth."  (*Id.* at 8.)

First Quarter 2018.  Mr. Pane reported that he was "not happy with the Consumer Beauty division performance to-date" and that "it will still take time for the full recovery" of the division. (Ex. X, Q1 2018 Earnings Call Tr., at 5.)  He reiterated that "we are defining [] 2018 as a year of stabilization and that's why we believe our sales in the second half will be roughly comparable with previous year."  (*Id.* at 11.)  Mr. Pane reported that Coty was growing e-commerce "at a healthy, above-the-market rate . . . although from a low base."  (*Id.* at 10.)

Mr. Talhouët disclosed that Coty completed the exit of the third stage of its TSA with

Procter & Gamble Company and that "[w]ith TSA behind us, we will now work on completion of the integration." (*Id.* at 6.) However, Mr. Pane explained that "we have inherited a business . . . smaller in operating margin than our expectation at the time of the roadshow" and that "[b]ecause of this, . . . combine[d] also with the business challenges we have faced last year . . . we believe it will take us longer to get to the $1.53 earnings-per-share target by fiscal year 2020." (*Id.* at 8.)

Second Quarter 2018. Mr. Pane reported that "Q2 has shown improvement for Consumer Beauty" but "it will still take time for full recovery," and "results are likely to be uneven from quarter-to-quarter." (Ex. Y, Q2 2018 Earnings Call Tr., at 6.) He reiterated that 2018 is "a year of stabilization" and that "[t]here is still much to do as we need to relaunch many brands, deliver our synergies and continue with our integration of the P&G Beauty Business." (*Id.*) He also expressed confidence that progress and commitment would "continue to move Coty gradually into the path of full recovery." (*Id.*) As to shelf space and advertising, he reported that "we expect our shelf space to be overall flat" and "we don't expect our advertising investment to drastically go up versus the level that we mentioned in the past of 25%, 26%." (*Id.* at 13.) He also reported that North American sales for Consumer Beauty were "definitely affected by an international decrease of our inventory" ahead of the planned relaunch of the CoverGirl and Clairol brands. (*Id.* at 15.)

Third Quarter 2018. Mr. Pane reported that Consumer Beauty "continues its uneven performance" given "a challenged mass beauty market and competitive pressure," and that "it will still take time for the full recovery." (Ex. Z, Q3 2018 Earnings Call Tr., at 4.) On brands, he reported that after the relaunch of CoverGirl it had "gone from primarily double-digit declines prior to relaunch to a low single-digit decline" but that "only 30%, 40% of the new product is on the shelf today," and that Clairol is similarly "still declining" but not as much as before the relaunch. (*Id.* at 12.) On advertising, Mr. Pane explained that "we remain confident in our . . . approximately 25%

of the marketing as a percentage of net revenues, [as] the right level that we need . . . ." (*Id.* at 15.)

Coty's 10-Q reported that: "[T]he diversion of resources to the integration of the P&G Beauty Business and the exit of all three stages of our transition services agreement with P&G . . . in fiscals 2017 and 2018 together with recent changes in our management teams as we reorganized our business, negatively impacted our fiscal year 2017 results." (Ex. J, Q3 2018 10-Q, at 67.)

<u>Fourth Quarter and Full Year 2018</u>.  Coty reported that Consumer Beauty net revenues declined 4% on a like-for-like basis and that "it is clear that the recovery is taking longer than expected." (Ex. P, Q4 2018 8-K, at 4-5.)  Mr. Pane cited "declines in the mass beauty category in [Europe and North America], aggressive competitive activity and supply chain disruption."  (Ex. AA, Q4 2018 Earnings Call Tr., at 5.)  He warned that the impact of supply chain restraints would peak in the next quarter, Q1 2019, and continue into the following quarter, Q2 2019.  (*Id.* at 7-8.) He emphasized that "we view fiscal '19 as an important step in the right direction to achieve our medium-term ambitions," and explained that Coty planned for "a fiscal '19 adjusted EPS target of $0.74 to $0.78." (*Id.* at 5.)  Mr. Pane reported "risk to our shelf space in fiscal '19" for Covergirl and "moderate[d]" decline in the U.S. for Clairol.  (*Id.* at 6-7.)  On advertising, he explained that "now over 30%" of media spending "is focused on digital," and that he expected advertising and consumer promotion spending to "remain in the mid-20s percentage."  (*Id.* at 12-13.)

On the P&G integration targets, Mr. Pane reiterated that "the original targets . . . discussed before the closing of the P&G transactions are not relevant anymore."  (*Id.* at 16.)  He explained three reasons for the difference in "our medium-term outlook versus the original numbers": (1) Coty "inherited a smaller business," because it "became smaller" during "the 16 months between the day of the announcement, July 15, and the day we took over the business, October 16"; (2) Coty "ha[s] faced the headwinds and challenges," including "the loss at the decline that we had

in the Consumer Beauty over the last 18 months," which "is something that we have to deal with because the market conditions have changed"; and (3) "the organization was designed for a larger business and clearly, with a higher fixed cost base," "[h]ence the restructuring, the cost-saving program that I'm announcing today with the $250 million of one-off charges." (*Id.*)

Coty's 10-K reported that a "diversion of resources to the integration of the P&G Beauty Business" and the exit of the TSA, along with recent management changes, "negatively impacted our fiscal year 2017 and 2018 results," and "we incurred significantly higher costs in the fourth fiscal quarter of 2017 due, in part, to the lack of visibility into the operating cash needs of the P&G Beauty Business while the [TSA] was in place." (Ex. K, 2018 10-K, at 7-8.)

First Quarter 2019.  Coty reported a 14% like-for-like decline in Consumer Beauty net revenues.  (Ex. Q, Q1 2019 8-K, at 4.)  Mr. Pane cited "disappoint[ing] supply chain disruptions" and explained that while Coty has been "working hard to remedy" the issues, "we do not expect to fully recover the Q1 financial impact in the balance of fiscal '19."  (Ex. BB, Q1 2019 Earnings Call Tr., at 4.)  He noted that "Consumer Beauty remains challenged" with "high single-digit decline" and "mixed morale" and that its performance "remains well below our goals of stabilization and predictability."  (*Id.* at 4, 7, 13, 15.)  Mr. Pane explained that synergies delivered "were more than offset by the supply chain-related headwinds, which we estimate impacted operating income by about $60 million despite the underlying deterioration in Consumer Beauty."  (*Id.* at 5.)  On brands, Mr. Pane explained that CoverGirl "continues to have performance in the mid-single-digit decline while the rest of the brands is more of a high single-digit decline in the U.S."  (*Id.* at 10.)  On the P&G integration, he noted that "we have done 80% of the integration" and that "the remaining 20%" does not "hav[e] a lot of cost savings attached."  (*Id.* at 12.)

14

F.     **Coty Performed an Interim Impairment Test and Recorded Impairment Charges in the Second Quarter of 2019 and Continued to Update Investors on Its Financial Performance**

On February 8, 2019, Coty filed its Form 10-Q for the second quarter of its 2018 fiscal year. (Ex. M, Q2 2019 10-Q.)  Coty recorded a goodwill impairment charge of $832.5 million, a $90.8 million impairment charge to indefinite-lived other intangible assets and a $7 million impairment charge to finite-lived other intangible assets.  (*Id.* at 16.)  It explained that:

> In the course of evaluating the results for the second quarter of fiscal 2019, the Company noted the cash flows associated with its Consumer Beauty reporting unit were adversely impacted by negative category trends and market share losses . . . ; expected increased costs in the short-term to offset the lower service levels caused by supply chain disruptions; and lower than expected net revenues and profitability for Younique. Additionally, the Company considered the impact of a 75 basis point increase in the discount rate, which adversely affected the fair value of the reporting unit. Management concluded that these adverse factors represented indicators of impairment that warranted an interim impairment test for goodwill and certain other intangible assets in the Consumer Beauty reporting unit.

(*Id.*)  Coty also disclosed in the 10-Q: "We have experienced challenges in connection with the [P&G] integration, including supply chain disruptions, higher than expected costs and lost customers and related revenue and profits."  (*Id.* at 64.)  And that "[t]he cash usage associated with such, and similar, expenses has impacted and could continue to impact our ability to execute our business strategies, improve operating results and deleverage our balance sheet."  (*Id.*)

On the same day the 10-Q was filed, Coty held its quarterly earnings call, which was the first earnings call for newly appointed CEO Pierre Laubies and newly appointed CFO Pierre-André Terisse.  (Ex. CC, Q2 2019 Earnings Call Tr., at 4.)  Mr. Laubies reported that supply chain disruptions resulted in "nearly $150 million of less net revenues" in the first half of 2019, "represent[ing] the majority of the impact we expect for the year."  (*Id.* at 6.)  He reported that Consumer Beauty recorded "second quarter like-for-like results of negative 7.3%" and that the "weak results[] indicat[e] that we still have much work to do to achieve stabilization."  (*Id.* at 7.)

15

Mr. Laubies explained that "the $965 million non-cash impairment charge that we are taking this quarter primarily connected with the Consumer Beauty division and selected brand trademarks" because (1) "[t]he Consumer Beauty division has experienced increased competitive and market pressure throughout the first half of fiscal '19 . . . result[ing] in weaker-than-expected revenue and earnings," and (2) "the discount rate associated with the division has also increased in the quarter." (*Id.* at 8.)  "Based on these 2 adverse factors," he explained, "management determined that they were indications that the goodwill of this division as well as certain trademarks, intangible asset may be impaired," and "accordingly, an interim goodwill impairment test was performed as of December 31, 2018," resulting in the charges.  (*Id.*)

Mr. Terisse, providing his first remarks as CFO, explained his key priorities for the remainder of the year as: resolving supply chain issues, "work[ing] towards delivering the [provided] profit target," and, along with Mr. Laubies, "spend[ing] the next few months assessing the risks and opportunities of the business and building medium-term plans with a focus on gross margin, adjusted operating income and free cash flow."  (*Id.* at 9.)

### G.    Coty Updated Investors on Its Recovery Efforts in the Third Quarter of 2019

On the third quarter 2019 earnings call, Mr. Laubies reported that, while "supply chain issues are largely resolved" and performance shows "increased control . . . over our cost structure," "the weak top line shows that there is still much to be done to turn around the business, specifically in Consumer Beauty."  (Ex. DD, Q3 2019 Earnings Call Tr., at 5.)  "Our focus now," he stated, "is to ensure that we have a reliable strategy going forward," which "should be completed towards the end of June."  (*Id.*)  Mr. Terisse elaborated that "[i]n Consumer Beauty, the third quarter like-for-like decline of 10% . . . impl[ies] a high-single-digit underlying like-for-like decline in both the third quarter and year-to-date," and that "our brands remained pressured by continued weaknesses in the global mass beauty markets, particularly in the U.S. and Europe, even as we continue to see

moderation in the pace of our share losses."  (*Id.* at 6.)

**H.      Coty Performed an Annual Impairment Test and Recorded Impairment Charges in the Fourth Quarter of 2019**

On July 1, 2019, Coty issued a press release announcing a new Turnaround Plan to "drive substantial improvement in Consumer Beauty."  (Ex. EE, July 1, 2019 8-K, at 1.)  Mr. Laubies explained that "[o]ver the past few months, we have focused on both stabilizing our operations and identifying a path towards turning around the company" and that as part of the Turnaround Plan, "we are intent on setting realistic targets and delivering them."  (*Id.*)

The press release further explained that "Coty is in the process of completing its annual testing for impairment in light of the Turnaround Plan and related projections, and expects to record an impairment of its intangible assets of approximately $3 billion."  (*Id.* at 3.)  It provided that "the final amount will be reflected in Coty's Fiscal Year 2019 earnings."  (*Id.*)

On a special investor call the same day, Mr. Terisse explained that the expected $3 billion impairment reflected "a large talking point [ ] as well as more realistic expectations."  (Ex. FF, July 1, 2019 Investor Call Tr., at 4).  A slide from the presentation titled "How We Got to This Point: A Difficult Merger," explained "What Went Wrong" in three points: (1) "P&G Beauty integration [took] longer and more complex than originally envisioned," (2) "[u]nderestimation of the negative trends of the acquired business" and (3) "[s]ustained commitment to early financial targets did not allow management to fully address underlying trends."  (Ex. EE, July 1, 2019 8-K, at 8.)

On August 28, 2019, Coty filed its annual 10-K for its 2019 fiscal year.  (Ex. GG, 2019 10-K.)  The 10-K confirmed that Coty recorded a goodwill impairment charge of $2.59 billion and an impairment charge of $202 million to indefinite-lived other intangible assets.  Coty disclosed that:

> The cash flows associated with our Consumer Beauty reporting unit were adversely affected by factors that developed during the fourth quarter of fiscal 2019 including fourth quarter net revenue results and market share trends that were below expectations, continued net revenue and profitability declines for Younique in

excess of management's expectations, and the development of our Turnaround Plan to stabilize operations and improve profitability. The Turnaround Plan impacted the projected cash flows associated with the Consumer Beauty reporting unit by lowering revenue growth and, in the near term, margin expectations. . . . Overall, these factors negatively impacted the cash flows of the Consumer Beauty reporting unit and resulted in a decrease in our assumed terminal growth rate, which also adversely affected the fair values.

(*Id.* at 49.)   The 10-K explained that similar factors led to the impairment charge related to indefinite-lived other intangible assets for Coty's CoverGirl, Max Factor, Sally Hansen, Bourjois, Clairol and two regional Brazilian trademarks.  (*Id.* at 50-51.)

## I.      **Plaintiff's Amended Complaint**

On July 31, 2020, Plaintiff filed an amended putative class action complaint alleging claims against Defendants under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, alleging that the Company made false and misleading statements relating to (1) Coty's integration of the P&G Beauty Business, including statements related to digital marketing and sales efforts to capitalize on the acquired brands, and (2) Coty's goodwill and intangible asset impairment tests and related impairment charges during its 2019 fiscal year.  (*See* AC ¶¶ 72, 77, 80, 84, 89, 91, 95, 97, 102, 107, 111, 115, 118, 121, 122, 141, 184, 202, 208.)

## **ARGUMENT**

To state a Section 10(b) or a Rule 10b-5 claim, a plaintiff must establish that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 237-38 (S.D.N.Y. 2006) (Stanton, J.), (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).  To meet "the [pleading] tests of Rule 9(b) and the PSLRA," Plaintiff must allege "with particularity the specific facts in support of [their] belief that

[defendants'] statements were false when made." *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004). A complaint alleging misleading statements or omissions under Section 10(b) must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Leykin*, 423 F. Supp. 2d at 238.

## I. PLAINTIFF FAILS TO ALLEGE ANY ACTIONABLE FALSE OR MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5

### A. Plaintiff Has Not Identified Any False or Misleading Statement

#### 1. Statements Concerning the Integration of the P&G Beauty Business Were Not False or Misleading

The Complaint critiques certain statements made by Coty during the Class Period relating to the integration of P&G Beauty Business (*see, e.g.,* AC ¶¶ 37-122),[9] claiming that these statements "[f]ailed to disclose that Coty did not have adequate infrastructure to smoothly integrate P&G's Beauty Business, including an adequate supply chain" and "that the integration issues, including supply chain issues, were pervasive, already existing, and continuing, and not 'short-term.'" (*See e.g., id.* ¶¶ 72, 77, 102, 107, 111, 118; *see also id.* ¶¶ 80, 84, 89, 95.) These conclusory allegations, however, are at odds with Coty's actual disclosures regarding the integration of the

---

[9] As a threshold matter, the Individual Defendants cannot be held primarily liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b) to the extent that they did not make a challenged statement. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43, 146-48 (2011). Since Mr. Talhouët and Mr. Pane departed in September and November of 2018, respectively (AC ¶¶ 22, 24), and Mr. Becht stepped down as Board Chairman in November 2018 (*id.* ¶ 21), while Mr. Laubies became CEO in November 2018 and Mr. Terisse became CFO in February 2019 (*id.* ¶¶ 23, 25), the Individual Defendants cannot be held liable for statements made when they were not Coty executives. *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 189-90 (4th Cir. 2009). Further, the Complaint offers only conclusory—and therefore insufficient—allegations that these Individuals engaged in so-called "scheme" liability under Rules 10b-5(a) and (c). (*See* AC ¶¶ 220-23.)

P&G Beauty Business, which were clear and iterative, and the Complaint contains no facts indicating that Coty's disclosures were false when made.

*First*, Plaintiff's allegations of falsity are not consistent with Coty's actual disclosures. The Court should consider Plaintiff's allegations in light of the surrounding disclosures and context of the statements on which Plaintiff attempts to rely. *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 12 (2d Cir. 2019) ("Whether a statement is misleading is evaluated not only by the 'literal truth' of the statement but also 'by [the] context and manner of presentation'"); *Martin v. Quartermain*, 732 F. App'x 37, 41-42 (2d Cir. 2018) (a court "must consider the statements at issue 'in light of all [ ] surrounding text, including hedges [and] disclaimers'") (quoting *Omnicare*, 575 U.S. at 190). Further, "[t]he Court need not accept allegations that . . . upon a full reading, point in the opposite direction." *Johnson v. Sequans Commc'ns S.A.*, No. 11 Civ. 6341(PAC), 2013 WL 214297, at *11 (S.D.N.Y. Jan. 17, 2013).

Contrary to these principles, the Complaint takes liberties with Coty's disclosures, repeatedly complaining that Coty falsely stated that integration issues were "short-term." (*See* AC ¶¶ 2, 5-6, 8, 10, 40, 43, 73, 142.) But Coty did not characterize the integration issues as "short-term." Instead, it noted "short-term negative transitional impacts," emphasizing that "the complexity of the merger, the sheer magnitude of this integration and simultaneous reorganization of our total company have impacted our organization and our short-term results." (*See id*. ¶ 142; Ex. A, Q2 2017 Earnings Call Tr., at 3.) Consistent with these disclosures, Coty later discussed "short term supply chain disruptions," (AC ¶¶ 60, 101,) which it largely resolved in the following months. (*See id.* ¶¶ 9, 70, 117.) The Complaint pleads no facts suggesting that Coty's repeated disclosures regarding supply-chain issues were false when made.[10] Indeed, Plaintiff concedes that

---

[10] *See e.g.*, AC ¶¶ 5, 8-9, 40, 60-63, 66-67, 70, 73, 101, 103-05, 108-09, 114, 117, 142, 146, 153.

Coty explicitly told investors that such issues would "resolve in the third quarter of fiscal 2019," and Plaintiff does not allege that this statement was false or that supply and inventory issues were not resolved by the end of the third quarter of fiscal 2019.

Similarly, Plaintiff alleges that during the February 8, 2019 call, "Coty finally admitted that it had not achieved the synergies from the P&G acquisition that the Company had touted for several years, and so had not realized the savings the integration was supposed to bring." (*Id.* ¶¶ 68, 110.) But this purported admission is nowhere to be found in the February 8, 2019 Call Transcript. To the contrary, Coty explained that it "[was] on track" to achieve the synergies it was expecting for the year. (Ex. CC, Q2 2019 Earnings Call Tr., at 13.)

Plaintiff also misleadingly claims that "Coty did not disclose on November 9, 2016 in either its SEC filings or in its November 9, 2016 earnings conference call, . . . that material integration issues had already materialized before November 9, 2016, but three months later they would state that integration problems had been present 'in the first semester,' *i.e.*, before November 9, 2016." (AC ¶ 39; *see also id.* ¶¶ 40, 73.) But again, these snippets are not faithful to the actual quote. In the February 9, 2017 press release, Mr. Pane explained that realizing Coty's "future potential" "is a long term journey and will require time and effort, as we will need to tackle short term challenges like the ones we faced in the first semester, complete the P&G Beauty Business integration and most importantly implement new programs to drive growth and further strengthen our brand portfolio and management capabilities." (Ex. T, Q2 2017 8-K, at 2.) Mr. Pane thus did not attribute the "short term challenges" of the "first semester" specifically to integration issues, but instead listed completing the integration as a goal separate from those challenges. (*Id.*) And he certainly did not state that the referenced challenges were present on November 9, 2016 as Plaintiff alleges with no support. (AC ¶ 39.) These mischaracterized disclosures fail to state a claim. *See S.C. Ret.*

*Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) ("Considering [the statement] in full—rather than considering the edited version that plaintiff provides in its brief—[demonstrates that] no misrepresentation or omission occurred."); *Ross v. Lloyds Banking Grp., PLC*, No. 11 Civ. 8530(PKC), 2012 WL 4891759, at \*7 (S.D.N.Y. Oct. 16, 2012) (dismissing claims premised on "selective[] quotes"), *aff'd*, 546 F. App'x 5 (2d Cir. 2013).[11]

*Second*, there is no inconsistency between statements regarding the progress of the integration,[12] including that the integration is "proceeding well," "remain[s] on track," and is "near completion,"[13] and statements disclosing integration challenges, including statements that "the integration took longer and was more complex than originally envisioned" (AC ¶ 151), or that "the merger has led to . . . financial setbacks for Coty."[14]   (*Id.*)  In no sense is a statement regarding the progress of the integration a guaranty against future risks.  Judge Rakoff's decision in *In re Razorfish, Inc. Securities Litigation* is instructive.  There, as here, the plaintiff alleged that a global technology company violated Sections 10(b) and 20(a) by making false and misleading statements about the progress of its ongoing post-merger integration, including that it was both "successful" and "complete."  *In re Razorfish, Inc. Sec. Litig.*, No. 00 CIV. 9474 (JSR), 2001 WL 1111502, at \*1 (S.D.N.Y. Sept. 21, 2001).  Judge Rakoff rejected the claim and held that the word "'***integration***'

---

[11] Plaintiff also takes out of context Mr. Talhouët's May 2017 statement that "'[we] have now fully integrated the legacy P&G Beauty Business into Coty's system,' calling it a 'tremendous achievement.'"  (AC ¶¶ 45, 79.)  Mr. Talhouët was only referring to "the first stage of our 3-stage exit from the Transitional Service Agreement," the exit for North America, which "account[s] for close to 1/3 of the combined company revenues."  (Ex. U, Q3 2017 Earnings Call Tr., at 7.)

[12] *See, e.g.,* AC ¶¶ 2, 5-9, 37, 40, 42-43, 45-47, 49, 51-52, 54-56, 60-62, 70-71, 73-74, 78-79, 81-82, 87-88, 92-94, 101, 103-05, 109, 117, 142, 144, 146.

[13] *See* AC ¶¶ 7, 8, 46-47, 62, 81-82, 104, 144, 146.

[14] *See also* AC ¶¶ 2, 5-10, 40, 42, 46, 49, 54-55, 60-62, 66-67, 70, 73, 92, 94, 101, 103-05, 108-10, 112-14, 117, 142, 144, 146, 148-152, 155-56.

***is far too loose and uncertain a term on which to premise a claim of securities fraud***." *Id.* at *2 (emphasis added). The same conclusion is warranted here. Nothing about the Company's disclosures contained any type of guarantees that the integration would not present challenges or adversely affect the Company's operations. Indeed, Coty's actual statements continuously disclosed the challenges presented by this "incredibly complex acquisition" (AC ¶¶ 46, 81, 144), as well as the effects and impact of these challenges on the Company's operations and financial performance.[15]

*Third*, Plaintiff's own allegations make clear that Coty kept investors apprised of the challenges that the integration presented throughout the Class Period and warned investors that Coty might not "be able to successfully manage integration and operation of the P&G Beauty Business" and that significant issues might arise. (*See* AC ¶¶ 123-25; *see also, e.g., supra* p. 22 n.14.) Thus, "[a]n examination of [Coty]'s statements in their full context illustrates the inadequacy of Plaintiff's fraud allegations." *FedEx Corp.*, 2021 WL 396423, at *9 (S.D.N.Y. Feb. 4, 2021). As explained above, from the first press release announcing the acquisition, Coty warned of the inherent risks associated with the integration and operation of the P&G Beauty Brands. (*See supra* pp. 5-9.) As Plaintiff concedes, Coty continued to disclose integration-specific risks throughout the Class Period, including (1) in November 2018, when it stated that the Company still had "much work to do to achieve stabilization" and that "it will take some time" to "return Coty to a path for

---

[15] The Complaint also pleads no facts suggesting that Coty's disclosures regarding its synergy goals were false when made and makes no effort to explain how statements that "the first half of [Coty's] synergies commitment has been delivered as planned by FY18," (AC ¶¶ 60, 101,) or that there was "a healthy synergy delivery already in 1Q19," (*id.* ¶¶ 62, 104), contradict the Company's later announcement of impairment charges. Similarly, Plaintiff does not dispute that statements that Coty "had control of [its] data, processes, and systems," (*id.* ¶¶ 52, 87; *see also id.* ¶¶ 51, 88), or that it "broadened the scope, including further go-to-market changes, systems enhancements and more complete one order, one shipment, one invoice," (*id.* ¶¶ 56, 93) were accurate when made.

growth" given "the difficult trajectory of our Consumer Beauty division" (AC  ¶¶ 180, 198); (2) in August 2018, when it stated that "the peak" of integration-related supply issues would continue until "the end of first half 2019" (*id.* ¶¶ 60, 101); and (3) in February 2019, when it stated that the Luxury and Professional Beauty divisions "cannot compensate . . . for the difficult trajectory of our Consumer Beauty division" and that Coty was "realistic that it will take time to achieve this outcome." (*Id.*  ¶¶ 67, 109.)  Such disclosures are fatal to Plaintiff's claims.  *See FedEx Corp.*, 2021 WL 396423, at *10 ("[T]he documents incorporated into the Complaint by reference make clear that Defendants contextualized their professed commitment to the income target with numerous disclosures about . . . the risks inherent in the [merger] integration process.").

Further, these disclosures make clear that the Company's July 2019 announcement of a "Turnaround Plan" and an additional impairment was far from a revelation of undisclosed issues.[16] As Plaintiff concedes, "[a] review of Coty's SEC filings and public statements reveals that Coty recognized the need for, and was engaged in, turnaround efforts during the earlier periods [before July 2019]."  (AC ¶ 179.)  Therefore, the announcement of the Turnaround Plan was entirely consistent with management's continuous efforts to counter the integration challenges the Company repeatedly and timely disclosed to investors.  (*See, e.g., supra* p. 22 n.14.)  *Cf. In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *24 (S.D.N.Y. Apr. 2, 2020) ("The facts alleged in the [complaint] show that, at the time that [the defendant] took the goodwill impairment charge in the second quarter, [the defendant] had already disclosed a multitude of challenges. . .").

*Finally*, Coty's "warnings of continually increasing integration expenses at every juncture during the Class Period belie any claim of concealment."  *FedEx Corp.,* 2021 WL 396423, at *14. For example, on the first day of the Class Period, Coty's 10-Q disclosed that Coty nearly doubled

---

[16] *See e.g.*, AC ¶¶ 10, 11, 148-152, 178-180, 195-97.

its anticipated costs associated with the P&G acquisition—from $500 million plus an additional $400 million in capital expenditures to $1.2 billion plus $500 million in capital expenditures.  (Ex. F, Q1 2017 10-Q, at 60.)  The same day, Mr. Talhouët explained that, with respect to P&G, the "amount [of synergies] that has been transferred to us is lower" and "there has been a material level of neglect from this businesses."  (Ex. S, Q1 2017 Earnings Call Tr., at 10, 17.)  After Coty first estimated the value of Consumer Beauty goodwill from the P&G acquisition as $4.19 billion, it quickly lowered its estimate by $1 billion during the measurement period.  (*Compare* Ex. D, Q2 2017 10-Q, at 11, *with* Ex. E, Q1 2018 10-Q, at 10-11.)  On its subsequent earnings calls, Coty disclosed continued struggles with the integration.  (*See, e.g.*, Ex. X, Q1 2018 Earnings Call Tr., at 8 (announcing "it will take us longer to get to the $1.53" earnings-per-share target for the integrated company due to the fact that "we have inherited a business . . . smaller in operating margin than our expectation at the time of the roadshow" combined with "the business challenges we have faced last year"); Ex. AA, Q4 2018 Earnings Call Tr., at 16 (explaining reasons for the discrepancy in "our medium-term outlook versus the original numbers that were discussed before the transactions").)  Thus, Coty provided continuous updates to investors regarding the progress of the integration accompanied by data demonstrating the effect of the disclosed challenges to Coty's operations.  *See In re Gen. Elec. Sec. Litig.*, No. 19cv1013 (DLC), 2020 WL 2306434 at *14 (S.D.N.Y. May 7, 2020) ("Strikingly, the trends that plaintiffs rely on in alleging that GE should have more quickly written down its goodwill were all publicly disclosed to investors during the Class Period.") , *aff'd*, No. 20-1741, 2021 WL 357756 (2d Cir. Feb. 3, 2021); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) ("[D]isclosure requirements are not intended to attribute to investors a child-like simplicity.  Rather, investors are presumed to have the ability to be able to digest varying reports and data," (citation omitted)).

## 2.   Statements Concerning Coty's Digital Marketing Efforts Were Not False or Misleading

Plaintiff also takes issue with Coty's statements regarding its digital marketing efforts, including statements that the Company was "advancing [its] end-to-end digital transformation" (AC ¶¶ 58, 61, 98, 106) and "working very hard on digital innovation" (*id*. ¶¶ 53, 90), and that "positive results" were "linked" to the Company's "growth strategy," which included "accelerating end-to-end digital transformation, including e-commerce" (*Id*. ¶¶ 52, 86; Ex. X, Q1 2018 Earnings Call Tr., at 5).[17]  Plaintiff claims that Coty failed to disclose that it "was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices."  (AC ¶¶ 77, 80, 84, 89, 91, 95, 97, 102, 107 ; *see also id*. ¶¶ 111, 118.)[18]

Again, however, Plaintiff's claims do not comport with Coty's actual statements, which accurately reflected the Company's marketing strategies and related objectives, as well as the specific metrics of its spending.  Indeed, throughout the Class Period, Coty disclosed the percentage of its budget that was allocated to digital media.  (*See, e.g.*, Ex. U, Q3 2017 Earnings Call Tr., at 13 ("we are now in the range of 30% in terms of digital spending as a percentage of total media"); Ex. AA, Q4 2018 Earnings Call Tr., at 12-13 ("now over 30%" of media spending "is focused on digital,"

---

[17] *See also, e.g.*, AC ¶¶ 2, 4-6, 10, 41, 44, 48-49, 51-53, 56-58, 60-61, 68, 75-76, 78, 82-83, 85-86, 90, 94, 96, 98-100, 106, 110, 148, 150.

[18] Statements regarding Coty's plans after the close of the Class Period (*see e.g.*, AC ¶ 156) should not be considered by the Court.  *See In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant . . . is liable only for those statements made during the class period."). In any event, statements discussing that "the percentage of A&CP being digital is now close to that of our peers" or discussing the growth of Coty's e-commerce business (AC ¶ 156,) are consistent with Coty's disclosures throughout the Class Period discussing its ongoing efforts regarding digital marketing.  (*Infra* pp. 26-28.)

and spending for advertising and consumer promotions is expected to "remain in the mid-20s percentage").)  In addition, Coty's disclosures made clear that its efforts to "advanc[e]" or "accelerat[e]" its digital media goals were representations relating to Coty's future plans and growth strategy on which it was "working very hard." (*See, e.g.*, AC ¶¶ 41, 44, 53, 58, 61, 75, 78, 90, 98, 106; *see also id.* ¶¶ 57, 96.)  Plaintiff also ignores that Coty cautioned investors that it might not be "successful in [its] digital transformation efforts or otherwise increase digital presence and grow our e-commerce activities." (Ex. K, 2018 10-K, at 6.)

Plaintiff cannot now feign ignorance of these disclosures and assert that the July 2019 announcement of the Company's Turnaround Plan "revealed the falsity of Coty's pronouncements . . . that Coty had been focused on taking advantage of their 'end-to-end digital capabilities.'" (AC ¶ 150.)  Nothing in this announcement contradicts Coty's disclosures which discussed the Company's *ongoing* efforts relating to digital transformation.  (*See, e.g.*, AC ¶¶ 41, 44, 53, 57, 58, 61, 75, 78, 85, 90, 96, 98, 106.)  Further, the Complaint misleadingly asserts that during a special call on July 1, 2019, Defendant Terisse purportedly "highlighted that Coty's A&CP (advertising and consumer promotion) had for years been at a level below industry practices." (AC ¶ 150.)  Instead, Defendant Terisse noted that the Company's focus on "innovation" and "positive evolution of the mix and value . . . . is going to be further helped by higher A&CP, advertising, which we will drive to a level *more in line with industry practices*." (Ex. FF, July 1, 2019 Investor Call Tr., at 8.)  This is entirely consistent with the Company's disclosures noting that Coty was "working very hard on digital innovation."  (AC ¶¶ 53, 90.)  *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 109 (S.D.N.Y. 2020) ("[T]he obligation to disclose extends only . . . to facts necessary to render what was revealed to not be so incomplete as to mislead.  And as already explained, the challenged statements were not misleading.

[Defendant] had already disclosed to the market, and the market understood [the allegedly omitted facts].").

Moreover, Plaintiff offers no factual allegations showing that Coty's "digital marketing and sales efforts were inadequate." (AC ¶¶ 77, 80, 84, 89, 91, 95, 97, 102, 107, 111, 118.) Although Plaintiff may have wanted the Company to spend more on its marketing and sales efforts, her subjective criticisms regarding Coty's business decisions are insufficient to plead securities fraud. *See Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *7 (S.D.N.Y. Jan. 16, 2018) ("The securities laws . . . do not provide remedies for bad business decisions; they provide remedies only for fraud."), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019).

### 3. Coty's Estimates of Impairment of Goodwill and Intangible Assets Were Not False or Misleading

The Complaint also alleges that Coty committed securities fraud by failing to take an additional impairment of goodwill and intangible assets in February or May 2019, instead of July 2019, which purportedly rendered Coty's financial statements misleading. (*See e.g.*, AC ¶¶ 2, 9-12, 66-69, 108-12, 114-16, 118, 122, 148-52, 155; *see also id.* ¶¶ 157-208.) Plaintiff alleges no particularized facts whatsoever to support its conclusion regarding Coty's subjective accounting judgments, which are subject to especially stringent standards.

Estimates of goodwill "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Fait*, 655 F.3d at 110; *cf. In re Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 3338 (ER), 2017 WL 3278930, at *14 (S.D.N.Y. Aug. 1, 2017) (applying the same rule to other intangible assets). As such, goodwill and intangible asset balances are quintessential opinion statements, for which Plaintiff must satisfy the pleading standards articulated in *Omnicare, Inc. v. Laborers District Council*

*Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015).  *See Lucescu v. Zafirovski,* No. 09cv4691 (DLC), 2018 WL 1773134, at *12 (S.D.N.Y. Apr. 11, 2018) ("[E]stimates of goodwill . . . are statements of opinion, and understood as such by investors.").

Under *Omnicare*, a statement of opinion is not actionable unless: (1) the speaker does not hold the belief professed, (2) the facts supplied in support of the belief professed are untrue, or (3) the speaker omits information that makes the statement misleading to a reasonable investor.  *See Omnicare*, 575 U.S. at 186-87; *accord Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016).  "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."  *Omnicare*, 575 U.S. at 186.  Further, "[a] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'"  *Lucescu*, 2018 WL 1773134, at *7 (quoting *Tongue*, 816 F.3d at 210).  "[R]easonable investors 'understand that opinions sometimes rest on a weighing of competing facts,' and do 'not expect that every fact known to an issuer supports its opinion statement.'"  *Id*. (quoting *Tongue*, 816 F.3d at 210). Accordingly, meeting the *Omnicare* standard "is no small task for an investor."  *Omnicare*, 575 U.S. at 194.

Plaintiff fails to satisfy these standards.  Plaintiff's core allegation—that Coty should have recorded the full impairment of its goodwill and other intangible assets in February 2019, instead of in July 2019 (*see e.g.*, AC ¶¶ 11, 12, 69, 115, 118, 122, 152)—boils down to "nothing more than disagreement with [Coty]'s accounting methodology."  *Finger*, 2019 WL 10632904, at *12; *see also id*. ("after-the-fact allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud").  Plaintiff relies on publicly available information regarding the "adverse conditions" disclosed in the Company's Q3 2019 10-Q, claiming that, although the Company clearly considered these adverse conditions included in its

disclosure, it nonetheless "failed to *appropriately* evaluate the[m]."  (AC ¶¶ 176, 194 (emphasis added).)

But the Complaint fails to allege facts demonstrating that Coty *did not honestly believe* that the February 2019 impairment was adequate *at the time.  See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 753  & n.60 (S.D.N.Y. 2018) ("For a statement of opinion or belief to be actionable as an untrue statement of a material fact, a complaint must plead facts sufficient to show that the defendant 'did not hold the belief . . . professed.'" (quoting *Omnicare*, 575 U.S. at 186)), *aff'd*, 806 F. App'x 35 (2d Cir. 2020).   "None of [P]laintiff's contentions actually speak to [D]efendant[s'] state of mind when making statements about [the company's] goodwill . . . , and so fail to state a claim against [them] for securities fraud."  *Lucescu*, 2018 WL 1773134, at *12. Plaintiff does not cite to a single confidential witness, internal document, or any other information that speaks in any way to any Defendant's knowledge of Coty's goodwill and intangible assets accounting and contradicts their public statements.   Plaintiff's assessment of the purported "overstated" figures (AC ¶¶ 115, 122,) set forth nothing that even suggests that Coty did not honestly believe that its subjective estimates were accurate when made.  Plaintiff is unable to contest that Coty promptly reacted to certain changed circumstances during the Class Period, conducted interim impairment testing and concluded that additional impairment was not permitted.  (*See id*. ¶¶ 9, 66-69, 108-10, 112, 114, 116; *see also id.* ¶¶ 173, 176, 181-82, 191, 194, 199-200.)

"Moreover, even if [a] complaint . . . plausibly plead[s] that defendants were aware of facts that <u>should</u> have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim" absent allegations that Defendants did not believe the statements were true at the time they were made.  *Lucescu*, 2018 WL 1773134, at *8 (emphasis in the original) (quoting *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68

(2d Cir. 2012)); *see also In re Express Scripts Holding Co. Sec. Litig.*, No. 16 Civ. 3338 (ER), 2018 WL 2324065, at *9 (S.D.N.Y. May 22, 2018) ("Even if Plaintiff had plausibly plead[ed] facts to show that [the] accounting treatment should have been different, [it had] not allege[d] that Defendants 'did not believe' that the accounting treatment was appropriate during the Class Period; and therefore [did] not state[] a claim for commission of securities fraud under Sections 10(b) and 20(a)."), (*aff'd*, 773 F. App'x 9 (2d Cir. 2019)).  Plaintiff has "failed to cite a point, factually or temporally, when the defendants' actions added up to something more than an exercise of real-time accounting judgment."  *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, No. 08 CIV. 10816 PKC, 2011 WL 2119734, at *4 (S.D.N.Y. May 24, 2011), *aff'd*, 679 F.3d 64 (2d Cir. 2012).

### 4. Coty's Treatment of Goodwill and Intangible Assets Did Not Violate GAAP or SEC rules

Nor does Plaintiff allege particularized facts showing that any statements about Coty's GAAP-compliant goodwill and intangible assets testing and calculations are actionable.  (*See* AC ¶¶ 12, 66-69, 108-16, 118-22, 157-208.)  As explained in more detail above, goodwill balances are accounting estimates produced through an exercise of judgment.  (*Supra* pp. 28-31.)  "Because a wide range of goodwill values could be compliant with GAAP, the plaintiffs must identify particular facts supporting an inference that [defendant's] accounting fell outside of that permissible range."  *Gen. Elec.*, 2020 WL 2306434, at *14; *see id.* at *12-15 (dismissing securities fraud claim related to "mammoth" $22 billion goodwill impairment write-off because complaint did not adequately allege that defendant's statements concerning goodwill were materially false or misleading).

Here, though Plaintiff claims that the Company's Q3 2019 10-Q filed on May 8, 2019 "failed to take into consideration the results of its annual May 1st impairment test, erroneously concluding that an interim goodwill impairment test was not required," (AC ¶¶ 176, 194; *see also* ¶¶ 69, 116, 119-21, 152, 176, 194, 203-08), that claim is both unsupported and contradicted by the

Company's disclosures.

First, the Company's disclosures made clear that it assessed goodwill and intangible assets "as of March 31, 2019." (Ex. N, Q3 2019 10-Q, at 19.) Plaintiff fails to allege that the adverse conditions purportedly requiring an impairment were not considered as of that date (even if the Company's subjective assessment was that they did not warrant an impairment at the time), or that the May 1st impairment test indicated that impairment was necessary *as of March 31, 2019*. Coty even cautioned investors that "[t]he results of operations for the three and nine months ended March 31, 2019 are not necessarily indicative of the results of operations to be expected for the full fiscal year ending June 30, 2019." (*Id.* at 9.)

Second, the cited financial statement disclosed that Coty performed its annual impairment test "as of May 1"—not that its analysis was complete and that the results were ready to be reported on May 1. (*See id.* at 19; *see also* AC ¶¶ 167, 187, 206.) Coty's 10-K explained that its auditors "evaluated the impact of changes in management's forecasts from the May 1, 2019 annual measurement date to June 30, 2019" before signing off on the Company's impairment charges. (*See* Ex. GG, 2019 10-K, at Report of Independent Registered Public Accounting Firm.) *See Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068 LLS, 1999 WL 756466, at *3 (S.D.N.Y. Sept. 24, 1999) (Stanton, J.) ("[D]efendants had no duty to report the results of the reserve study before those results were final. There is generally no duty to publicize a moment-to-moment account of a company's investigations; indeed, such intermediate appraisals risk creating expectations not justified by the ultimate results.").

In an attempt to bolster its deficient allegations, Plaintiff summarizes accounting standards, inserts long block quotes of Coty's disclosures, and asserts, in a conclusory fashion, that Defendants violated GAAP in the Q2 2019 10-Q and Q3 2019 10-Q quarterly filings "by knowingly or

recklessly failing to impair" Consumer Beauty goodwill and trademarks (AC at ¶¶ 162, 185), and "by fail[ing] to perform" interim impairment tests of its goodwill and indefinite-lived intangible assets in its Q3 2019 10-Q and record an additional impairment. (*Id*. at ¶¶ 184, 202.)  But these "naked assertions" of liability that "recite different accounting standards in some detail, or baldly assert that [Coty] violated those standards" do not "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 406-07 (S.D.N.Y. 2019).  Nor is it sufficient to allege that Coty must not have performed its calculations in conformance with GAAP because it ultimately recognized a second impairment charge later in time that could be attributed to the "same conditions" as the earlier charge.  (AC ¶¶ 183, 201.)  *See Lucescu*, 2018 WL 1773134, at *11-12 (allegations that the "'same circumstances' that led to the September impairment existed in May" were "insufficient to state a claim that the assurances that [the company had] complied with GAAP were false"); *see also Adient plc*, 2020 WL 1644018, at *24 ("that [the company] ultimately would take an impairment charge in the fourth quarter does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent.")

### B.   Numerous Challenged Statements Are Not Actionable Because They Are Protected Forward-Looking Statements

Under Section 21E(c)(1) of the Exchange Act (as added by the PSLRA), a forward-looking statement is not actionable if a statement is (1) forward looking and accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge that the statement was false or misleading.  *See* 15 U.S.C. § 78u-5(c)(1); *see also FedEx Corp.*, 2021 WL 396423, at *11. Satisfaction of any of these three conditions renders the statement nonactionable as a matter of law. *Id*.  The "bespeaks caution" doctrine offers similar protection to statements that adequately disclose the risk factors that might cause a different outcome to occur than the one then forecast by the issuer.

*In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 355 n.7 (S.D.N.Y. 2020).

Forward-looking statements include the "plans and objectives of management for future operations" and statements relating to "future economic performance." 15 U.S.C. § 78u-5(i)(1). Additionally, "[f]or a forward-looking statement to be actionable, the plaintiff must show that the statement was made with actual knowledge of [its] falsity by the speaker." *Philip Morris*, 437 F. Supp. 3d at 356. This scienter requirement is "stricter than for statements of current fact" because "liability . . . attaches only upon proof of knowing falsity." *Id.* at 355-56 (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010)).

Plaintiff attempts to plead fraud based on statements regarding the integration of the P&G Beauty Business that communicate the Company's ongoing and future plans, including statements that "[o]n the integration of the P&G Beauty Business, we are making good progress," (AC ¶¶ 43, 78); "we do expect that these business integration related impacts will be largely over by the end of first half 2019," (*id.* ¶¶ 60, 101); "[w]e continue to target the total four-year synergies," (*id.* ¶¶ 37, 71); "[t]he integration is progressing as expected, with no major issues to date," (*id.* ¶¶ 40, 42, 73-74, 142); "our integration efforts are proceeding well and we remain on track with the synergy delivery," (*id.* ¶¶ 46, 81, 144; *see also id.* ¶ 7); "[t]he first step is integration of the businesses, a step which I believe is 'well underway and on track,'" (Ex. W, Q4 2017 Earnings Call Tr., at 6 (quoted in AC ¶¶ 47, 82)); "[t]he overall integration is 'progressing in line with our time table,'" (Ex. Z, Q3 2018 Earnings Call Tr., at 7 (quoted in AC ¶¶ 56, 93)); and "[w]e . . . expect [supply chain issues] to substantially 'resolve in the third quarter of fiscal 2019.'" (Ex. L, Q1 2019 10-Q, at 31 (quoted in AC ¶¶ 61, 103)).[19]

---

[19] *See also, e.g.*, AC ¶¶ 2, 5-8, 37, 40, 42-43, 46-47, 56, 60-62, 71, 73-74, 78, 81-82, 93, 101, 103-05, 142, 144, 146.

Similarly, the Complaint cites numerous statements by Coty that communicated future plans regarding its financial targets and its strategy about promotions and digital media, including that "[f]or adjusted operating margin, we continue to aim for a healthy improvement in the second half of the year versus the prior year," (AC ¶¶ 54, 92); "by shifting [the traditional media to digital], we will achieve not only the consumers that we want to achieve but also in the right place and the right time," (*id.* ¶ 76); "we're going to put much more focus on the digital transformation of the company," (*id.* ¶¶ 57, 96); and "we will drive [Advertising and Consumer Promotions ("A&CP")] to a level more 'in line with industry practices.'"  (Ex. FF, July 1, 2019 Investor Call Tr., at 8 (quoted in AC ¶ 10); *see also* AC ¶¶ 2, 150).[20]

These statements, however, are "plainly forward looking" under 15 U.S.C. § 78u-5(c)(1) because they are "framed as . . . expectation[s] or projection[s]," *Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies Inc.*, 548 F. App'x 16, 18 (2d Cir. 2013), and are accompanied by meaningful risk disclosures. *See In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840 (RJS), 2018 WL 2081859, at *12-13 (S.D.N.Y. Mar. 30, 2018) (holding that statements that "'we remain on track to deliver adjusted EBITDA in line with expectations'" fell "within the PSLRA safe harbor for forward-looking statements"); *aff'd,* 764 F. App'x 127 (2d Cir. 2019); *Adient plc*, 2020 WL 1644018, at *19 (concluding that statements about a company "being 'on track' with respect to its projected margin expansion" were "'forward-looking' statements within the meaning of the PSLRA").

Further, Coty's forward-looking statements were identified as such and were accompanied by meaningful and specific cautionary language that described the risks that may materialize

---

[20] *See also e.g.*, AC ¶¶ 5-6, 41, 44, 49, 51-54, 57-58, 60-61, 67, 75-76, 78, 83, 85-86, 90, 92, 96, 98-100, 106, 109, 150.

regarding the "incredibly complex integration of P&G Beauty Business" (AC ¶ 7), the Company's financial targets and its marketing strategy. *See Karolyi v. Loma Negra Compania Industrial Argentina Sociedad Anonima*, No. 18 Civ. 11323 (LLS), 2020 WL 1989423, at *5-6 (S.D.N.Y. Apr. 27, 2020) (Stanton, J.) (finding that defendants' forward-looking statements were protected under the safe harbor because "conditions may change" and the prospectus specifically disclosed this risk). For example, whereas Plaintiff relies on the November 9, 2017 Press Release to allege that Coty "assur[ed]" investors about the success of the integration (AC ¶¶ 37, 71), that Press Release actually warned investors:

> "*We give no assurance* that we will be able to successfully manage integration and operation of the P&G Beauty Brands business thereafter, either of which could increase costs and management distraction. The amount and timing of this charge and management distraction could adversely affect our liquidity, cash flows and period-to-period operating results, which could result in a reduction in the market price of shares of our common stock."

(Ex. F, Q1 2017 10-Q, at 60; AC ¶ 123 (emphasis added).) Coty also repeatedly disclosed the risks inherent in the integration that Plaintiff now complains of and warned investors that its forecasts were

> based on certain assumptions and estimates that the Company considers reasonable and are subject to a number of risks and uncertainties, *many of which are beyond the Company's control*, which could cause actual events or results to differ materially from such statements, including . . . the integration of the P&G Beauty Business . . . and the ability to realize synergies, reduce costs and other potential efficiencies and benefits at the levels and at the costs and within the time frames currently contemplated or at all.

(Ex. O, Q4 2017 8-K, at 7 (emphasis added); *see also supra* pp. 8-9 & n.7.) *See Adient plc*, 2020 WL 1644018, at *20 (holding statements were protected under PSLRA's safe harbor because defendants had cautioned that the statements were "subject to numerous important risks, uncertainties, assumptions and other factors, some of which are beyond [the company]'s control, that could cause [the company]'s actual results to differ materially from those expressed or implied

36

by such forward-looking statements" (citation omitted)).

Similar cautionary language appears alongside the other integration related statements identified by Plaintiff [21] and "make[s] clear that Defendants contextualized their professed commitment to the income target with numerous disclosures about . . . the risks inherent in the [merger] integration process." *FedEx Corp.*, 2021 WL 396423, at *10; *see id.* at *11 (statements were protected by safe harbor where disclosures specifically cautioned that "[t]he failure to integrate successfully the businesses and operations of [the two companies] in the expected time frame and at the expected cost may adversely affect our future results"). Likewise, Coty warned investors that "[i]f we are not successful in our digital transformation efforts or otherwise increase digital presence and grow our e-commerce activities, we will not be able to compete effectively." (Ex. K, 2018 10-K, at 6.) [22] "In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Philip Morris*, 437 F. Supp. 3d at 355 n.7.

---

[21] *See*, *e.g.* Ex. H, 2017 10-K, at 8; AC ¶¶ 124-30 ("If our management is not able to effectively manage the integration process, address fixed and other costs, or if any significant business activities are interrupted as a result of the integration process, our business, prospects, financial condition, results of operations, cash flows, as well as the trading price of our securities may be materially adversely affected."); Ex. T, Q2 2017 8-K, at 8 (listing "risks and uncertainties . . . beyond the Company's control . . . which could cause actual events or results to differ materially").

[22] *See also* Ex. P, Q4 2018 8-K, at 9-10 ("These forward-looking statements reflect our current views with respect to, among other things, the Company's targets and outlook for future reporting periods (including the extent and timing of revenue and profit trends and the Consumer Beauty division's stabilization) . . . synergies, savings, performance, cost, timing and integration relating to our recent acquisitions (including the "P&G Beauty Business"), . . .[and] future performance in digital and e-commerce and the expected impact of our digital transformation agenda."); Ex. H, 2017 10-K, at 7 ("Changes in industry trends and consumer preferences could adversely affect our business, prospects, financial condition and results of operations. . . . Product life cycles and consumer preferences continue to be affected by the rapidly increasing use and proliferation of social and digital media by consumers, and the speed with which information and opinions are shared.").

Moreover, even if the Court were to credit Plaintiff's meritless allegation that certain statements were not identified as forward-looking or were not accompanied by cautionary language[23]—and it should not—Plaintiff's argument fails for the independent reason that the Complaint fails to plead that the forward-looking statements were made with actual knowledge of falsity.  *See FedEx Corp.*, 2021 WL 396423, at *11 ("As the safe harbor is written in the disjunctive, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.") (emphasis in the original).  The Supreme Court recently observed that a legal dictionary definition of "actual knowledge" is "[r]eal knowledge as distinguished from presumed knowledge or knowledge imputed to one."  *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020).

Here, Plaintiff offers no allegations that these statements were made with "actual knowledge" of their purported falsity.  "Plaintiff cannot make that showing by relying on the Company's subsequent revision of its target."  *FedEx Corp.*, 2021 WL 396423, at *11; *see id.* at *1, *11 (finding that plaintiffs had failed to show "actual knowledge" of purported falsity of the statements and holding that safe harbor protected company's statements regarding its financial targets because "[the court] cannot conclude that six months of difficulties at [a recently acquired subsidiary] in late 2017 would preclude the achievement of a target set at two years into the future"); *see also In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *18-19 (S.D.N.Y. Oct. 25, 2017) ("The Amended Complaint does not plead particularized facts showing that Defendants actually knew that they were engaged in improper accounting practices when reporting and disclosing [r]ecord [r]evenue and [e]arnings to investors during the Class

---

[23] *See* AC ¶ 218.

Period.").  The Company's forward-looking statements thus fall within the PSLRA's safe harbor and the "bespeaks caution" doctrine.  *See In re Ferrellgas Partners*, 2018 WL 2081859, at *12-13.

### C.   Many of the Challenged Statements Are Nonactionable Puffery

Further, many of the challenged statements regarding Coty's integration of the P&G Beauty Business and Coty's marketing strategy constitute immaterial, nonactionable "puffery." [24] "[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174.  That is so because "companies must be permitted to operate with a hopeful outlook" and  "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future."  *Id*.

Plaintiff challenges such statements as:

- "we are focused on rejuvenating our core business and amplifying our growth potential, by [among others] 'advancing our end-to-end digital transformation,'" (Ex. K, 2018 10-K, at 1 (quoted in AC ¶¶ 58); *see also* AC ¶¶ 61, 98 106);

- "e-commerce . . . is a big focus for us," (AC ¶¶ 56, 94);

- "e-commerce was a bright spot in Consumer Beauty,'" (*id*. ¶¶ 68, 110);

- "we now have a much improved team, structure and culture to make the vision of this merger a reality," (*id*. ¶ 36);

- "[w]e continue to target the total four-year synergies," (*id*. ¶¶ 37, 71);

- "I have a great deal of confidence that the management team we have put into place is the right one to develop this plan," (Ex. HH, Q2 2019 8-K, at 3 (quoted in AC ¶¶ 67, 109));

- "on the integration of the P&G Beauty Business, we are making good progress," (AC ¶¶ 43, 78);

- "our integration efforts are proceeding well and we remain on track with the synergy delivery," (*id*. ¶¶ 46, 81, 144);

- "[we] continue to see strong e-commerce momentum," (*id*. ¶¶ 68, 110);

---

[24] *See, e.g.*, AC ¶¶ 6-8, 36-37, 41, 43-46, 49, 51-53, 56-58, 60-62, 67-68, 71, 75-76, 78-79, 81-83, 85-86, 90, 93-94, 96, 98-101, 104-06, 109-110, 144, 146, 150.

- "we . . . expect that these business integration related impacts will be largely over by the end of first half 2019," (*id.* ¶¶ 60, 101); and

-  "This is a tremendous achievement." (*Id.* ¶¶ 45, 79 (referring to Coty's completion of the first stage of its three-stage exit from the TSA)).

But these statements are quintessential expressions of puffery—they are "so vague, broad, and non-specific that a reasonable investor would not rely on [them]." *FedEx Corp.*, 2021 WL 396423, at *14. This principle applies with special force here, "where [the statements] were accompanied by the types of qualifiers which render the statements even more in the nature of puffery, such as what Defendants 'expected' to see, what they 'felt confident' about, and what they were 'comfortable' with." *Adient plc*, 2020 WL 1644018, at *22; *see id.* at *22-23 (holding that statements that the business was "on the upwards trajectory" and that "new management . . . was rapidly stabilizing the business" were inactionable puffery); *see also In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539-GHW, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements about what the company "focused on, what it is aiming to do, and what its priorities are" were inactionable puffery); *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, No. 17 Civ. 3501 (JFK), 2019 WL 452051, at *5 (S.D.N.Y. Feb. 5, 2019) (rejecting as inactionable puffery statements that "[w]e've made good progress this year," "the distractions that we [had] to overcome earlier this year are now behind us," and "[w]e feel good about our progress so far"); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07 Civ. 3994(LTS)(AJP), 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("[A]djectives used to describe the management team, such as 'strong,' 'experienced,' and 'capable,' . . . are nothing more than puffery.").

Further, courts in this district have repeatedly held that "[v]ague and non-specific pronouncements on the success of integrating acquisitions are inactionable puffery." *In re Royal Bank of Scot. Group PLC Sec. Litig.*, No. 09 Civ. 300(DAB), 2012 WL 3826261, at *10 (S.D.N.Y. Sept. 4, 2012), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scot. Grp. PLC*, 540 F. App'x 33 (2d

Cir. 2013).  "Rosy affirmations" about an acquisition and its integration "that do not contain guarantees . . . and are far too vague to be actionable."  *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 CIV. 7840 (RJS), 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019); *see also Lighthouse Fin. Group v. Royal Bank of Scot. Group*, 902 F. Supp. 2d 329, 341-42 (S.D.N.Y. 2012) (dismissing claims based on statements that integration was "progressing well" and "off to a promising start" as "vague pronouncements of corporate optimism"), *aff'd sub nom. IBEW Local 58 Pension Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, *PLC*, 783 F.3d 393 (2d Cir. 2015); *In re Ferrellgas Partners*, 2018 WL 2081859, at *12 (statement that integration "was smooth and seamless" was "far too vague to be actionable").

### D.  Many of the Challenged Statements Are Nonactionable Because They Constitute Sincerely Held Statements of Opinion

In addition to the Company's goodwill and accounting judgments, Plaintiff challenges other statements that are nonactionable opinions under *Omnicare*.  Specifically, Plaintiff alleges that statements regarding the Company's aspirations were false and misleading, including that "we believe we have enough funds for our future success and re-launches," (AC ¶ 76); "I believe [integration of the businesses] is well underway and on track," (*id.* ¶¶ 47, 82); "we . . . expect that these business integration related impacts will be largely over by the end of first half 2019," (*id.* ¶¶ 60, 101); "[w]ith a healthy synergy delivery already in 1Q19, these modifications [in our distribution center consolidation plan] should have no impact to our [synergies] commitment," (*id.* ¶¶ 62, 104); "[t]he Consumer Beauty division continue[d] its uneven performance but with encouraging signs of stability," (*id.* ¶¶ 54-55, 92, 94); and "we are confident that we can return Coty to a path of sustainable growth."  (*Id.* ¶¶ 67, 109.)

"Such statements, often marked by phrases such as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not

omit information rendering the statement misleading." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018).  Plaintiff makes no attempt to show that Defendants did not actually hold these beliefs at the time or omitted material information that rendered those statements of future projections false or misleading.  *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 230 (S.D.N.Y. 2018) (opinions relating to future earnings were nonactionable where plaintiff offered only "scant" detail about allegedly omitted facts), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. Oct. 15, 2019); *Lefkowitz v. Synacor, Inc.*, No. 18 Civ. 2979 (LGS), 2019 WL 4053956, at *7 (S.D.N.Y. Aug. 28, 2019) (statement that Synacor "expect[ed] accelerated revenue growth of about 30% this year" was nonactionable opinion), *aff'd sub nom. Schreiber v. Synacor, Inc.*, 832 F. App'x 54 (2d Cir. 2020).  The Complaint therefore fails to state a claim premised on these statements of opinion.[25]

### E.      Plaintiff Has Not Identified Any Actionable Omissions

Plaintiff's attempt to premise a claim on alleged omissions fares no better.[26]  A corporation "is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  *In re Optionable Sec. Litig.*, 577 F.

---

[25] Plaintiff also challenges the Company's view that in February 2017, "the integration [wa]s progressing as expected, with no major issues to date."  (AC ¶¶ 40, 42, 73-74, 142.)  Plaintiff fails to note that the following statement also noted: "It's fair to say this is a significant undertaking as we are both integrating and simultaneously reorganizing the entire company to create the organization we need to deliver our mission."  (Ex. T, Q2 2017 8-K, at 6.)  In any event, this statement reflected the Company's view at the time, and "[c]haracterizing a problem as minor reflects the use of judgment and is not, read in context, a factual assertion."  *In re Gen. Elec. Sec. Litig.*, No. 19cv1013 (DLC), 2020 WL 2306434, at *12 (S.D.N.Y. May 7, 2020), *aff'd*, No. 20-1741, 2021 WL 357756 (2d Cir. Feb. 3, 2021) (rejecting argument that "it was misleading for GE to characterize the problem as requiring only 'minor' adjustments" because GE was later "forced" to record a related "$200 million charge").

[26] *See, e.g.*, AC ¶¶ 11-12, 39, 43, 47, 54, 62, 69, 72, 77-78, 80, 84, 89, 91, 95, 97, 102, 105, 107, 111, 115-16, 118, 121, 141.

Supp. 2d 681, 692 (S.D.N.Y. 2008). "Such a duty may arise when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

Plaintiff alleges that "[h]aving discussed the integration of P&G positively, Defendants were duty bound to disclose that integration issues existed . . ." (AC ¶ 95; *see also id*. ¶¶ 80, 84, 89.) But general statements of "praise[]" are "too vague and inconsequential to give rise to any duty to disclose." *Shemian v. Research in Motion Ltd.*, No. 11 Civ. 4068(RJS), 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014); *see also Finger v. Pearson PLC,* No. 17 Civ. 1422 (RJS), 2019 WL 10632904, at *11 (S.D.N.Y. Sept. 16, 2019) ("By praising [the online software product]'s new features, Defendants did not bind themselves to revealing any and all problems with [the online software product]'s old features.").

Plaintiff also incorrectly claims that because Coty "[had] warned generally about potential problems with integrating P&G," it had a duty to disclose additional integration issues that "eventually caused Defendants to impair $4 billion in goodwill and intangible assets impairments." (AC ¶ 141; *see also id.* ¶ 72.) Under the securities laws, "[t]he requirement to be complete and accurate . . . does not mean that by revealing one fact . . . one must reveal all others that, too, would be interesting." *Pearson*, 2019 WL 10632904, at *11. Moreover, even if such a duty existed, Plaintiff has not alleged any particularized facts showing that the purported misstatements were ever misleading. "Plaintiff nowhere pleads facts supporting the inference that, at the time of their statements, Defendants were aware of information contradicting their statements. . . . Because it is well established that securities laws do not impose a duty on corporate officials to be clairvoyant,

these claimed omissions are not actionable."  *Shemian*, 2013 WL 1285779, at *21.[27]

## II.  PLAINTIFF FAILS TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Plaintiffs in securities fraud actions must comply with Rule 9(b), which requires that plaintiffs "state with particularity the circumstances constituting fraud," and the PSLRA, which requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Pope Invs. II, LLC v. Deheng Law Firm*, No. 10 Civ. 6608 (LLS), 2013 WL 3946126, at *3 (S.D.N.Y. July 31, 2013) (Stanton, J.) (quoting 15 U.S.C. § 78u–4 (b)(2)(A)), *aff'd*, 586 F. App'x 1 (2d Cir. 2014).  "The required state of mind for a securities fraud claim is scienter—the intent to deceive, manipulate, or defraud, or knowing misconduct."  *Id*.  This is a high bar: the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  "[W]hile [courts] normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter."  *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

Scienter can be established "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Hammer v. Reetz*, No. 16 Civ. 6590 (LLS),

---

[27] Plaintiff attempts to distort Coty's public statements claiming that Coty "admitted in February of 2017" that integration "issues had already arisen before November 9, 2016," and thus the Company had a duty to disclose that the risk discussed had already materialized on November 9, 2016.  (AC ¶ 72.)  But the cited disclosure says no such thing.  As explained above, Defendant Pane discussed "challenges faced in the first semester," but distinguishes those from integration-related challenges.  (*See supra* pp. 21-22.)

2017 WL 946336, at*6 (S.D.N.Y. Feb. 27, 2017) (Stanton, J.).  "To survive dismissal under the 'conscious misbehavior' theory, the [plaintiff] must show that [she] alleged reckless conduct by [defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  Here, because Plaintiff has not attempted to plead motive, "the strength of the circumstantial allegations must be correspondingly greater."  *ECA & Local*, 553 F.3d at 198-99.

Plaintiff does not satisfy this onerous burden.  Plaintiff's scienter allegations are devoid of any particularity.  They essentially consist of the conclusory contention that "Defendants had actual knowledge of the [alleged] misrepresentations and/or omissions of material facts . . . or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them."  (AC ¶ 225; *see also id.* ¶¶ 28, 224.)  Plaintiff attempts to bolster this unsupported contention by asserting that the Individual Defendants "directly participated in the management of the Company"; "participated in and oversaw the day-to-day operations of the Company at the highest levels"; "were privy to confidential, proprietary information concerning the Company and its business and operations"; and "were directly or indirectly involved in the oversight or implementation of the Company's internal controls."  (*Id.* ¶ 28.)

But the Complaint does not even attempt to link these vague and formulaic allegations to the alleged misstatements, let alone to any Defendant's state of mind.  *See In re WebMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382(JFK), 2013 WL 64511, at *12 (S.D.N.Y. Jan. 2, 2013) ("There is a missing link between Defendants' cognizance of potentially adverse business conditions and Plaintiffs' accusation that the statements and projections were not simply too optimistic but actually

false and made with an intent to deceive, manipulate, or defraud.  In the absence of any compelling and specific showing by Plaintiffs, it is far more plausible that Defendants were not deceitful but mistaken.").  Numerous courts have rejected such generic allegations as inadequate.  *See, e.g.*, *FedEx Corp.,* 2021 WL 396423, at *15 (allegations that the individual defendants had access to relevant non-public information about the Company's operations "because of their positions within FedEx," and "their positions of control and authority as officers and/or directors of the Company" were insufficient to plead scienter); *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) ("[I]t is practically hornbook law that 'accusations' . . . which are 'founded on nothing more than a defendant's corporate position[,] are entitled to no weight.'"); *Kinsey v. Cendant Corp.*, No. 04 Civ.0582 RWS, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) ("[C]onclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness.").[28]

Further, to allege Defendants acted with recklessness, Plaintiff "must *specifically identify* the reports or statements that are contradictory to the statements made, or must provide specific instances in which Defendants received information that was contrary to their public declarations."

---

[28] To the extent that Plaintiff tries to impute scienter based on the Individual Defendants' signing of Coty's annual or quarterly reports and Sarbanes-Oxley certifications (*see, e.g.*, AC ¶¶ 29-32, 38, 40, 43, 49, 51, 53-54, 58, 61, 66, 69), that attempt is also futile.  "[I]n the absence of more particularized allegations . . .  sign[ing] or certif[ying] SEC disclosures is insufficient to support a finding of scienter."  *In re Molycorp, Inc. Sec. Litig.*, No. 13 Civ. 5697(PAC), 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015); *Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016) (same). Similarly, courts have repeatedly rejected the argument that resignations of executives alone raise a strong inference of scienter.  (*See* AC ¶¶ 59, 64-65, 180.) *See e.g.*, *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, at 240 (S.D.N.Y. 2020) ("Terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter. Indeed, there are any number of reasons that an executive might resign, most of which are not related to fraud."); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) ("Standing alone . . . resignation[s] do[] not raise a strong inference of scienter.").

*Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (emphasis in original).  Plaintiff

fails to point to any such contradictory information.  The Complaint fails to reference a single

internal report, memorandum, or communication with the Individual Defendants that contained

information "inconsistent with the statements made." *Local No. 38 Int'l Bhd. of Elec. Workers*

*Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (citation omitted),

*aff'd*, 430 F. App'x 63 (2d Cir. 2011), *see also Jackson v. Halyard Health, Inc.*, No. 16-CV-05093-

LTS, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018), *aff'd sub nom.*, *Jackson v. Abernathy*,

960 F.3d 94 (2d Cir. 2020); *In re Iconix*, 2017 WL 4898228, at *18 ("[T]he magnitude and number

of Iconix's accounting errors are not in themselves sufficient to raise a strong inference of scienter,

and Plaintiffs are required to proffer additional factual allegations of corresponding fraudulent

intent.").

At bottom, Plaintiff rests her claim on a disagreement with Defendant's accounting

judgments, positing that the goodwill and intangible asset impairments should have been taken

earlier.[29]  This is a classic "fraud by hindsight theory" that this Court and numerous others have

rejected as inadequate to plead scienter.  *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x

9, 15 (2d Cir. 2019) ("Defendants need not be clairvoyant. . . . Allegations . . . that defendants

should have anticipated future events and made certain disclosures earlier than they actually did do

not suffice to make out a claim of securities fraud."); *Pope Invs. II LLC v. Deheng Law Firm*, No.

10 Civ. 6608 (LLS), 2011 WL 5837818, at *6 (S.D.N.Y. Nov. 21, 2011) (Stanton, J.) ("As the

Court of Appeals has stated, 'in the context of securities fraud claims,' allegations 'that Defendants

knew but concealed some things, or knew or were reckless in not knowing other things,' 'are so

---

[29] *See, e.g.*, AC ¶¶ 10-12, 69, 115-16, 118, 121-22, 162, 176, 179, 183-85, 194, 197, 201-02, 207-
08.

broad and conclusory as to be meaningless.'" (quoting S*hields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994))).

To demonstrate recklessness here, Plaintiff must at least allege "that the failure to take an impairment charge earlier was . . . an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud." *In re Loral Space & Commc'ns Ltd. Secs. Litig.*, No. 01 Civ.4388(JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004). But Plaintiff fails to plead anything to indicate that Defendants were aware that they were obligated under GAAP to test for and record an impairment earlier, yet consciously refused to do so. *See Pearson*, 2019 WL 10632904, at *13 (finding that where plaintiffs alleged that defendants knew the company's issues existed for years and necessitated an earlier impairment, knew that the company's digital products were plagued with defects, and later took two large goodwill impairments totaling over $3 billion, plaintiffs failed to plead scienter because they did not explain what defendants knew, when or how they came to possess such information, and why they did not subjectively believe their statements and valuations); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("Given the flexibility in interpreting GAAP and financial reporting requirements, deference is afforded executives absent evidence of corresponding fraudulent intent.").[30] Because "[t]he assessment of goodwill was a judgment based on other judgments and projections," any alleged failures described in the Complaint "were at worst failures in judgment." *In re Gen. Elec. Sec. Litig.*, No. 19cv1013 (DLC), 2020 WL 2306434, at *15 (S.D.N.Y. May 7, 2020), *aff'd*, No. 20-1741, 2021 WL 357756 (2d Cir. Feb. 3, 2021). "They do not constitute conscious recklessness" and should be dismissed. *Id.*

---

[30] *See also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("[T]he magnitude of the write-downs is insufficient to plead scienter.").

Finally, Coty's repeated and iterative disclosures regarding the challenges of the integration and the Consumer Beauty segment's poor performance (*see supra* pp. 9-17, 22-26 & n.14) cuts against an inference of scienter. *See In re Loral Space*, 2004 WL 376442, at *17 ("The plaintiffs have failed to allege sufficient facts to show that the failure to take an earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent, particularly in view of the disclosures of the ongoing poor performance of [the company]."); *see also Lachman v. Revlon, Inc.*, No. 19-cv-2859 (RPK) (RER), 2020 WL 5577406, at *15 (E.D.N.Y. Sept. 17, 2020) (to be reported in F. Supp. 3d) ("[The company's] steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors because they did not offer the specific additional warnings that plaintiffs allege were warranted.").

## III. PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE AN UNDERLYING SECTION 10(b) CLAIM

In order to state a claim under Section 20(a) of the Exchange Act, Plaintiff must allege: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). Here, for the reasons described above, Plaintiff fail to sufficiently allege a primary violation of Section 10(b) or culpable participation. Accordingly, her control person claims fail. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Complaint with prejudice.

Dated: New York, New York
        March 8, 2021

                                                Respectfully submitted,

                                                /s/ Scott D. Musoff
                                                Jay B. Kasner
                                                Scott D. Musoff
                                                Thania Charmani
                                                SKADDEN, ARPS, SLATE,
                                                    MEAGHER & FLOM LLP
                                                One Manhattan West
                                                New York, NY 10001
                                                Phone: (212) 735-3000
                                                Fax:   (212) 735-2000
                                                scott.musoff@skadden.com
                                              jay.kasner@skadden.com
                                              thania.charmani@skadden.com

                                              *Attorneys for Defendants Coty Inc., Lambertus Becht, Patrice de Talhouët and Pierre-André Terisse*