**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| CRYSTAL GARRETT-EVANS, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:20-cv-07277 |
|  | : | **CLASS ACTION** |
| Plaintiff, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| COTY INC., LAMBERTUS "BART" BECHT, CAMILLO PANE, PIERRE LAUBIES, PATRICE DE TALHOUËT, and PIERRE-ANDRE TERISSE, | : | **JURY TRIAL DEMANDED** |
|  | : |  |
| Defendants. | : |  |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   STATEMENT OF FACTS ...................................................................................... 2

      A.    Coty Acquires the P&G Beauty Business................................................. 2

      B.    Coty Misleads About the Difficulties it Encountered in Integrating the P&G
            Beauty Business ..................................................................................... 3

      C.    Coty Misrepresents its Digital Advertising and Marketing Focus........................ 6

      D.    Coty's Risk Warnings about the P&G Beauty Business Integration..................... 9

      E.    Coty Fails to Impair the Full $4 Billion in Goodwill and Intangible Assets in
            February 2019 ........................................................................................ 9

      F.    Defendants Reveal the Full Truth ......................................................... 12

III.  ARGUMENT ...................................................................................................... 14

      A.    Standard of Review.................................................................................. 14

      B.    The Complaint Adequately Alleges Falsity and Scienter ................................... 15

            1.    The Complaint Adequately Alleges the Falsity of and Scienter for
                  Defendants' Integration Statements........................................... 16

            2.    The Complaint Adequately Alleges the Falsity of and Scienter for
                  Defendants' Synergy Statements ............................................... 23

            3.    The Complaint Adequately Alleges the Falsity of and Scienter for
                  Defendants' Risk Warnings ....................................................... 25

            4.    The Complaint Adequately Alleges the Falsity of and Scienter for
                  Defendants' Statements About Digital Marketing and E-Commerce....... 26

            5.    The Complaint Adequately Alleges the Falsity of and Scienter for Coty's
                  Financial Statements and that Defendants Violated GAAP and SEC
                  Regulations by Failing to Take the Entire $4 Billion Impairment in
                  February 2019 ....................................................................... 29

      C.    The Alleged False and Misleading Statements are Neither Forward-Looking Nor
            Protected by the Safe Harbor ................................................................. 31

      D.    Defendants' Statements About the State of the Integration Process Are Not
            Inactionable Puffery................................................................................. 34

      E.    The Complaint Adequately Alleges Actionable Omissions ................................ 36

      F.    The Complaint Adequately Pleads a Claim for Control Person Liability ............ 37

IV.   CONCLUSION.................................................................................................... 38

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .................................................................................... 37

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................... 27

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 14

*Camelot Event Driven Fund, A Series of Frank Funds Trust v. Alta Mesa Resources, Inc.*,
  No. 4:19-CV-957, 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ........................... 21

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .................................................................................... 15

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008) ..................................................................... 25

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F. 3d 645 (8th Cir. 2001) ................................................................................. 21

*Flynn v. Sientra, Inc.*,
  No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016) ............... 25

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................... 33

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) .................................................... 22, 25, 34, 36

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
  369 F. App'x 260 (2d Cir. 2010) ............................................................................. 32

*In re Adient plc Sec. Litig.*,
  No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ...................... 30

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ..................................................................... 21

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ....................................................................... 23

*In re Carter-Wallace, Inc., Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000)................................................................................... 15

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  No. 17 CIV. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018) ............... 32

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  No. 16 CIV. 7840 (RJS), 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ................ 36

*In re Merit Medical Systems, Inc. Sec. Litig.*,
  No. 8:19-02326 DOC (ADSx), 2021 WL 1192133 (C.D. Cal. Mar. 29, 2021) ....... 22

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)................................................................... 28

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .............................................................................. 32

*In re Razorfish, Inc. Sec. Litig.*,
  No. 00 CIV. 9474 (JSR), 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001)................. 21

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011).................................................................... 33

*In re Tronox, Inc. Sec. Litig.*,
  No. 09 CIV. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010)................. 37

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005).................................................................... 25

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)............................................................................ 31, 34

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)................................................................................... 24

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010).................................................................................. 32

*Levin v. Res. Cap. Corp.*,
  No. 15 CIV. 7081 (LLS), 2016 WL 5867451 (S.D.N.Y. Oct. 5, 2016) ................... 18

*Lucescu v. Zafirovski*,
  No. 09CV4691 (DLC), 2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018) .................... 30

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................... 24, 32, 33

*Manavazian v. Atec Grp., Inc.*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) ................................................................ 33

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)............................................................................... 18

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................................. 28

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011)..................................................................... 14, 32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................... 15, 34

*Plumbers Union Local 12 Pension Fund v. Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)................................................................ 15

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) .................................................................... 21

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ............................................................................. 16

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)..................................................................... 21, 22, 23, 26

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)............................................................................. 37

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020).......................................................................... passim

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ........................................................................... 25

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014).................................................................. 37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................... 15

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)........................................................................................... 27

*Wilson v. LSB Indus., Inc.*,
   No. 15 CV 7614 (RA), 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ...................................... 36

*Zwick Partners, LP v. Quorum Health Corp.*,
   No. 3:16-CV-2475, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)................................. 29, 30

**Statutes**

15 U.S.C. § 78u-4(b)(1) and (b)(2) ............................................................................................... 15

15 U.S.C.A. § 78t(a) ..................................................................................................................... 37

## I.    PRELIMINARY STATEMENT

For two-and-a-half years, Defendants told investors that while it was having some problems integrating its $11.5 billion purchase of Proctor & Gamble's Specialty Beauty Business ("P&G Beauty Business")—an acquisition that **tripled Coty's total assets** from $7.2 billion to $21.9 billion—those problems were "short-term" and "temporary," and the Company would reap the benefits it told investors to expect. Defendants, however, misled, failing to disclose the true magnitude of the difficulties it encountered in integrating the P&G Beauty Business, difficulties that ultimately forced Coty to impair the P&G Beauty Business' goodwill and intangible assets by approximately $4 billion. Investors suffered when the truth was revealed.

Reversing dismissal, in *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204 (2d Cir. 2020) ("*Omega*"), the Second Circuit recently found that having spoken about the **existence** of material problems, a company is duty-bound to disclose the **magnitude** of those problems, and that disclosure of adverse information without conveying the scope and magnitude of the distress is materially misleading. Defendants omitted that the failure of their integration efforts caused all of Coty's financial problems and that those material, adverse circumstances required Coty to impair the P&G Beauty Business assets. Further, Coty never told investors that it had not actually achieved the synergy savings it stated that it would from the merger or that Coty had never devoted the resources and focused on vital digital and e-commerce marketing as it repeatedly stated that it had. Coty's failure to disclose the magnitude of the difficulties integrating the P&G Beauty Business was fraud.

Coty's omission of the magnitude of its problems integrating the P&G Beauty Business extended to its impairment of goodwill and intangible assets. In February 2019, Coty announced that it had performed an interim impairment test and had impaired approximately $1 billion of the value of the P&G Beauty Business. Months later, on July 1, 2019, Coty impaired an additional

1

$3 billion of the value of the P&G Beauty Business. Yet Coty itself disclosed that the impairment factors that existed in July already existed in December 2018 and February 2019. Coty, therefore, was required to impair the full $4 billion in February. Having fraudulently failed to do so in February 2019, those same factors were present in May 2019, when Coty had completed its required annual impairment analysis. Failure to impair the $3 billion in February 2019, and then in May 2019, violated GAAP and SEC rules, and was fraud.

None of the Amended Complaint's ("Complaint") allegations constitute "fraud by hindsight." The argument that Defendants only realized at the end of the Class Period the true magnitude of the integration problems and its consequences is absurd. The P&G Beauty Business acquisition was enormous in both size and importance, its success core to Coty's operations and financial success. The problems leading to a $4 billion impairment did not suddenly appear overnight. Defendants spent $11.5 billion to triple their total assets, and then spent two-and-a-half years telling investors that things were going well when they were not. Defendants were duty-bound to reveal the true extent of the integration failure throughout the Class Period. By choosing not to, they committed fraud.

This Court should deny Defendants' motion to dismiss in its entirety.

## II.      STATEMENT OF FACTS

### A.      Coty Acquires the P&G Beauty Business

Coty is one of the world's largest beauty product companies, marketing, selling, and distributing its products in over 150 countries, with over 18,000 employees in 46 countries. Coty describes itself the "global leader in fragrance, a strong number two in professional salon hair color & styling, and number three in color cosmetics." Coty operates three product category focused segments: (1) Consumer Beauty, focusing on color cosmetics, retail hair coloring and styling products, body care and mass fragrances sold primarily in the mass retail channels; (2)

Luxury, focusing on prestige fragrances and skincare brands and (3) Professional Beauty, focusing on servicing nail salon owners and stores selling to nail supply owners and salons. Coty. In fiscal year 2020, ending on June 30, 2020, Coty produced approximately 80% of its products. ¶¶33-34.

On October 1, 2019, Coty completed its acquisition of the P&G Beauty Business for $11.5 billion. Defendant Becht, Chairman of Coty's Board of Directors, stated that "we now have a much improved team, structure and culture to make the vision of this merger a reality." ¶36. Successful integration of the P&G Beauty Business was core to Coty's financial success, as the acquisition tripled Coty's total assets from $7.2 billion to $21.9 billion.[1]

### B. Coty Misleads About the Difficulties it Encountered in Integrating the P&G Beauty Business

Even as they disclosed challenges Coty faced integrating the P&G Beauty Business, throughout the Class Period,[2] Defendants repeatedly downplayed the magnitude of those challenges, couching such difficulties in hopeful language and touting the expected benefits from the integration. In a press release on November 9, 2016, reporting financial results for the first quarter fiscal of 2017, Defendant Becht stated that "[w]e continue to target the total four-year synergies and working capital benefits of $750 million and $500 million, respectively, with no change to the operating costs to realize both."[3] Coty failed to mention any early integration problems. ¶¶37-38, 71.

---

[1] *Compare* Defendants' Exhibit ("Def. Ex.") C, at 19 (Coty's total assets of $7.2 billion before the P&G Beauty Business acquisition), *with* Def. Ex. T, at 23 (Coty's total assets of $21.9 billion immediately after the P&G Beauty Business acquisition).

[2] The Class Period is November 9, 2016 to June 30, 2019, inclusive.

[3] The Company stated that the $750 million of synergies would be "driven by cost, procurement, supply chain, and SG&A savings over the next four years." *See* Def. Ex. D, at 35.

3

On February 9, 2017, in a press release reporting financial results for the second fiscal quarter of 2017, Defendants acknowledged integration issues dating back before November 9, 2016, including inventory issues relating to "the P&G business," but labelled the issues "short-term," calling them a "distraction." ¶¶40, 42, 73. In an earnings call that same day, Defendant Payne stated that "the integration is progressing as expected." ¶73. In the next reporting period, in a May 10, 2017, press release, Defendant Payne stated that the previous difficulties had been "short-term," and that Coty was "making good progress" on the integration. ¶¶43, 78. In the earnings call, Defendant Talhouët stated that "we have [ ] now fully integrated the legacy P&G Beauty Business into Coty's system," calling it a "tremendous achievement." ¶¶45, 79. During the February 9, 2017 earnings call, Defendant Talhouët "reconfirm[ed] the $750 million synergies," and stated that Defendants were "very confident" about achieving the "synergies target of $750 million." Def. Ex. A, at 11.

Part of the title of an August 22, 2017 press release discussing fiscal year 2017 results was "Integration Progressing Well." Defendant Pane assured that Coty had "successfully reached significant milestones in our integration efforts," was meeting integration targets, and that "our integration efforts are proceeding well and we remain on track with the synergy delivery." ¶¶46, 81. Defendants boasted in an earnings call that same day that the integration was "on track." ¶¶47, 81. In an earnings call that same day, Defendant Pane stated that Coty had "reached significant milestones in our integration efforts." ¶82.

The next quarter, in a November 9, 2017 press release discussing financial results for the first quarter fiscal of 2018, and in an earnings call that same day, Defendants Pane and Talhouët, discussing success in the P&G Beauty Business integration progress, stated that Coty now had "control of processes, systems and data across the new Coty." ¶¶51, 87. Three months later, on

May 9, 2018, Defendants conveyed to investors that any integration problems would be overcome and not affect achieving the end synergy goals, with Defendant Pane noting Consumer Beauty's uneven performance but stating that "we continue to deliver on our merger synergies." ¶¶54, 92. During the earnings call, Defendant Talhouët lauded that the P&G Beauty Business integration was "progressing in line with our timetable," and that Coty had "broadened the scope" of the integration. ¶¶56, 93.

Discussing full fiscal year 2018 results in an August 21, 2018 press release, Coty characterized then-current integration problems as "short term supply chain disruptions" that would be over by the next fiscal quarter and would not affect Coty's revenue targets. ¶¶60, 101. The very next quarter, in a November 7, 2018 10-Q for the first fiscal quarter of 2019, just three months before the announcement of the $1 billion impairment, Defendants disclosed that the "supply chain disruptions" continued past the time Coty had assured they would be resolved, but again assured that the supply chain issues were short-term, and that they would "resolve in the third quarter of 2019." ¶¶61, 103. In a press release issued that same day, Coty again called the integration difficulties "temporary," and Defendant Pane told investors that the P&G Beauty Business integration was "near completion," and that the supply chain integration issues would not affect Coty's achieving $750 million in synergy savings from the P&G Beauty Business acquisition. ¶¶62, 104. During the November 7, 2018 earnings call, Defendant Pane stated that the Company had confronted no systemic issues in integrating the P&G Beauty Business, stating that "we really did a lot of complex integration things without having any issue." ¶105.

Just three months later, on February 8, 2019, in a 10-Q for the second fiscal quarter of 2019, Coty announced a $965.1 million impairment of goodwill and intangible assets, almost entirely related to the Consumer Beauty segment and the P&G Beauty Business assets. ¶66.

Contradicting their previous pronouncements throughout the Class Period that any integration difficulties had been short-term and successfully overcome, Defendants stated in a press release that the "difficult trajectory" of Coty's Consumer Beauty division would prevent Coty from achieving growth for the foreseeable future. ¶¶67, 109. Further, during the February 8, 2019 earnings call, Defendants disclosed that despite having repeated just three months earlier that Coty would achieve its $750 million announced synergy savings, ¶62, Coty had failed to achieve those synergies and realize the savings from the P&G Beauty Business acquisition. ¶68.

On July 1, 2019, Coty announced an additional almost $3 billion impairment of goodwill and intangible assets, related to Consumer Beauty and the P&G Beauty Business assets, confirming that the P&G Beauty Business had been vastly overvalued. ¶¶149, 155.

During a July 1, 2019 earnings call, Defendants revealed the material falsity of their Class Period disclosures that the P&G Beauty Business integration had proceeded smoothly and suffered only "temporary" or "short-term" issues. Defendant Laubies stated that "it is clear that the difficulty of th[e P&G Beauty Business] merger lies at the heart of many of the issues that Coty has faced since then" because the "integration took longer and was more complex than originally envisioned" and "many parts of the acquired business had weak performance since the merger." ¶151. Laubies continued that it was "very true that the P&G Beauty Business merger has led to value separation and financial setbacks for Coty." ¶151.

On August 28, 2019, Coty confirmed that of the $3.9 billion in goodwill and intangible assets impairments, almost all of it was related to Consumer Beauty and the P&G Beauty Business acquisition. ¶155.

C.    **Coty Misrepresents its Digital Advertising and Marketing Focus**

Throughout the Class Period Defendants touted their concentration on e-commerce and digital transformation to support the integration and increase Consumer Beauty and other sales. In

the February 9, 2017 10-Q for the second quarter of fiscal year 2017, Coty claimed to be "accelerating our end-to-end digital transformation including e-commerce." ¶¶41, 75. In an earnings call that same day, Defendants emphasized that they were switching their focus to digital and e-commerce. ¶76. Three months later, on May 10, 2017, in a press release discussing third quarter 2017 results, Defendants again stated that they were "accelerating our end-to-end digital transformation including e-commerce." ¶¶44, 78.

During the August 22, 2017 earnings call, Defendant Pane touted not only the Company's focus on e-commerce, but that Coty was succeeding, stating that Coty had "continued success … both on our digital communication and e-commerce expansion," and specifically touting the results for Coty's CoverGirl campaign, which he claimed had "significantly exceeded our expectations." ¶¶48, 82. The next day, August 23, 2017, in Coty's 2017 10-K, Defendants told investors that they were focused on taking advantage of their "end-to-end digital capabilities." ¶¶49, 83. Defendants repeated this exact claim three months later, on November 9, 2017, in the 10-Q for the first quarter of 2018. That same day, in an earnings call, Defendant Pane linked Coty's positive results to "end-to-end digital transformation, including e-commerce." ¶¶52, 85-86.

Coty touted its digital transformation and e-commerce focus and success each quarter during the Class Period. In the February 8, 2018 10-Q for the second quarter of 2018, Defendants stated that they were focused on taking advantage of their "end-to-end digital capabilities." ¶¶53, 90. During an earnings call that same day, Defendant Pane stated that Coty was "accelerat[ing] our end-to-end digital transformation, including e-commerce," and that Coty was "putting a lot of focus [on]" and "working very hard on digital innovation." ¶¶53, 90.

During a May 9, 2018 earnings call, Defendant Pane called Coty's e-commerce efforts a "big focus." ¶¶56, 94. Defendant Talhouët represented Coty at a June 12, 2018 conference hosted

by Deutsche Bank. Defendant Talhouët stated that Coty was putting "much more focus on the digital transformation of the company," and on e-commerce, and that Defendant Pane was a "very strong advocate on that." ¶¶58, 96. In the 2018 10-K filed on August 21, 2018, and in a press release that same day, the Company, discussing Coty's digital capabilities, stated that it was "advancing our end-to-end digital transformation and e-commerce efforts." ¶¶98-100. On November 7, 2018, in a press release discussing fiscal year 2018 results, Defendants again touted Coty's "end-to-end digital transformation." ¶60. On November 7, 2018, in the 10-Q for 2019's first quarter, Coty further emphasized that it was "advancing our end-to-end digital transformation." ¶¶61, 106.

On February 8, 2019, announcing the almost $1 billion impairment, Coty impaired $90.8 million related to the intangible assets of CoverGirl's and Clairol's tradenames, the same CoverGirl about which Coty had bragged earlier that its digital campaign had "significantly exceeded our expectations." ¶¶48, 67, 108. Nevertheless, Defendants called the e-commerce efforts a "bright spot in Consumer Beauty," even as it impaired Consumer Beauty by $1 billion. ¶¶68, 110.

At the end of the Class Period, on July 1, 2019, Coty finally disclosed that digital advertising and e-commerce had never been a focus or priority. Defendant Terisse told investors that Coty's advertising had been at a level below industry standards *for years*, and that the Company now intended to raise spending to industry levels. ¶150. Defendant Terisse specifically emphasized the lack of previous investment in digital and e-commerce, announcing that Coty would shift spending to working media, "both digital and conventional." ¶150. On August 28, 2019, during an earnings call, Defendants reiterated that during the Class Period Coty's digital spending had been far below its peers and could never be described as a "focus." Defendant Terisse

stated that "[t]he percentage of A&CP being digital is now close to that of our peers." ¶156. In response to an analyst question, Defendant Terisse further stated that Coty was now "definitely aim[ing] at stepping up our level and start closing the gap we have with competition." ¶156.

### D.    Coty's Risk Warnings about the P&G Beauty Business Integration

Throughout the Class Period, in every quarterly and annual SEC filing and during every earnings call, Coty warned, generally, about the risk that a failure to successfully integrate the P&G Beauty Business could materially adversely affect its financial success, its ability to realize synergies, and its stock price. ¶¶123-140. In none of these risk warnings, or elsewhere in the SEC filings and earnings calls, did Defendants ever state that these risks had materialized, in whole or in part, or that the failure of the integration could or might lead to impairing $4 billion in goodwill and intangible assets related to Consumer Beauty and the P&G Beauty Business assets. ¶¶123-140.

### E.    Coty Fails to Impair the Full $4 Billion in Goodwill and Intangible Assets in February 2019

On the February 8, 2019 earnings call, Defendant Terisse disclosed that "competitive and market pressure throughout the first half of fiscal 2019 [ending on December 31, 2018], which resulted in weaker-than-expected revenues and earnings" in Consumer Beauty, combined with an increase in the discount rate associated with the division, caused management to determine "that there were indications that the goodwill of this division, as well as certain trademark intangible assets, may be impaired and accordingly an interim goodwill impairment test was performed as of December 31, 2018." ¶181.

On February 8, 2019, in its Q2 2019 10-Q, Coty recorded a $965.1 million impairment charge. The impairment charge consisted of $832.5 million for the Consumer Beauty goodwill, $97.8 million for Consumer Beauty trademarks and licenses (CoverGirl, Clairol trademarks, a

regional Brazilian skin care trademark, and a regional hair license agreement), $22.8 million for the philosophy trademark (part of Luxury), and $12.0 million for a corporate equity security investment. ¶173.

In the February 8, 2019 10-Q, the Company disclosed the following adverse conditions which contributed to a decline in its quarterly revenues and necessitated the impairment testing:

(a)    Negative market share trends in the color cosmetics, hair color and mass fragrance categories as a result of shelf-space losses in North America and Europe for *CoverGirl*, *Rimmel* and *Clairol*;

(b)    Supply Chain Disruptions which resulted in lower net revenues mainly in the color cosmetics category, namely the *Rimmel*, *Max Factor* and *Bourjois* brands;

(c)    Reduced net revenues for *Max Factor*, *Bourjois*, *Adidas* and the retail hair line of *Wella* hair products due to decreased sales volume to improve retailer trade inventory levels;

(d)    Negative overall category trends in the color cosmetics and mass fragrance categories;

(e)    Reduced net revenues from *Younique* due to a decline in product sales and presenter sponsorship as we continue to refine our product offerings and compensation plan structure to drive improvements in presenter sales activity, recruitment, and retention.

(f)    Indicators of impairment related to the philosophy trademark that is part of the Luxury reporting unit. In addition to the impact of a 75 basis point increase in the discount rate, we considered the impact of lower than expected net

10

revenue growth in the U.S. during the quarter, shelf space losses at key retailers and a decrease in the level of expected profitability of the trademark. ¶174.

Coty's required annual impairment testing takes place on May 1 of each year. ¶187. Impairment testing requires gathering significant amounts of information ahead to time. ¶207. Coty did not announce an additional impairment on May 8, 2019. ¶176.

On May 8, 2019, one week *after* its annual required goodwill impairment test date, the Company filed its Q3 2019 10-Q in which it disclosed the following adverse conditions that contributed to a decline in its quarterly revenues:

(g)    Shelf-space losses primarily impacting *CoverGirl*, *Rimmel* and *Clairol* which have contributed to the negative share trends in the color cosmetics and hair color categories in North America;

(h)    Performance challenges in our brands across Europe which have contributed to the region's negative market share trends in the color cosmetics category;

(i)    Reduced net revenues from *Younique* due to a decline in product sales and presenter sponsorship as we continue to refine our product offerings to drive improvements in presenter sales activity, recruitment, and retention;

(j)    Reduced net revenues in North America due to the adoption of the New Revenue Standard primarily impacting *CoverGirl* and *Sally Hansen*; and

The negative impact of foreign currency exchange translation. ¶175.

On July 1, 2019, Coty announced an additional $2.87 billion impairment charge which, as was the case in Q2 2019, was almost entirely for goodwill and intangible assets related primarily to Consumer Beauty:

11

(k)    $2,558.6 million for Consumer Beauty goodwill;

(l)    $201.8 million for Consumer Beauty trademarks (CoverGirl, Max Factor, Sally Hansen, Bourjois, Clairol, two regional Brazilian trademarks and an undisclosed trademark);

(m)    $27.0 million for Wella trademark (Consumer Beauty); $86.8 million for philosophy trademark (Luxury). ¶177.

The same conditions that Coty stated caused it to take the almost $3 billion goodwill and intangible assets impairment on July 1, 2019, existed before December 31, 2018, at the time when it took the smaller $1 billion impairment:

(n)    75 basis point increase (from 7.25% to 8.0%) in the discount rate for the Consumer Brands division;

(o)    Negative trends and expectations related to *CoverGirl, Max Factor, Clairol, Younique,* and *Wella* hair products trademarks;

(p)    Supply chain disruptions which resulted in lower net revenues mainly in the color cosmetics category, namely the *Rimmel*, *Max Factor* and *Bourjois* brands;

(q)    Indicators of impairment related to the *philosophy* trademark that is part of the Luxury reporting unit; and

(r)    Increased costs and reduced cash flows from turnaround efforts. ¶¶183, 201.

## F.    Defendants Reveal the Full Truth

The Complaint alleges four partial and/or complete corrective disclosures. On February 9, 2017, before the market opened, Coty reported its first quarter fiscal year 2017 results after its completion of the P&G Beauty Business merger. Coty disclosed what it characterized as "short-

term negative transitional impacts especially including significant trade inventory build in the first quarter of fiscal 2017 in parts of the P&G business," indicating that the P&G Beauty Business may have been overvalued. At the same time, Defendant Pane assured the market that "[o]n the P&G Beauty Business merger, we are reiterating our previously communicated $750 million synergy target by fiscal 2020. The integration is progressing as expected, with no major issues to date." On this news, Coty's stock price dropped $1.76 per share, or nearly 9%, from a close of $20.04 per share on February 8, 2017 to close at $18.28 per share on February 10, 2017 after two days of trading on heavy volume. 142-143.

On August 22, 2017, before the market opened, Coty surprised investors, announcing disappointing financial results for the fourth quarter and fiscal year ended June 30, 2017 including a 10% organic revenue decline in Consumer Beauty—which historically accounted for nearly half of Coty's revenue—signaling that the integration of the P&G Beauty Business's over 40 beauty businesses was still not proceeding well. Defendant Pane disclosed that "our Consumer Beauty division remains under pressure," but assured investors that "[w]e completed the incredibly complex acquisition of the P&G Beauty Business, fully reorganized into a product and customer focused organizational structure, successfully reached significant milestones in our integration efforts, and boosted our brand portfolio…" and that "[r]egarding the P&G Beauty Business, our integration efforts are proceeding well and we remain on track with the synergy delivery." On this news, Coty's stock price dropped $3.31 per share, or nearly 17%, from a close of $19.55 per share on August 21, 2017 to close at $16.24 per share on August 24, 2017 after three days of trading on heavy volume. ¶¶144-145.

On November 7, 2018, before the market opened, Coty announced a bigger than expected decline in first quarter sales due to "several temporary supply-chain related headwinds" which

13

included "[w]arehouse and planning center consolidated disruptions in Europe and the U.S." While conceding the internal challenges integrating P&G's Beauty Business into Coty's structure, Defendant Pane indicated that the challenges would be short-lived: "With the P&G Beauty integration near completion, and after we have overcome the internal challenges, we will be better equipped to focus more externally." On this news, Coty's stock price dropped $2.88 per share, or nearly 26%, from a close of $11.18 per share on November 6, 2018 to a close of $8.30 per share on November 8, 2018 after two days of trading on heavy volume. ¶¶146-147.

On July 1, 2019, Coty announced an almost $3 billion impairment of goodwill and intangible assets, almost entirely related to Consumer Beauty and the P&G Beauty Business assets. ¶¶148-149. On news of the $3 billion impairment, Coty's stock price dropped $1.94, or over 14%, from an opening price of $13.53 per share on July 1, 2019 to a closing price of $11.59 per share that day on heavy volume.

## III.    ARGUMENT

### A.    Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), courts accept all well-pleaded allegations in a complaint as true, drawing all inferences in favor of plaintiffs. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 12 (2d Cir. 2011). Although the factual allegations "must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), once a complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that a §10(b) claim must "'specify'" each false statement, explain "'the reason or reasons why the statement [was] misleading,'" and "'state with particularity facts giving rise to a strong inference'"

14

of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)). Plaintiff adequately pleads all the elements of a §10(b) claim.

"[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Circumstantial evidence of reckless conduct gives rise to an inference of scienter if the complaint alleges "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ...." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). Specifically, a strong inference of scienter exists where a complaint alleges that the defendants: (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that their public statements were not accurate"; or (3) "failed to check information they had a duty to monitor." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 199.

The Court must view scienter allegations holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

**B.      The Complaint Adequately Alleges Falsity and Scienter**

Falsity and scienter … are generally strongly inferred from the same set of facts." *Plumbers Union Local 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 185 (S.D.N.Y.

15

2010), citing to *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). The Complaint's allegations adequately plead both falsity and scienter.

> **1.    The Complaint Adequately Alleges the Falsity of and Scienter for Defendants' Integration Statements**[4]

Defendants devote page after page of their MTD brief ("D.Br.") to publishing their own words,[5] hoping that the sheer volume of their own discussion of the P&G Beauty Business integration immunizes them from liability. Defendants' statements about the P&G Beauty Business integration, however, were materially false for failing to disclose the magnitude of the difficulties integrating the P&G Beauty Business to investors, and made with scienter.[6] Recently, in *Omega*, 968 F.3d 204, reversing dismissal, the Second Circuit found factually analogous statements by the defendant company actionably incomplete for disclosing problems but failing to reveal the magnitude of those problems, pleading both falsity and scienter. *Omega* controls here.[7]

Omega is a self-administered real estate investment trust that invested in nursing homes and assisted living facilities. *Omega*, 968 F.3d at 207. Orianna is Omega's second largest facilities

---

[4] Throughout their brief, Defendants misstate the clear meaning of quotes from documents they attach. For example, Defendants argue that when Coty referred in February 2017 to integration problems occurring after the P&G Beauty Business acquisition was finalized on October 3, 2016, but before November 9, 2016, *see* ¶¶36, 39, it did not mean what it said. D.Br. at 21. Yet the paragraph to which the Complaint refers quotes Defendant Pane speaking about "the new Coty" and "the combination of our iconic and emerging brands." *See* Def. Ex. T, at 2.

[5] *See. e.g.*, D.Br. at 6-14.

[6] Contrary to Defendants' suggestion, *See* Defendants' Brief (D.Br.") at 19 n.9, the Complaint alleges with particularity which named Individual Defendant made which quoted statements in quarterly and annual filings, and during earnings conference calls, while employed by and representing Coty. Where statements are unattributed within a particular SEC filing, and thus at a minimum attributable to Coty, the Complaint alleges with particularity which Individual Defendants signed SOX Certifications certifying the accuracy of the filed documents. ¶¶38, 40, 43, 49, 51, 53, 54, 58, 61, 66, 69.

[7] Defendants submit hundreds of pages of documents of which this Court may take judicial notice. They never justify their voluminous submissions, however, failing to assert that the Complaint misquotes them.

operator, representing 7% of Omega's investment portfolio. *Id.* at 208. By late 2016 and early 2017, Orianna was suffering "severe financial difficulties" and became delinquent on its rent payments to Omega. *Id*. On May 2, 2017, Omega made a $15 million working capital loan to Orianna that, in turn, Orianna used to pay quarterly rent back to Omega. *Id.*

Omega repeatedly and publicly discussed Orianna's financial troubles and inability to pay complete rent. Just after making the working capital loan, defendants stated that Orianna was suffering from "performance pressure" made worse by the "complete replacement of [Orianna's] senior management," and disclosed that Orianna's operational performance metrics meant that it had "significant cash flow issues." *Id*. at 208 & n.5. The defendants also stated on May 4, 2017 that as of the end of the previous quarter, Orianna was 45 days delinquent in its rent. *Id.* at 209, 214. The *Omega* defendants reassured analysts and investors, expressing comfort that Orianna would return to paying rent in full, but never mentioned the working capital loan. *Id.* at 209.

In the next quarter, in July 2017, Omega told investors that Orianna's financial condition had worsened, and that Orianna was "struggl[ing] with various operational pressures." *Id.* at 209–210. The defendants warned that "any further deterioration … may result in cash basis accounting [for Orianna]." *Id.* at 209. Omega's second quarter 2017 quarterly report on Form 10-Q stated that Orianna "has been facing liquidity pressures following a management transition." *Id.* at 210.

Omega further disclosed in July 2017 that as of the end of the previous quarter, Orianna was 90 days delinquent on its rent payments to Omega, *id*. at 214, but that Orianna was "currently making partial monthly rent payments." *Id.* The defendants did not disclose that those partial rent payments were made with the funds from the working capital loan, *i.e.*, were made with Omega's own money. Even as it disclosed Orianna's continuing difficulties, however, once again, the

defendants nevertheless expressed optimism that Orianna would "eventually return to its former profitability." *Id.* at 209.

By the end of the third quarter of 2017, Omega announced that Orianna had not achieved its goals, that it was placing Orianna on a cash basis, and that Omega had not recognized any revenue from Orianna during the quarter. *Id.* at 210–211. Omega announced that it had taken substantial impairments on direct financing leases and for uncollectible amounts related to Orianna. *Id.* at 210. The stock price fell materially, and investors were damaged.

The district court granted defendants' motion to dismiss, finding that omitting mention of the working capital loan was material, but that plaintiffs had failed to plead scienter with respect to the loan because Omega had "disclosed Orianna's financial predicament repeatedly to investors" in May and July of 2017. *Id.* at 211–212.

Reversing the district court's dismissal, the Second Circuit found that Omega had a duty to disclose the loan, and ruled that scienter was adequately pleaded. *Omega*, 968 F.3d at 213 n.12, 215. Even with Omega's repeated disclosures of Orianna's financial and operational issues, failure to disclose the loan gave investors "a false impression of the financial health of one of Omega's largest assets." *Id.* at 214.[8] The omission of the working capital loan, the Second Circuit wrote, "concealed the extent of Orianna's solvency problems: Orianna could not pay rent without borrowing from its landlord." *Id.* The Court noted that "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id*. at 214 n.15 (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). Having disclosed that Orianna was making "partial

---

[8] *See also Levin v. Res. Cap. Corp.*, No. 15 CIV. 7081 (LLS), 2016 WL 5867451, at *1 (S.D.N.Y. Oct. 5, 2016) (Stanton, J.) ("[t]o describe loan as 'performing' or 'current' without stating the qualification that it was a non-interest paying troubled debt of a borrower in financial difficulty" was materially misleading).

monthly payments," Omega was "duty-bound to disclose that its loan was the source of Orianna's rent payments." *Omega*, 968 F.3d at 214. "[B]y putting Orianna's rental payments 'in play,'" the Second Circuit wrote, "Defendants were required to speak accurately and completely." *Id*. at 215 n.15.

The Second Circuit ruled that scienter was adequately pleaded, holding that non-disclosure of the loan was at least "highly unreasonable" and was a "sufficiently extreme departure from the standards of ordinary care to satisfy the PSLRA's requirement for showing recklessness." *Id.* at 215. Orianna's financial performance "plainly impacted Omega's overall financial health; Omega had to know that revealing the full extent of Orianna's performance problems would have been troubling news to investors." *Id.* The pleaded facts "create[d] a compelling inference that Defendants made a conscious decision to not disclose the Loan in order to understate the extent of Orianna's financial difficulties." *Id.* Importantly, the Second Circuit continued, Omega's numerous disclosures of Orianna's financial difficulties ***strengthened*** rather than weakened the strong inference of scienter. "Those disclosures," the Court wrote, "support a finding of recklessness here as they strongly suggest that Defendants sought to use Orianna's 'partial rental payments' to express optimism and underrepresent the extent of those very problems." *Id.* at 216.[9]

*Omega* is directly on point. Defendants concede that the purchase and successful integration of the P&G Beauty Business assets was material to Coty's financial success. Just as in *Omega*, Defendants here warned generally of risks, in this case that the integration might not succeed, warnings that did not disclose the materialization of those risks. ¶¶123-140. Just as in *Omega*, Defendants here publicly disclosed specific problems with the integration, while always

---

[9] Defendants argue that the positive statements accompanying the disclosure of short-term integration issues are irrelevant to the analysis here, *see* D.Br. at 22, missing entirely that those optimistic statements served to "underrepresent the extent of those very problems."

19

including a positive statement about the integration or about achieving synergy goals, thereby using those positive statements to "express optimism and underrepresent the extent of those very problems." *Omega,* 968 F.3d at 216.[10] Just as in *Omega*, Defendants' disclosures and warnings did not disclose that the situation was much worse than the disclosures led investors to believe. The Circuit Court's ruling that falsity was adequately alleged because investors would have wanted to know that Orianna could not pay any rent on its own finds its analogy here in investors wanting to know that the integration was going far worse than revealed (and would result in an enormous impairment) and that the cause of Coty's financial problems all related to problems integrating the P&G Beauty Business assets.

Further, any argument that the magnitude of the problems was unknowable or unknown to Defendants before December 31, 2018, is absurd. Just as Omega recognized Orianna's distress long before the end of the Class Period, the Individual Defendants were laser-focused on the P&G Beauty Business integration,[11] discussing it in every quarterly statement and in every earnings call before the first impairment. ¶¶73-74, 78-79, 81-83, 88, 92-93, 101, 103-105. The success of the P&G Beauty Business integration was core to Coty's success. It is implausible to infer that a $4 billion impairment and the failure to achieve synergy goals, both almost exclusively related to the P&G Beauty Business assets and their integration, ¶¶149, 152, 155, snuck up on Defendants at the end of 2018.

---

[10]*See, e.g.,* ¶¶42-43, 78 (revealing "short-term" integration issues while assuring Coty was "making good progress" on integration); ¶¶54, 56, 92-93 (disclosing Consumer Beauty's uneven performance while assuring that the P&G Beauty Business integration was "progressing in line with our timetable"); ¶¶63, 104 (citing to "temporary" integration problems while assuring that the integration was "near completion" and problems would not affect achieving synergy savings).

[11] *See, e.g.,* ¶128 ("Our management has been, and will continue to be, required to devote a substantial amount of time and attention to the process of integrating the P&G Beauty Business with our business operations").

The Second Circuit has found that the magnitude of problems, alone, supports a strong inference of Defendants' recklessness. In *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000), the Second Circuit found that the magnitude of a write-off rendered less credible the proposition that the defendant believed it likely that it could recover royalty advances through future sales. The Second Circuit found "remarkable" the defendants' claim that "prior to the fourth quarter of 1997, [defendant] was unable to appreciate that the poor performance of its products after a disappointing first year sales required substantial expensing of royalty advances each quarter but suddenly realized that $73.8 million of $87.5 million in royalty advances, *i.e., over 84 percent* of the total royalty advances it had capitalized by the end of the third quarter of 1997, needed to be expensed." *Id.* (emphasis in original); *see also Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F. 3d 645, 666 (8th Cir. 2001) ("[T]he sheer size of the [ ] write-down adds to the inference that the defendants must have been aware the problem was brewing"); *Rehm v. Eagle Fin. Corp.,* 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("the mere fact that the company had to make a large correction is some evidence of scienter"); *Camelot Event Driven Fund, A Series of Frank Funds Trust v. Alta Mesa Resources, Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at *11 (S.D. Tex. Apr. 14, 2021) ("enormity of the [$3.1 billion] write-off over a short period of time is enough for the case against these defendants to proceed.").[12]

---

[12] Defendants cite to *In re Razorfish, Inc. Sec. Litig.*, No. 00 CIV. 9474 (JSR), 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001), claiming that statements related to integration can never be actionably false. D.Br. at 22-23. Defendants omit vital language from their quote from that case. Defendants quote from that decision that "integration" was "too uncertain a term on which to premise a securities claim." Defendants omit that the sentence ends with the words "in this context." 2001

The P&G Beauty Business purchase increased the Company's total assets by ***200%***, and its successful integration was not merely material, but core to Coty's financial success. *Rothman v. Gregor* is on point. Any argument that Defendants were unaware of the magnitude of the integration problems until the end of the Class Period is indeed "remarkable," and belies common sense and plausible inferences. The magnitude of the integration issues, resulting a $4 billion impairment, one-third of the purchase price for the P&G Beauty Business, and a missed synergy goal evidences Defendants' reckless disregard, by no later than the start of 2018 that the integration issues were far worse than Defendants disclosed.

All of Defendants' disclosures about "temporary" or "short-term"[13] problems in integrating the P&G Beauty Business, *see, e.g.,* ¶¶42-43, 54, 56, 63, 78, 92-93, therefore, were false, legally insufficient, and made with scienter. Defendants' failure to disclose the true magnitude of the integration problems materially misled the market.[14]

---

WL 1111502, at *2. Judge Rakoff reached no overarching conclusion. Rather, he ruled that the allegations in that particular case about integration did not adequately allege falsity. Many courts, however, have found statements about integration actionable, denying motions to dismiss. *See, e.g., Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 292–93, 298–99 (S.D.N.Y. 2018) (positive statements about integration including that it "remains on track" and is "meeting … expectations" actionably false); *In re Merit Medical Systems, Inc. Sec. Litig.*, No. 8:19-02326 DOC (ADSx), 2021 WL 1192133, at *2-3, 8 (C.D. Cal. Mar. 29, 2021) (finding actionably false statements that "integration … is going as well as could be expected" and "integration … continue[s] to drive growth" when half of the integration plans were not yet complete).

[13] Defendants' argument that "short-term negative transitional impacts" from "the magnitude of this integration" cannot be understood to mean short-term or temporary integration issues, D.Br. at 20, is unconvincing and ignores the plain meaning of Defendants' words.

[14] Defendants argue, in contrast to the cases cited above, that it is "fatal to Plaintiff's claims" that Defendants disclosed when they announced the $1 billion impairment in February 2019 that it would take some time for the Consumer Beauty division to meet its goals. D.Br. at 24. That Defendants said this only when the truth was partially disclosed, even as they refused to say that another $3 billion impairment was necessary, supports, rather than is fatal to, Plaintiff's case. Similarly, Defendants' recitation of periodic disclosures of problems with integrating the P&G Beauty Business, *see* D.Br. 24-25, do not help their cause. As discussed, Defendants hid from investors the ***magnitude*** of the integration problems. *Omega*, 968 F.3d at 214-15.

22

### 2.    The Complaint Adequately Alleges the Falsity of and Scienter for Defendants' Synergy Statements

*Omega* should lead this Court to conclude that the Complaint adequately alleges actionable false statements with respect to Defendants' claims that despite "temporary" integration issues Coty would realize the $750 million synergy savings from the P&G Beauty Business acquisition. ¶¶7, 40, 42, 46, 62, 73-74, 81, 104, 142, 144. As late as November 7, 2018, just three months before the $1 billion impairment and two years after the integration of the P&G Beauty Business assets began, Defendants assured investors that any integration issues would not stop Coty from achieving its $750 million announced synergy savings, ¶¶62, 104. Just three months later, Defendants finally told investors that the synergy savings would not be achieved, ¶68,[15] a realization that, like the magnitude of the integration problems, did not sneak up on Defendants. *See Rothman*, 220 F.3d at 92.

Even as Defendants repeatedly stated that Coty would achieve their synergy goals, they hid from investors the depth and magnitude of the integration problems. Investors were entitled to know the actual magnitude of the issues in considering for themselves Defendants' synergy statements. The failure to so disclose renders those statements actionably false.

---

[15] Defendants again omit relevant parts of sentences and misstate their meaning, quoting Defendants as having said they would meet their 2019 synergy target. *See* D.Br. at 21. A plain reading of the prose in question, including the words Defendants omitted from their brief, shows that Coty stated that it would only reach 50% of its goal. Def. Ex. FF, at 13 ("So just the answer on synergies. We were expecting about $225 million for the year. And we are on track, ***so I would say roughly half, so that's just to give you a sense***") (emphasis on clause D.Br. omitted). *Cf. In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588 n.1 (D.N.J. 2001) ("the Court would like to note that Defendants' counsel misrepresents the quoted language …. Misquoting cases is not acceptable in the Southern District of New York nor is it acceptable in the District of New Jersey."

Further, the Complaint adequately pleads scienter for these synergy statements. Defendants knew the truth about the integration problems and were, therefore, minimally reckless in their synergy statements. While Defendants were permitted to *hope* that the situation would materially improve, they were not permitted to *lie*. In *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008), the Seventh Circuit wrote that "the fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails," however, "is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." (citation omitted).

Citing to *Tellabs*, the Second Circuit in *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016), stated that though the defendant argued that "it is simply implausible that … any of the defendants would deliberately conceal the "misconduct of rogue employees for just over two months" because "the benefits of a brief concealment would be low," the Court noted that "[t]his argument confuses expected with realized benefits," and that it was "cogent and at least as compelling … to infer that … SAIC believed it had more time before prosecutors would reveal its role in the scheme … and that if SAIC believed it had more time," then "the benefits of concealment might [have] exceed[ed] the costs," citing *Tellabs.*, 513 F.3d at 710. "In fact, at that time," the Court continued, "it was unclear when and to what degree SAIC's role in the fraud would be made public." The Complaint adequately pleads that Defendants knew the truth about the magnitude of their integration problems, and the related truth about the synergy issues, and adequately alleges the falsity of and Defendants' scienter for Defendants' statements about synergy goals.

24

### 3.   The Complaint Adequately Alleges the Falsity of and Scienter for Defendants' Risk Warnings

The Complaint adequately alleges the falsity of and Defendants' scienter for all of the risk warnings in Coty's annual and quarterly statements and in earnings calls, cautioning about the hypothetical possibility that the integration would fail, *see* ¶¶123-140.[16] Having warned generally, the failure to disclose that the integration difficulties had materialized and materially impacted Coty's financial condition was fraud. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005). *See also Galestan*, 348 F. Supp. 3d at 291 (company's lengthy risk warning that integration could take longer than anticipated or fail to achieve benefits actionably false when integration-related changes had already produced negative financial results).

Risk disclosures, themselves, are actionable when they warn of a risk that has already materialized. *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (citations and internal quotations omitted) ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (reversing dismissal, holding that warning of possibility of product liability claims in the abstract is actionable when the risk had come to fruition), *aff'd* 563 U.S. 27 (2011); *Flynn v. Sientra, Inc.*, No. CV1507548SJORAOX, 2016 WL 3360676, at *10–11 (C.D. Cal. June 9, 2016).

Having adequately alleged Defendants published general, hypothetical risk warnings without disclosing that the risks had materialized, ¶¶123-140, and the magnitude of the

---

[16] *See, e.g.,* ¶123 ("We give no assurance that we will be able to successfully manage integration and operation of the P&G Beauty Brands business thereafter").

25

materialization of that risk, which adequately alleges Defendants' recklessness,[17] the Complaint adequately pleads both the falsity of and Defendants' scienter for their risk warnings.

### 4.    The Complaint Adequately Alleges the Falsity of and Scienter for Defendants' Statements About Digital Marketing and E-Commerce

From the start of the Class Period in 2016 until its end in 2019, Defendants touted their uptick and focus on digital marketing and e-commerce in support of the integration process. Their statement at the end of the Class Period—that their spending had been well below industry standards throughout the Class Period—proves the falsity of all of their earlier statements, establishing their scienter. Unable to escape this conclusion, Defendants obfuscate, even telling this Court, incorrectly, it may not consider Coty's end-of-Class Period statements.

Defendants touted throughout that they "would take advantage of" and were "accelerating our end-to-end digital transformation including e-commerce," and that it was a "big focus" *See, e.g.,* ¶¶41, 44, 49, 56, 75, 78, 83, 94. Defendants told investors they were having "continued success … both on our digital communication and e-commerce expansion," and specifically touted the results of their CoverGirl campaign, which they claimed had "significantly exceeded our expectations." ¶¶48, 82.

These statements, taken in context, created the impression that Defendants were actually doing what they said. But Defendants lied. Their spending on digital advertising and e-commerce was well below industry standards, an industry in which they proclaimed themselves a leader. ¶¶33-34. Defendants make no argument that they were not at all times aware of the amount of their digital and e-commerce spending, and Defendants disclosed at the end of the Class Period that Coty's advertising had been at a level below industry practices *for years*, and that the Company

---

[17] *See, e.g., Rothman*, 220 F. 3d at 92, *supra.*; *Omega*, 968 F.3d at 215-216, *supra*.

only now intended to raise spending and shift spending to working media, "both digital and conventional," stating on July 1, 2019 that it was finally "aim[ing] at stepping up our level and start closing the gap we have with competition," because its spending had been well below its peers. ¶¶150, 156.

There is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Defendants signaled to investors the importance to the success of the P&G Beauty Business integration of the digital and e-commerce spending and focus by talking about it every quarter. *See, e.g.,* ¶¶41, 44, 49, 56, 75, 78, 83, 94. Investors believed that Defendants were doing what they told them they were doing. Investors would certainly have wanted to know that Defendants were not actually following through or even bringing their spending levels near that of their competitors. These facts also establish their recklessness with respect to their failure to disclose their own misleading statements about digital and e-commerce spending and focus. Defendants knew yet continued telling investors that they were "***accelerating*** our end-to-end digital transformation including e-commerce," that it was a "big focus," and that they were having "continued success … both on our digital communication and e-commerce ***expansion***," *See, e.g.,* ¶¶41, 44, 48-49, 56, 75, 78, 82-83, 94. These were misrepresentations that establish not only falsity but scienter as well.

Defendants' argument that this Court may not consider, at all, Defendants' end-of-Class Period statements that they would increase digital and e-commerce spending to industry levels, *see* D.Br. at 26 n. 18, makes no sense at all. Defendants' statements are ***corrective*** of their previous

27

false statements, not themselves claimed as false.[18] A "later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his earlier statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) (citation omitted). Here, the Individual Defendants who made the statements, quarter after quarter, knew that spending lagged significantly behind Coty's peers. Yet they told the market that they were "focused" on the subject and having "continued success," *see. e.g.,* ¶82, when in fact they were not. Indeed, Coty impaired $90.8 million related to the intangible assets of CoverGirl's and Clairol's tradenames, the same CoverGirl about which Coty had bragged earlier that its digital campaign had "significantly exceeded our expectations." ¶¶48, 67, 108.

Defendants cite to Coty's statement that it cautioned investors that it might not increase its digital presence and grow its e-commerce activities. *See* D.Br. at 27, citing to Def. Ex. K, at 6. But this reference only strengthens the already-strong falsity and scienter inferences. Defendants knew they were not growing their digital activities in the way their statements led the public to believe. The risk had materialized, yet they never let investors know this. The Complaint adequately alleges the falsity of and Defendants' scienter for their statements about digital marketing and e-commerce.

---

[18] *In re Int'l Bus. Machines Corp. Sec. Litig.,* 163 F.3d 102, 107 (2d Cir. 1998), is distinguishable. In that case the court held that there is no liability for a statement made before the Class Period that was not alleged as false. The court nowhere stated that it could not consider a corrective disclosure that contradicted earlier statements.

**5. The Complaint Adequately Alleges the Falsity of and Scienter for Coty's Financial Statements and that Defendants Violated GAAP and SEC Regulations by Failing to Take the Entire $4 Billion Impairment in February 2019**

The Complaint alleges adequately that Coty should have taken the full $4 billion impairment on February 8, 2019, when it announced the $1 billion impairment. Coty's failure to do so violated GAAP and SEC regulations and led to the publishing of materially false financial statements. Further, the pleaded facts demonstrate Defendants' scienter.

GAAP and SEC regulations compelled Defendants to conduct the interim impairment analysis whose results they announced on February 8, 2019. ¶¶157-208. In impairing goodwill and intangible assets by approximately $1 billion, Defendants shared publicly the *seven* triggering factors they found existed. ¶174. When Coty announced the additional $3 billion impairment in July and August of 2019, it cited triggering factors *that already existed* before December 31, 2018, *i.e.*, substantially the same triggering factors. ¶¶179-183, 192-197. Defendants do not argue that the factors changed in the interim, or that they did not understand the factors they themselves published in both February and July of 2019. The entire impairment should have been recognized in February 2019.

*Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-CV-2475, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018), is instructive. In *Zwick* Plaintiffs alleged that Defendants were aware of "numerous triggering events" that should have prompted an earlier interim impairment. *Id.* at *5 & n. 7. Denying the motion to dismiss, the court held that "given the underlying 'red flags,' [] the decisions … not to take those impairments in 1Q 2016 were fraudulent." *Id.* at *6. Defendants' decisions not to take an impairment earlier "did not fairly align with the information in [Defendants'] possession at the time." *Id.* Acknowledging that impairment determinations are statements of opinion, *id*. at 4, the court stated that for the purposes of a motion to dismiss,

29

accepting all the allegations as true, the complaint adequately alleged falsity for failing to impair goodwill earlier.

The court in *Zwick* further found scienter adequately alleged. The court noted the pleading of numerous "red flags." Rejecting Defendants' explanation of a good faith error, the court noted the pleading of "specific indicators of impairment," and ruled the inference of scienter at least as strong as any opposing inference. *Id.* at 8-9. The facts establishing scienter are stronger here than in *Zwick*. Here not only does the Complaint allege "specific indicators of impairment" as of December 31, 2018, it pleads substantially similar "specific indicators of impairment" in July 2019, and both sets of indicators were published by Coty itself.

Defendants rely on *Lucescu v. Zafirovski*, No. 09CV4691 (DLC), 2018 WL 1773134, at *11–12 (S.D.N.Y. Apr. 11, 2018), for the proposition that allegations fail where the plaintiff alleges that the "same circumstances" existed earlier. D.Br. at 33. *Lucescu* reached no such overarching conclusion. The court listed plaintiff's "same circumstances" claim amongst other claims, but never cited that particular claim as the reason for dismissing. Further, in *Lucescu* plaintiffs averred that the "same circumstances" existed earlier, but defendant had not listed them on the earlier date plaintiffs claimed defendant should have impaired. *Lucescu*, 2018 WL 1773134, at *1–2. Here, Defendants themselves listed the "triggering events" that existed as of the earlier date, December 31, 2018. ¶174.[19]

The facts here are stronger than in *Zwick*, and *Lucescu* is distinguishable. Plaintiff does not have to convince that numerous triggering factors existed as of December 31, 2018. Rather, Coty

---

[19] *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *24 (S.D.N.Y. Apr. 2, 2020), is also factually distinguishable. In that case plaintiff claimed that defendants should have impaired intangible assets earlier when they impaired goodwill. Here, both were impaired on February 8, 2019, thus Plaintiff can point to the factors Defendants themselves disclosed existed as of December 31, 2018 as requiring the entire $4 billion be impaired on the earlier date.

stated that they existed and named them. ¶174. Nor does Plaintiff need to opine that substantially the same triggering factors existed when the later impairment was taken, as again, Defendants listed them, and their similarity is a matter of fact. ¶¶179-183.[20]

Having failed to recognize the full $4 billion impairment in either February 2019 or May 2019, the financial statements published on February 8, 2019, and on May 8, 2019, materially understated Coty's operating loss, net loss, and loss per share, and materially overstated Coty's goodwill and intangible assets. ¶¶112-115, 120-122.

The Complaint adequately alleges the falsity of and scienter for Defendants' financial and other statements during the Class Period for failure to impair the full $4 billion in February 2019. ¶¶108-122.

## C.    The Alleged False and Misleading Statements are Neither Forward-Looking Nor Protected by the Safe Harbor

Defendants' claim that the PSLRA's safe harbor shields them from liability for certain statements is unavailing. The large majority of the statements Defendants contend are forward-looking, *see* D.Br. at 33-39, are statements of present or historical fact not entitled to the protection of the safe harbor.

The Second Circuit acknowledges that, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245–49 (2d Cir. 2016). Even if "[m]ost" of the Integration Statements contain forward-looking elements, "statement[s] may contain some elements that look

---

[20] As the same triggering factors that existed as of December 31, 2018, still existed as of June 30, 2018, and having failed to take the entire $4 billion impairment in February, Defendants' failure to impair goodwill and intangible assets in May 2019 is adequately alleged as violating GAAP and SEC regulations, and as false. In May 2019 Defendants disclosed adverse conditions similar to the triggering factors it disclosed both before and after. ¶¶175-176.

forward and others that do not," and the "forward-looking elements" may be "severable" from the "non-forward-looking" elements. *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010). See also *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 CIV. 1580 (LGS), 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (statement that defendant was "achieving important milestones" not forward-looking even when attached to forward-looking statement that defendant "does not believe that its pending contractual claims and disputes will have a materially adverse effect on its future results of operations"). Further, "misrepresentation of present or historical facts cannot be cured by cautionary language." *Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264 (2d Cir. 2010).

In *MF Glob*, 620 F.3d at 144, reversing dismissal, the Court held that a statement that a system is "robust" invites the inference that the system will reduce a company's future risk. *Id.* Nevertheless, "robust" conveys "present or historical fact as to the measures taken." *Id..* In *Celestica*, 455 Fed. App'x. at 15, reversing dismissal, the Circuit Court held that representations that "the restructuring was going according to plan" and that the company was "managing its inventory well" "reported on past or present circumstances." Courts throughout the country have similarly distinguished the present or historical elements in mixed statements from the forward-looking elements. In *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1147 (9th Cir. 2017), the Ninth Circuit ruled that a statement about "current pipeline" in a mixed statement in support of future projections was not forward-looking. In *Tellabs, Inc.*, 513 F.3d at 705, the Seventh Circuit, holding that "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present," *id.* at 702, ruled that a statement that sales were "still going strong" stated both that current sales were strong and that they would continue to be so. Nevertheless, even though there is an "element of prediction in saying that sales are 'still going

32

strong,'" the safe harbor does not apply to the "statement's representations concerning current sales." *Id.* at 705.

Courts in this Circuit have similarly deemed "on track" statements to be statements of present or historical fact. In *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010), the court noted that "on track" statements are statements of current condition, citing to *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 473–74 (E.D.N.Y. 2001) (statement that company was "still on track" to maintain its revenue and growth earnings models was statement of present fact). Further, in *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564–65 (S.D.N.Y. 2011), the court found that a pharma company's disclosure that the FDA had requested "no additional trial in obesity" was a statement of present fact, and "an investor would have understood this statement to mean that … the FDA approval process was on-track."

The principle underlying these cases mandates that the mixed statements to which Defendants cite contain present or past-looking elements that are not entitled to the protection of the safe harbor. "The overall integration is progressing in line with our timetable," ¶¶56, 93, plainly contains present-looking elements. Coty is announcing that there is a timetable, with steps to be reached at particular times, and that as of the moment that the sentence is spoken, Coty has reached the point in that timetable it needed to be in order to one day achieve the goal of "overall integration" in line with that timetable. Similarly, "the integration is progressing as expected, with no major issues to date," ¶¶40, 42, 73-74, 142, is a statement of present and past progress. The clause "no major issues to date" has no forward-looking element at all, while "progressing as expected" refers, again, to Coty's timetable for the integration progress, and the "progress" is as of the date the statement is made, and not about the future. Similarly, the statements "our integration efforts are proceeding well and we remain on track with the synergy delivery," ¶¶46,

33

81, 144, and "the integration of the businesses … is well underway and on track," ¶¶47, 82, all contain statements of present or past fact, namely "proceeding well and we remain on track" and "on track." Similarly, even a statement such as "[w]e continue to target the total four-year synergies and working capital benefits of $750 million and $500 million, respectively, with no change to the operating costs to realize both," conveyed to investors both that synergy creation was in line with Coty's timetable as of that moment, and that as of that moment operating costs had not changed.[21]

Because the Complaint adequately alleges the falsity of all of the non-forward-looking elements of mixed statements, the falsity of each is adequately alleged.

**D.    Defendants' Statements About the State of the Integration Process Are Not Inactionable Puffery**

Defendants' argument that many of the statements they incorrectly claim are forward-looking are also inactionable puffery is similarly wrong. *See* D.Br. 39-41. In *Galestan*, 348 F. Supp. 3d at 303, the court ruled that statements about an integration process such as "the integration is going smoothly," when defendants were aware of material concerns, was actionable and not puffery. Similarly, statements such as "early success with the rollout" and references to the "popularity of [the] auto refinance program," "were not so general that a reasonable investor could not have relied upon them in evaluating whether to purchase" stock. *Id.* In *Vivendi*, the jury held that statements such as "the results produced … in the second quarter are well ahead of market consensus" were also not so general that an investor could not have relied upon them. *Vivendi*, 838 F.3d at 245. In *Novak*, 216 F.3d at 315, the Second Circuit held that statements such as "in good

---

[21] Similarly, Defendant Talhouët's statement at the Deutsche Bank conference that Coty was putting "much more focus on the digital transformation of the company," ¶¶57, 96, references a present statement that the focus was already occurring.

shape" and "under control," when defendants allegedly knew the opposite was true, were not merely "rosy predictions," but actionable.

The statements Defendants target as "puffery" are material and actionable. *See* ¶39. As explicated above, statements such as "on the integration, [we are] making good progress" and "our integration efforts are proceeding well and we remain on target with the synergy delivery" were statements of present fact important to investors in making investment decisions. Statements that Coty's integration of an entity it purchased for $11.5 billion, that tripled Coty's total assets, were proceeding in line with what Coty itself called its "timetable," ¶¶56, 93, implicate Coty's financial status, and eventually resulted in a $4 billion impairment of the very assets being integrated. To call them "puffery," is incompatible with the cited law.

Similarly, statements made by Defendants in every single quarter about their focus on digital marketing and e-commerce and its importance to the success of the integration were not inactionable puffery. *See* ¶¶41, 44, 49, 56, 75, 78, 83, 94 (Defendants "would take advantage of" and were "accelerating our end-to-end digital transformation including e-commerce," and it was a "big focus"; ¶¶48, 82 (Defendants said they were having "continued success … both on our digital communication and e-commerce expansion," and stated that the CoverGirl campaign "significantly exceeded our expectations"). By connecting the success of the integration to their expansion and focus on digital marketing and e-commerce, Defendants told investors that the focus on e-commerce was material and important. Since they knew, as they disclosed at the end of the Class Period, that their spending was well below industry standards throughout the Class Period,

35

¶¶150, 156, these statements "were not so general that a reasonable investor could not have relied upon them in evaluating whether to purchase" Coty stock. *Galestan*, 348 F. Supp. 3d at 303.[22]

The statements Defendants challenge are actionable, and not puffery.

## E.    The Complaint Adequately Alleges Actionable Omissions

Defendants' statements are also actionable because they omitted material information about the state of the integration process. Courts in this Circuit have consistently held that the "PSLRA" safe harbor [provision] … does not protect material omissions." *Galestan,* 348 F. Supp. 3d at 304 (*quoting Wilson v. LSB Indus., Inc.*, No. 15 CV 7614 (RA), 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017). In *Galestan,* the court found that defendants' failure to disclose problems and uncertainties of which they knew relating to the integration they had discussed was an omission that, if disclosed, would have influenced investors' decision to purchase or sell the stock. The court concluded that because the allegations related to "omissions of material information, the PSLRA safe harbor provision cannot insulate the challenged statements." 348 F. Supp. 3d at 304.

Defendants' attempts to undermine this conclusion fails. Defendants cite to cases holding that "vague and inconsequential" statements cannot be actionable omissions, and that not every fact must be disclosed. *See. D.Br. at 43*. Defendants ignore the actual allegations. The Complaint does not allege the omission of "vague and inconsequential" facts, but, having created the false impression that the P&G Beauty Business integration was going well, was "on track," and any problems were "temporary" and would be overcome soon, Defendants were duty bound to disclose

---

[22] The cases Defendants cite are distinguishable. *See, e.g., In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 CIV. 7840 (RJS), 2018 WL 2081859, at *11–12 (S.D.N.Y. Mar. 30, 2018) (statement that defendant "has performed well in this challenging environment" puffery, especially as defendants disclosed the reasons the environment was "challenging").

*that they were not telling the truth*. Such disclosures were material and would certainly have influenced investors' decisions to buy or sell Coty stock.

### F.    The Complaint Adequately Pleads a Claim for Control Person Liability

For the reasons described above, the Complaint adequately pleads a claim against the Individual Defendants for control person liability under Section 20(a) of the Exchange Act. For the reasons stated above, the Complaint alleges a primary violations of Section 10(b). It also alleges the Individual Defendants' control over Coty. ¶¶230-233 (Second Claim)Accordingly, the Complaint adequately alleges Section 20(a) control person liability.[23]

---

[23] Courts in this Circuit have consistently erred, imposing a burden on plaintiffs to plead a control person's "culpable participation" with heightened particularity. The Exchange Act's plain language rejects that. Once a court finds a complaint adequately pleads a primary violation against a controlled party, the controlling party is jointly and severally liable, "unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action." 15 U.S.C.A. § 78t(a). Thus, the statute's plain language establishes an affirmative defense of "good faith," but does not require that a complaint plead or a plaintiff bear the affirmative burden of proving at summary judgment or trial "culpable participation." The *dictum* in *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 109 (2d Cir. 2007) relies on *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) in which the Second Circuit reviewed judgment following a bench trial. *Compare In re Tronox, Inc. Sec. Litig.*, No. 09 CIV. 6220 (SAS), 2010 WL 2835545, at *14–15 (S.D.N.Y. June 28, 2010) with *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437–38 (S.D.N.Y. 2014). Even if, however, this Court requires that the Complaint plead culpable participation against the Individual Defendants, for the reasons stated above, the Complaint's scienter allegations suffice.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. Should the Court grant Defendants' motion in whole or in part, Plaintiff respectfully requests leave to amend the Complaint within 30 days.

Dated: April 22, 2021                                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jacob A. Goldberg
Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

and

Phillip Kim
Laurence M. Rosen
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the
Putative Class***

38

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2021, I electronically filed the foregoing *Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Email: jgoldberg@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*