**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CRYSTAL GARRETT-EVANS, Individually, :
and on Behalf of All Others Similarly Situated, :
                                 :

                Plaintiff,      :

                                   :

          v.                    :     20-cv-07277 (LLS)

                                     :

COTY INC., LAMBERTUS "BART" BECHT, :
CAMILLO PANE, PIERRE LAUBIES,      :
PATRICE DE TALHOUËT, and          :
PIERRE-ANDRE TERISSE,            :

                                     :

              Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CERTAIN DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Jay B. Kasner
Scott D. Musoff
Thania Charmani
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
jay.kasner@skadden.com
scott.musoff@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants Coty Inc., Lambertus Becht, Patrice de Talhouët and Pierre-André Terisse*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT.............................................................................................................................2

I.      PLAINTIFF HAS NOT IDENTIFIED ANY ACTIONABLE FALSE OR
        MISLEADING STATEMENTS..................................................................................2

        A.      Statements Concerning the Integration of the P&G Beauty Business Were
                Not False or Misleading..................................................................................2

        B.      Plaintiff's Allegations Regarding Coty's Estimates of Impairment of
                Goodwill and Intangible Assets Fail to Satisfy Controlling Standards .................10

        C.      Coty's Synergy Statements Were Not False or Misleading...................................16

        D.      Statements Concerning Coty's Digital Marketing Efforts Were Not False
                or Misleading .................................................................................................17

        E.      The PSLRA Safe-Harbor Protects Many of the Challenged Statements...............19

        F.      Many of the Challenged Statements Are Nonactionable Puffery or
                Sincerely Held Statements of Opinion................................................................23

        G.      Plaintiff Has Not Identified Any Actionable Omissions ......................................26

II.     PLAINTIFF FAILS TO PLEAD CONSCIOUS MISBEHAVIOR OR
        RECKLESSNESS........................................................................................................27

III.    PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD BE DISMISSED ...........................33

IV.     THE REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED............................33

CONCLUSION..........................................................................................................................33

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE(S)**

*In re Adient plc Securities Litigation*,
    No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ....................... passim

*In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................................31

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020)..................11

*In re Bemis Co. Securities Litigation*,
    No. 19 Civ.. 3356 (JPC), 2021 WL 101559 (S.D.N.Y. Jan. 12, 2021)..............................22

*In re Bernard L. Madoff Investment Securities LLC*,
    818 F. App'x 48 (2d Cir. 2020) .......................................................................................33

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) .......................................................................................25

*Camelot Event Driven Fund v. Atla Mesa Resources, Inc.*,
    No. 4:19-CV-957, 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021)....................................31

*Chapman v. Mueller Water Products, Inc.*,
    466 F. Supp. 3d 382 (S.D.N.Y. 2020)..............................................................13, 14, 16, 23

*City of Roseville Employees' Retirement System v. Nokia Corp.*,
    No. 10 CV 00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) .......................................7

*City of Taylor General Employees Retirement System v. Magna International Inc.*,
    967 F. Supp. 2d 771 (S.D.N.Y. 2013)........................................................................5, 6, 7

*Cole v. Blackwell Fuller Music Publishing, LLC*,
    No. 16-CV-7014 (VSB), 2018 WL 4680989 (S.D.N.Y. Sept. 28, 2018)....................15, 24

*In re Coty Inc. Securities Litigation*,
    No. 14-cv-919 (RJS), 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)..................................4

*In re Diebold Nixdorf, Inc., Securities Litigation*,
    No. 19-CV-6180 (LAP), 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021).................. passim

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).......................................................................................25, 27

*Edison Fund v. Cogent Investment Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008)..............................................................................23

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011)...............................................................................................1

*In re FBR Inc. Securities Litigation*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)...............................................................................23

*In re FedEx Corp. Securities Litigation*,
    No. 1:19-cv-05990 (RA), 2021 WL 396423 (S.D.N.Y. Feb. 4, 2021) ..................18, 22, 33

*In re Ferrellgas Partners, L.P., Securities Litigation*,
    No. 16 Civ. 7840 (RJS), 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018),
    *aff'd*, 764 F. App'x 127 (2d Cir. 2019)..............................................................................21

*Finger v. Pearson PLC*,
    No. 17 Civ. 1422 (RJS), 2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019)....................11, 29

*Florida State Board of Administration v. Green Tree Financial Corp.*,
    270 F.3d 645 (8th Cir. 2001) ............................................................................................31

*Flynn v. Sientra, Inc.*,
    No. CV 15-07548 SJO (RAOx), 2016 WL 3360676 (C.D. Cal. June 9, 2016).................23

*Freudenberg v. E\*Trade Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................................21

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)..........................................................................23, 26

*In re General Electric Securities Litigation*,
    Nos. 19cv1013 (DLC), 19cv1244, 2020 WL 2306434 (S.D.N.Y. May 7, 2020),
    *aff'd*, 844 F. App'x 385 (2d Cir. 2021)........................................................10, 12, 13, 29

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................................27

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020), *aff'd*, No. 20-1530-cv, 2021 WL 745310
    (2d Cir. Feb. 26, 2021)......................................................................................................20

*Gurfein v. Ameritrade, Inc.*,
    411 F. Supp. 2d 416 (S.D.N.Y. 2006)...............................................................................33

*Harbinger Capital Partners LLC v. Deere & Co.*,
    632 F. App'x 653 (2d Cir. 2015) ......................................................................................33

*In re Health Management Systems, Inc. Securities Litigation*,
    No. 97 CIV. 1865 (HB), 1998 WL 283286 (S.D.N.Y. June 1, 1998) .................................7

*In re HEXO Corp. Securities Litigation*,
    19 Civ. 10965 (NRB), 2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) .......................... passim

*In re Iconix Brand Group, Inc.*,
    No. 15 Civ. 4860 (PGG), 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017)..........................28

*Indiana Public Retirement System v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)..................................................................................................32

*Levin v. Resource Capital Corp.*,
    No. 15 Civ. 7081 (LLS), 2016 WL 5867451 (S.D.N.Y. Oct. 5, 2016)................................9

*Leykin v. AT & T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007)..................33

*In re Loral Space & Communications Ltd. Securities Litigation*,
    No. 01 Civ. 4388 (JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) .........................2, 28

*Lucescu v. Zafirovski*,
    No. 09cv4691 (DLC), 2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018) .............11, 13, 14, 29

*Makor Issues & Rights Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .............................................................................................32

*Manavazian v. Atec Group*,
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) ...............................................................................21

*In re Noah Educational Holdings, Ltd. Securities Litigation*,
    No. 08 Civ. 9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ...........................23

*In re Nokia Corp. Securities Litigation*,
    No. 19-cv-3509 (ALC), 2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ........4, 8, 24, 27, 33

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006).........................................................................10, 19

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..............................................................................................26

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015).......................................................................................1, 10, 11, 16

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of*
    *Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)...............................................................................28

*Pope Investments II LLC v. Deheng Law Firm*,
    No. 10 Civ. 6608 (LLS), 2011 WL 5837818 (S.D.N.Y. Nov. 21, 2011) ..........................32

*In re PXRE Group, Ltd., Securities Litigation*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Group
   Ltd.*, 357 F. App'x 393 (2d Cir. 2009).................................................................28

*In re Razorfish, Inc. Securities Litigation*,
   No. 00 CIV. 9474 (JSR), 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001)...........................4

*Rehm v. Eagle Finance Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) ..................................................................31

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..................................................................9, 17, 24

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).............................................................................30

*Setzer v. Omega Healthcare Investors, Inc.*,
   968 F.3d 204 (2d Cir. 2020)......................................................................7, 8, 30

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) .................................23

*In re Skechers USA, Inc. Securities Litigation*,
   444 F. Supp. 3d 498 (S.D.N.Y. 2020)..............................................................33

*SRM Global Fund Ltd. Partnership v. Countrywide Financial Corp.*,
   No. 09 Civ. 5064 (RMB), 2010 WL 2473595 (S.D.N.Y. June 17, 2010),
   *aff'd*, 448 F. App'x 116 (2d Cir. 2011).........................................................2, 5, 26

*In re Supercom Inc. Securities Litigation*,
   No. 15 Civ. 9650 (PGG), 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018).....................21

*Tanaskovic v. Realogy Holdings Corp.*,
   No. 19-15053 (SRC), 2021 WL 211049 (D.N.J. Jan. 21, 2021)................................20

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)............................................................................11

*In re UBS AG Securities Litigation*,
   No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub
   nom. City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)......................................................................15, 24

*In re Vale S.A. Securities Litigation*,
   No. 1:15-cv-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017)......................26

*In re Van der Moolen Holding N.V. Securities Litigation*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)..............................................................22

v

*In re Vivendi, S.A. Securities Litigation*,
    838 F.3d 223 (2d Cir. 2016)............................................................................................26

*In re Wachovia Equity Securities Litigation*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)..............................................................................6

*Woolgar v. Kingstone Cos.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020).............................................................................15

*Zwick Partners, LP v. Quorum Health Corp.*,
    No. 3:16-cv-2475, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ...........................15, 31

## PRELIMINARY STATEMENT

Plaintiff's Opposition (the "Opposition" or "Opp.") magnifies the fatal flaws of the Complaint.[1]  The Opposition relies on long-discredited pleading techniques to criticize Coty's subjective accounting judgments while ignoring controlling Supreme Court and Second Circuit precedent.

First, Plaintiff complains that Coty encountered challenges in integrating the P&G Beauty Business, which Plaintiff surmises should have led Coty to record a greater impairment of its goodwill and other intangible assets in February 2019 than it had done, rather than having recorded an additional impairment in August 2019.  But Plaintiff fails to recognize, let alone sufficiently address in her Opposition, that Coty's accounting judgments constitute quintessential matters of opinion for which Plaintiff must satisfy the demanding pleading standards articulated in, among other cases, *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) and *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (impairments to goodwill and other intangible assets "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact").[2]

Further, the Opposition confirms that no plausible reading of Coty's disclosures can suggest that Coty's accounting judgment to record a $965 million impairment in February 2019 resulted from securities fraud rather than a good faith implementation of Coty's impairment testing. Quarter after quarter, Coty disclosed the challenges it faced in integrating the P&G Beauty Business and warned of the specific risks inherent in an integration of this size.  (Br. at 9-14.) Plaintiff fails to explain "why or how" these disclosures were deficient or misleading when made.

---

[1] Capitalized terms have the same definitions as those set forth in Defendants' Principal Brief ("Br.").

[2] Neither *Omnicare* nor *Fait*, and their line of cases which provide the appropriate legal framework for the majority of Plaintiff's claims, are addressed or even cited in the Opposition.

*See SRM Glob. Fund Ltd. P'ship v. Countrywide Fin. Corp.*, No. 09 CIV. 5064 (RMB), 2010 WL 2473595, at *8 (S.D.N.Y. June 17, 2010), *aff'd*, 448 F. App'x 116 (2d Cir. 2011).

Second, Plaintiff's failure to allege a cogent and compelling strong inference of scienter with particularity constitutes an independent basis to dismiss. Plaintiff has identified no document, no confidential witness and no well-pleaded fact to support Plaintiff's bold allegation that Defendants knew that their statements were false when made. In an effort to conceal the paucity of her scienter allegations, Plaintiff ends every section of her equally deficient falsity allegations by stating that the Complaint adequately pleads "the falsity of and Defendants' scienter for . . . ." (*See, e.g.*, Opp. at 24, 26, 28; *see also id.* at 22, 31.) But apart from inapposite cases, that is the depth of Plaintiff's entire scienter argument. This is patently insufficient to satisfy Plaintiff's heightened burden which is subject to especially stringent standards. *See In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004) (to demonstrate recklessness relating to subjective accounting judgments, a plaintiff must at least allege "that the failure to take an impairment charge earlier was . . . an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud").

For these reasons, and the reasons set forth below and in Defendants' Principal Brief, the Complaint should be dismissed with prejudice and without leave to amend.

## ARGUMENT

### I.  PLAINTIFF HAS NOT IDENTIFIED ANY ACTIONABLE FALSE OR MISLEADING STATEMENTS

#### A.  Statements Concerning the Integration of the P&G Beauty Business Were Not False or Misleading

Plaintiff's Opposition focuses on a theory (almost entirely absent from the Complaint) that although Coty made multiple and iterative disclosures regarding the issues it faced with the integration of the "incredibly complex acquisition" of the P&G Beauty Business (AC ¶ 81), it

nonetheless failed to disclose the "magnitude" of these "difficulties" and that is purportedly the "fraud." (Opp. at 1.) Not so. Coty accurately and timely disclosed the state of the Company's integration efforts, including not only the challenges it faced, but also the continuous effects of these challenges on the Company's operations and financial performance. That is precisely why the Principal Brief "devote[s] page after page . . . to publishing [Defendants'] own words" (Opp. at 16); Defendants' own disclosures throughout the Class Period provided investors with all the information that Plaintiff now complains was omitted.

For example, Coty told investors: the merger would be more expensive than planned, incurring an additional $700 million in operating expenses and $100 million in capital expenditures, (Ex. F, Q1 2017 10-Q, at 60); "[t]he business was impacted by significantly higher-than-anticipated inventory levels in the market," (Ex. A, Q2 2017 Earnings Call Tr., at 4); Coty experienced "continued negative performance" and "continued . . . underlying challenges" in Consumer Beauty, (Ex. U, Q3 2017 Earnings Call Tr., at 4-5); "we have inherited a business . . . smaller in operating margin than our expectation," and Coty would take longer to hit its 2020 earnings-per-share target, (Ex. X, Q1 2018 Earnings Call Tr., at 8); "recovery [in Consumer Beauty] is taking longer than expected," citing "the decline of the mass beauty market" and "supply chain disruption," (Ex. P, Q4 2018 8-K at 4-5); Coty would record $250 million in restructuring charges because the P&G Beauty Business "became smaller" during the "16 months [following] . . . the announcement" but it "was designed for a larger business," (Ex. AA, Q4 2018 Earnings Call Tr., at 16); and "Consumer Beauty remains challenged" with "high single-digit decline" due in part to "disappoint[ing] . . . supply chain disruptions." (Ex. BB, Q1 2019 Earnings Call Tr., at 4, 13.)[3]

---

[3] Plaintiff inaccurately describes Defendants' statements regarding supply chain disruptions. According to Plaintiff, Coty stated that supply chain disruptions "would not affect [its] revenue targets." (Opp. at 5.) Instead, Mr. Pane said the disruptions "will have a significant impact on both top and bottom line," but Coty's "FY19 targets take these

Plaintiff makes vague references to allegedly concealed "integration issues" (Opp. at 22), but fails to identify any statement or fact that contradicts, or even casts doubt on, *any* of these disclosures.[4]  Judge Carter and Judge Preska recently rejected nearly identical allegations where plaintiffs provided no evidence to support vague allegations that defendants failed to disclose integration issues.  *See In re Nokia Corp. Sec. Litig.*, No. 19-cv-3509 (ALC), 2021 WL 1199030, at *15 (S.D.N.Y. Mar. 29, 2021) ("[p]laintiff d[id] not meaningfully specif[y] the respects as to which such integration is said to have occurred which had not actually occurred" and "relies on vague references to 'integration' and alleged 'significant problems,'" which "is not sufficient to plead falsity"); *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19-CV-6180 (LAP), 2021 WL 1226627, at *11 (S.D.N.Y. Mar. 30, 2021) ("Critically, [p]laintiff points to no <u>data</u> . . . suggesting that [d]efendants' statements regarding . . . integration efforts were false or misleading <u>when made</u>, let alone that [d]efendants knew of such data but made their representations anyway.").[5]

---

disruptions into consideration." (Ex. P, 4Q 2018 8-K, at 2.)  Plaintiff also states that Coty "assured" investors that supply chain disruptions would be resolved prior to the first quarter of 2019. (Opp. at 5.)  Instead, Mr. Pane said "the impact of the supply chain . . . will come in 1Q19, with a smaller tail end in 2Q19." (Ex. P, 4Q 2018 8-K, at 2.)

[4] Plaintiff asks the Court to rewrite the plain meaning of Coty's statements, accusing Defendants of "misstat[ing] the clear meaning of quotes from documents they attach." (Opp. at 16 n.4.)  For example, in one of Mr. Pane's first press releases as CEO, he reflected: "This is a long term journey and will require time and effort, as we will need to tackle short term challenges like the ones we faced in the first semester, complete the P&G Beauty Business integration and most importantly implement new programs to drive growth and further strengthen our brand portfolio and management capabilities." (Ex. T, Q2 2017 8-K, at 2.)  Plaintiff insists that because Mr. Pane listed both Coty's challenges and the P&G integration in the same sentence, he confessed that "integration problems had been present 'in the first semester.'" (Opp. at 16 n.4; *see also* AC ¶¶ 39, 40, 73.)  Not so.  The fact that Mr. Pane also commented that it was his "privilege to be leading the new Coty" and that Coty's "great future potential" includes "the combination of our iconic and emerging brands, energized employees, and the comprehensive strategy we are laying out," is simply irrelevant. (*See* Ex. T, Q2 2017 8-K, at 2.)  Similarly, Plaintiff asks the Court to conflate the words "issue" and "impact" to rewrite Coty's financial results as discussing causes rather than effects. (Opp. at 22 n.13.)  Plaintiff argues that when Coty reported "short-term negative transitional impacts" as one of several factors affecting its Q2 2017 financial results, Coty assured investors that all integration issues would be "short-term." (*See id.*)  But a description of a current financial impact is not a pledge against future integration issues.  *See In re Coty Inc. Sec. Litig.*, No. 14-cv-919 (RJS), 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) ("[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.").

[5] Plaintiff attempts in vain to draw a distinction between Judge Rakoff's holding in *Razorfish* and the analogous facts here. (Opp. at 21.)  Plaintiff claims that Defendants' Principal Brief "omit[ted] vital language" from *Razorfish* because it did not note that the Court stated that its holding was—as is the case with most holdings— "in this context," i.e. in the "context" of plaintiff's allegations there. (*See id.*)  But the words "in this context" do not change the analysis.  The "context" in *Razorfish* was that plaintiffs alleged that a number of statements related to a merger integration, such as

Further, contrary to Plaintiff's contention that Defendants "contradict[ed] their previous pronouncements" (Opp. at 6), Plaintiff does not explain how Coty's statements throughout the Class Period detailing the integration issues that the Company was facing are contradicted by the statements at the end of the Class Period that purportedly "reveal[ed] the true extent" of these issues. (Opp. at 2.) For example, Plaintiff alleged that on the July 1, 2019 call, Mr. Laubies admitted that the "integration took longer and was more complex than originally envisioned," and "many parts of the acquired business had weak performance since the merger." (AC ¶ 151.) But throughout the Class Period, Defendants disclosed that "there ha[d] been a material level of neglect" within the P&G Beauty Business before Coty took it over; that the P&G Beauty Business was "smaller in operating margin than [Coty] expect[ed]" and therefore it would "take [Coty] longer to get to the $1.53" earnings-per-share target by 2020; and that Consumer Beauty faced "continued negative performance" and a "longer than expected" recovery. (*See supra* p. 3; Br. at 9-14.)

Plaintiff does not, and cannot, show how these disclosures are "meaningfully different" than the statements Plaintiff cites that purportedly reveal their falsity. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 793–94 (S.D.N.Y. 2013) (rejecting securities fraud claim where the alleged corrective disclosure and the company's disclosures throughout the class period were "strikingly similar"); *cf. Countrywide*, 2010 WL 2473595, at *8 ("[T]here can be no omission where the allegedly omitted facts are disclosed.").

"[E]ven assuming, *arguendo*, that these disclosures materially differed, [P]laintiff has

---

"major integration efforts [were] complete," "the company successfully converged service offerings and pricing, completing the . . . integration," "we have successfully integrated our acquisitions," and listing "the successful integration" as an accomplishment were false because purportedly "the integration was neither successful nor complete." *In re Razorfish, Inc. Securities Litigation*, No. 00 CIV. 9474 (JSR), 2001 WL 1111502, at *1-2 (S.D.N.Y. Sept. 21, 2001). Judge Rakoff rejected those allegations stating: "But 'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud in this context." *Id*. at *2. The context here is the same. Plaintiff brings equally meritless allegations that Coty's integration statements were false because the integration presented more significant issues than expected, precisely as in *Razorfish*. *See id.* at *1-2.

failed to allege any particularized facts supporting the conclusion that defendants knew or had access to information that either contradicted their public descriptions of the . . . problems, or permitted them to expound upon these issues earlier than they did." *Magna*, 967 F. Supp. 2d at 793–94 (holding that iterative disclosures providing further details on the magnitude of the company's issues did not indicate fraud but instead "demonstrate[d] that defendants were working to 'better understand' the . . . problems, . . . and disclosed what they knew, when they knew it"). Therefore, "any purported 'lack of detail' in the disclosures cannot form the basis of an actionable securities fraud claim." *Id*.; *see also Diebold*, 2021 WL 1226627, at *12 ("Plaintiff simply maintains that [d]efendants should have disclosed <u>more</u>. However . . . [d]efendants' failure to paint the fullest picture possible is not actionable, especially considering the array of other information that was disclosed to the market."); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 364 (S.D.N.Y. 2011) ("[M]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.").

Judge Buchwald's holding in *Magna*, 967 F. Supp. 2d at 771, is instructive. In *Magna*, the company repeatedly warned investors that several of its European facilities were facing production problems. *See id.* at 776. Despite Magna's disclosures throughout the class period of "operating inefficiencies," "underperformance," and lower margins in Europe, plaintiff argued that Magna fraudulently "downplayed" the "full extent" and "magnitude" of its problems. *Id.* at 789-91. Plaintiff alleged that Magna "'did not provide enough detail' about the operational problems," "failed to present an 'accurate portrayal' of the factors affecting [its finances]," and "misle[d] investors by discussing the upward direction of European margins," among other things. *Id.* at 782, 784-85. The Court rejected plaintiff's claims. *Id.* at 792. The Court held that the allegations, "stripped of their verbiage and ellipses, clearly demonstrate[d] that defendants made a cascade of

6

disclosures" about the problems. *Id.*

Coty, like Magna, continuously disclosed quarter after quarter the issues it faced with the P&G integration and its Consumer Beauty division. (*See supra* p. 3; Br. at 9-14.) "In this circumstance, it is hard to fathom precisely what more information defendants could have disclosed to render their statements not misleading." *Magna*, 967 F. Supp. 2d at 792; *see also In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865 (HB), 1998 WL 283286, at *2, *5 (S.D.N.Y. June 1, 1998) (rejecting argument that company "downplayed . . . write-off as a positive, one-time charge that would not affect [its] future performance," because "[a]side from the fact that [it] did end up spending more . . . than anticipated, the complaint wholly fails to specify how the statements . . . were false at the time they were made"); *City of Roseville Emps. Ret. Sys. v. Nokia Corp.*, No. 10 CV 00967, 2011 WL 7158548, at *6-7 (S.D.N.Y. Sept. 6, 2011) (holding that "statements . . . that allegedly 'downplayed' the seriousness of competitive threats . . . are not actionable" because "[p]laintiff . . . do[es] not show that . . . [d]efendants did not genuinely or reasonably believe the positive opinions . . . or that the opinions imply certainty").

Plaintiff's cited cases are not to the contrary. Far from being "directly on point" (Opp. at 19), *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204 (2d Cir. 2020), highlights the frailty of Plaintiff's argument. In *Omega*, when one of Omega's largest tenants faced solvency problems, Omega assured its investors that the tenant was "making partial monthly rent payments." *Id.* at 208, 210. However, Omega did not disclose that it had in fact loaned the tenant $15 million and "its loan was the source of [the tenant's] rent payments." *Id.* at 208, 214. The Court found that this omission "concealed the extent of [the tenant's] solvency problems," because investors were unaware that the tenant "could not pay rent without borrowing from its landlord." *Id.* at 214.

*Omega* finds no application here. First, Omega failed to disclose the undisputed *fact* that

7

it made a $15 million loan to its cash-strapped tenant. *See id.* at 208-11, 214. Unlike *Omega*, where defendants failed to disclose the mere existence of the fact that would inform investors of the nature of the tenant's payments, here, Coty repeatedly disclosed the existence and the extent of its challenges related to the integration of the P&G Beauty Business. (*See supra* p. 3.) Second, at issue in *Omega* was a single, narrow topic: one tenant's ability to pay its rent. *See Omega*, 968 F.3d at 212-15. Omega told investors that the tenant was "making partial monthly rent payments," thus "effectively communicat[ing] that, notwithstanding any disclosures regarding [the tenant]'s performance issues, [the tenant] could pay more than half of its rent from its earnings." *Id.* at 214. Unlike here, where Plaintiff faults Defendants for their "positive statements" that allegedly "underrepresented" the extent of the integration related issues, Omega did not merely offer a "positive" take of the tenant's financial condition. Instead, it "concealed the extent of [the tenant]'s solvency problems: [the tenant] could not pay rent without borrowing from its landlord." *Id*.

Here, Plaintiff identifies *no fact* that was concealed. Instead, Plaintiff surmises that because the merger would result in an impairment, it must be the case that the integration "was going far worse than revealed." (Opp. at 20.) Plaintiff claims that investors "want[ed] to know" that "the cause of Coty's financial problems all related to problems integrating the P&G Beauty Business assets." (*Id*.) But neither of these unsupported assertions explains what it is that Coty allegedly failed to disclose and ignores that its disclosures did inform investors of the integration's effects and warned that Coty could provide "no assurance that we will be able to successfully manage integration and operation of the P&G Beauty Brands business thereafter, either of which could increase costs and management distraction" and "adversely affect our liquidity, cash flows and period-to-period operating results." (Br. at 36.) *See Nokia*, 2021 WL 1199030, at *15 ("The [c]omplaint nowhere alleges that Nokia claimed that all compliance issues had been identified. In

8

fact, Nokia continued to warn otherwise.").

Further, Plaintiff inexplicably fails to even acknowledge that the assessment of Coty's intangible asset impairment is a subjective judgment and subject to the stringent standards set forth in *Omnicare* in order to be actionable, a crucial difference between the *fact* that Omega concealed and Plaintiff's assumptions about Coty's alleged omissions that supposedly led to an impairment. (*See infra* pp. 10-16).[6]

Finally, Plaintiff claims that Defendants "publicly disclosed specific problems with the integration," but "always include[ed] a positive statement about the integration or about achieving synergy goals[.]" (Opp. at 19-20.)  Yet courts have held time and time again that optimistic statements without more do not constitute securities fraud, even if—with the benefit of hindsight— they appear misguided.  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("[C]ompanies must be permitted to operate with a hopeful outlook . . . [executives] are not required to take a gloomy, fearful or defeatist view of the future."); *Diebold*, 2021 WL 1226627, at *10 ("Although [d]efendants may have expressed a rosy outlook regarding the [m]erger . . . they also offered cautionary statements to temper their optimism."); *In re HEXO Corp. Sec. Litig.*, 19 Civ. 10965 (NRB), 2021 WL 878589, at *17 (S.D.N.Y. Mar. 8, 2021) ("[A]s the Second Circuit has held, even amidst disclosures and warnings regarding deteriorating financial condition, misguided optimism is not a cause of action, and does not support an inference of fraud.").

Plaintiff does not even attempt to explain "why and how" Coty's statements were misleading, as required by Rule 9(b) and the PSLRA.  *Rombach*, 355 F.3d at 174.  But whether

---

[6] *Levin v. Res. Capital Corp.*, 2016 WL 5867451, No. 15 Civ. 7081 (LLS) (S.D.N.Y. Oct. 5, 2016) (Stanton, J.) (Opp. at 18 n.8) is inapposite. Unlike here, in *Levin*, defendants misrepresented undisputed facts.  Defendants told investors that "[a]ll of [the company's] real estate loans were current" and "performing," without disclosing that a $41 million loan "was a non-interest-paying troubled debt of a borrower in financial difficulty."  *Id*. at *1. The Court held that absent this "qualification," statements that the loan was "performing" or "current" by not paying interest, were "a counter-intuitive use of those characterizations."  *Id.*

9

positive or not, Plaintiff does not argue that these statements were in any way inaccurate or not honestly believed when made. (Opp. at 19-20.) As Judge Preska held in *Diebold*: "[The company] undertook a merger that proved to be more complex, and less lucrative, than its senior executives initially thought it would be. But Plaintiff cannot leverage Defendants' general expressions of corporate optimism about that merger, although perhaps misguided, to bootstrap a Section 10(b) or Rule 10b-5 claim." *Diebold*, 2021 WL 1226627, at *12. "Hindsight, although 20/20, cannot be used to prove securities fraud." *Id.*[7]

### B.    Plaintiff's Allegations Regarding Coty's Estimates of Impairment of Goodwill and Intangible Assets Fail to Satisfy Controlling Standards

Plaintiff's conclusory argument that "Coty should have taken the full $4 billion impairment on February 8, 2019, when it announced the $1 billion impairment" and inapposite caselaw (Opp. at 29-31) fail to overcome the hurdle that Coty's subjective accounting judgments on whether and when to take impairments to goodwill and valuing intangible asset balances are quintessential opinion statements, for which Plaintiff must satisfy the pleading standards articulated in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).

Although *Omnicare* is not mentioned (or even cited) in the Opposition, "the Second Circuit has observed that '[e]stimates of goodwill depend on management's determination of the "fair value" of the assets acquired and liabilities assumed, which are not matters of objective fact.' Accordingly, goodwill balances are opinion statements." *In re Gen. Elec. Sec. Litig.*, Nos. 19cv1013 (DLC), 19cv1244, 2020 WL 2306434, at *13 (S.D.N.Y. May 7, 2020) (quoting *Fait v.*

---

[7] Contrary to Plaintiff's contention, Defendants did not argue that "positive statements accompanying the disclosure of short-term integration issues are irrelevant." (Opp. at 19 n.9.) Rather, Defendants' Principal Brief explains that earlier statements about integration progress and later statements disclosing integration challenges—such as end-of-Class Period statements that "the integration took longer and was more complex than originally envisioned" or that the merger "led to . . . financial setbacks for Coty" (AC ¶ 151)—are not inconsistent because "[i]n no sense is a statement regarding the progress of the integration a guaranty against future risks." (Br. at 22.) *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.").

*Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)), *aff'd*, 844 F. App'x 385 (2d Cir. 2021).

It is not surprising that Plaintiff attempts to evade these well-established holdings because meeting the *Omnicare* standard "is no small task for an investor." *Omnicare*, 575 U.S. at 194. A task that Plaintiff here fails to accomplish because she fails to plead that (1) Coty did not hold the beliefs it professed relating to its goodwill and asset impairments, (2) the facts supplied in support of Coty's subjective accounting judgments were untrue, or (3) Defendants omitted information that rendered the relevant statements misleading to a reasonable investor. *See id.* at 185-89; *see also Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016).

Plaintiff is unable to meet this stringent standard because her core allegation is essentially a "disagreement" with Coty's "accounting methodology" based on Plaintiff's own subjective judgment that the totality of the impairment should have been taken earlier. *Finger v. Pearson PLC*, No. 17 Civ. 1422 (RJS), 2019 WL 10632904, at *12 (S.D.N.Y. Sept. 16, 2019). This "do[es] not make out a claim of securities fraud." *Id.*; *see also HEXO*, 2021 WL 878589, at *18 ("allegations regarding accounting irregularities are not sufficient to state a securities fraud claim" absent "evidence of corresponding fraudulent intent"). Moreover, Plaintiff fails to put forth a single confidential witnesses, internal document, or other information that speaks in any way to any Defendant's knowledge of Coty's goodwill and intangible assets accounting and shows that the Defendants "did not hold the belief . . . professed." *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 753 (S.D.N.Y. 2018) (quoting *Omnicare*, 575 U.S. at 185-86), *aff'd*, 806 F. App'x 35 (2d Cir. 2020); *Lucescu v. Zafirovski*, No. 09cv4691 (DLC), 2018 WL 1773134, at *12 (S.D.N.Y. Apr. 11, 2018) ("None of plaintiffs' contentions actually speak to defendant['s] . . . state of mind when making statements about [the company's] goodwill . . . , and so fail to state a claim against him for securities fraud.").

11

Plaintiff ignores these arguments and the settled authority laid out in the Principal Brief. For example, Plaintiff does not attempt to distinguish and thus concedes that *General Electric*, 2020 WL 2306434, applies squarely here. In *General Electric*, the court dismissed a securities fraud claim related to a "mammoth" $22 billion goodwill impairment write-off because plaintiffs did not adequately allege that General Electric's ("GE") statements concerning goodwill were materially false or misleading. *Id*. at *12-14. Plaintiffs alleged that GE's goodwill was misleading because "GE knew before it took the massive impairment about the very trends that it used to justify the impairment—chiefly, the absence of synergies from the . . . acquisition and the decreasing global demand" for gas turbines and related products. *Id.* at *14. The Court found the plaintiffs' "theory ultimately rest[ed] entirely on a disagreement about the exercise of judgment," because "a company's knowledge of unfavorable trends does not show that its goodwill balances were misleading as of the time they were stated; previously known trends may later reveal themselves to be of a different magnitude or importance than initially expected." *Id.* The Court also stated that the fact that GE disclosed the issues that ultimately led to the write-down undermined plaintiffs' securities fraud claim. *Id.* ("Strikingly, the trends that plaintiffs rely on in alleging that GE should have more quickly written down its goodwill were all publicly disclosed to investors during the [c]lass [p]eriod.").

*General Electric* is directly on point. Similar to GE, Coty repeatedly disclosed the challenges it faced integrating the P&G Beauty Business and the negative market trends impacting its Consumer Beauty Division and took impairment charges based on these disclosed issues in real time. (*See supra* p. 3; Br. 9-14.) *See HEXO*, 2021 WL 878589, at *17 (where CEO was "confident" in company's "conservative" earnings guidance, but months later company withdrew guidance and missed earnings target by 40 percent, change in guidance did not render CEO's statements false or

misleading: "to the contrary, plaintiffs' allegations demonstrate that the . . . [d]efendants disclosed information with respect to [the company]'s declining position in real time"). Plaintiff merely argues that Coty should have taken its impairment earlier based on the dollar amount and the existence of negative trends, but as in *General Electric*, Plaintiff's mere conclusions do not state a claim for securities fraud. *See Gen. Elec.*, 2020 WL 2306434, at *12-14; *see also Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020) ("If [p]laintiffs were able to state a claim for securities fraud by alleging that [the company] carried out its responsibilities and made an adjustment, then no company discharging its responsibilities would be free from a securities suit . . . .").

Even if the Court credits Plaintiff's allegation that Coty's second impairment charge later in time could be attributed to the "same triggering factors"[8] as the earlier charge (Opp. at 29, 31 n.20)—and it should not—Plaintiff's argument that Coty therefore should have recorded the charge earlier has been repeatedly rejected by the courts. For example, in *In re Adient plc Securities Litigation*, No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020), the Court rejected allegations that defendants made false and misleading representations to the market by taking a goodwill impairment charge in the second quarter of 2018, stating that no further impairments were necessary at the time, and then "'belated[ly]' taking a long-lived asset impairment charge in the fourth quarter of 2018." *Id.* at *23. Even though plaintiffs alleged that "the same factors underlying the fourth quarter fiscal 2018 performance that necessitated another impairment charge were well known to Adient in the second quarter of fiscal 2018, when Adient purportedly tested, but failed to identify, any further asset impairments," the court held that such "speculative allegations about 'what really happened in the second quarter' are insufficient to state

---

[8] Plaintiff ignores that the stated factors actually differ. (*Compare* AC ¶ 182, *with id.* ¶ 175, *with id.* ¶ 178.)

13

a claim." *Id*. at *7, *24; *see also Lucescu*, 2018 WL 1773134, at *11-12 (allegations that the "'same circumstances' that led to the September impairment existed in May" were "insufficient to state a claim that the assurances that [the company] complied with GAAP were false").[9]  The court in *Adient* concluded that plaintiffs did not plead with particularity any facts showing that the "failure to take an earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent, *particularly in view of the disclosures of the ongoing poor performance*." *Adient*, 2020 WL 1644018, at *24 (emphasis added).

The same is true here.  Coty disclosed the effects of the integration issues throughout the Class Period and Plaintiff's hindsight conclusion that Coty should have taken the impairment earlier is insufficient to plead fraud.  *See Mueller*, 466 F. Supp. 3d at 403 ("The law is well-settled that where a claim is based on the timing of an accounting write down, it is not sufficient to simply allege the write down should have occurred earlier."); *Diebold*, 2021 WL 1226627, at *2, *6, *11-12 (rejecting plaintiff's allegations that defendants "painted an unjustifiably positive picture" that "masked the true extent of the [c]ompany's difficulties related to the integration" and should have known to take goodwill impairment charge earlier).[10]

Plaintiff mistakenly relies on a single distinguishable case from the Middle District of

---

[9] Plaintiff attempts to distinguish *Lucescu*, 2018 WL 1773134, by arguing that (1) the Court did not reach an "overarching conclusion" on plaintiff's argument that the existence of the "same circumstances," revealed that the two write-downs should have been taken together and (2) plaintiffs there did not allege that defendants listed the same factors for both write-downs.  (Opp. at 30.)  Neither point alters its applicability here.  In *Lucescu*, the Court found that—accepting plaintiffs' allegations as true—the fact that the "same circumstances" that led to the company's write-down allegedly existed in the previous quarter was *insufficient to state a securities fraud claim*, because "[e]ven if [the defendant] knew of facts that cut against the representations of [the company's] goodwill, that does not make the statements, which are statements of opinion, false or misleading." *Lucescu*, 2018 WL 1773134, at *5, *12.  The same is true here.

[10] Plaintiff's distinction of *Adient* is meaningless.  (Opp. at 30 n.19.)  The fact that in *Adient*, plaintiff claimed that defendants should have taken the intangible asset impairment at the same time of the goodwill impairment, while here, Plaintiff alleges that Coty should have taken both goodwill charges and both intangible asset impairment charges at the same time, does not alter the analysis.  The crux of plaintiffs' argument in both instances is that because allegedly the "same conditions" (AC ¶¶ 183, 201), or the "same factors," *Adient*, 2020 WL 1644018, at *7, underlined both accounting judgments, then the company's judgment not to account for the later impairment at the time of the earlier impairment constitutes fraud.  Like in *Adient*, these allegations fail.

Tennessee.  In *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018), a large hospital operator, allegedly "chose to spin-off 38 of its worst hospitals into [a new entity] in order to improve its performance and generate cash to pay down its huge debt," and waited until after the spin-off to write down its goodwill and long-lived assets "to make [the spin entity] look more appealing to investors and secure more financing."  *Id.* at *6.  Plaintiffs argued that, in choosing not to take impairments, defendants disregarded triggering events, including: "a sustained, significant decrease in share prices for both [companies]," "a dramatic decline in overall financial performance," "vivid under-performance of [the spin entity]'s hospitals," "a deterioration in the entire healthcare industry," and "increased cost factors."  *Id.* at *5.  The Court found that plaintiffs "pled specific facts concerning the underlying financial conditions, industry trends, stock prices and other 'red flags' that sufficiently state a claim that [d]efendants' statements . . . were false when made," and concluded that defendants' decisions to not test for or take impairments in the prior quarter were fraudulent because they "did not fairly align with the information in [defendants'] possession at the time."  *Id.* at *6-7.

No such facts are present here, where instead of a litany of specific allegations pointing to defendants' contemporaneous knowledge of facts contradicting their public statements, Plaintiff rests her case on her opinion that Coty should have taken its second impairment earlier without being able to set forth one iota of factual allegations that Defendants did not honestly believe their subjective assessment when it was made.[11]  *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193,

---

[11] Plaintiff does not dispute that Coty performed its annual impairment test "as of May 1"—not *on* May 1—and Coty's auditors evaluated management's forecasts until June 30, 2019, before signing off on the impairment charges.  (Br. at 32.)  Plaintiff therefore concedes and waives her argument that in Coty's May 8, 2019 Form 10-Q, Coty knowingly or recklessly failed to disclose the results of its annual impairment test performed as of May 1, 2019.  (AC ¶¶ 12, 69, 116, 118, 121, 152, 194, 203-08.)  *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11, *18 n.18, *21 n.19, *23 n.22 (S.D.N.Y. Sept. 28, 2012) (holding that where plaintiff failed to respond to arguments in its opposition brief, it "conceded the point[s] by silence"), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16-CV-7014 (VSB), 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) (concluding the same and collecting cases).

15

224 (S.D.N.Y. 2020) ("The [c]omplaint is devoid of allegations demonstrating—or even plausibly suggesting—that [d]efendants did not honestly believe their opinions . . . ."); *Mueller*, 466 F. Supp. 3d at 404 ("Plaintiffs' theory is one of underestimation in hindsight, which relies on conclusory allegations to mask the legally insufficient contention at its core, which is that defendants could not possibly have believed their own estimates, since plaintiffs interpret those estimates to have proven inadequate."). Such allegations are insufficient to plead that Coty's statements violated the securities laws or that its accounting judgments violated GAAP or SEC rules. (Br. at 31-33.)

### C.    Coty's Synergy Statements Were Not False or Misleading

Plaintiff's entire argument about Coty's alleged missed synergies target is baseless. (*See* Br. at 21.) Plaintiff misconstrues Coty's earnings call transcript and now argues that Defendants' Principal Brief "omitted" vital language that Coty would "only reach 50% of its goal." (Opp. at 23 n.15.) But Defendants' "voluminous submissions"—that Plaintiff complains of because Defendants do not "assert that the Complaint misquotes them" (Opp. at 16 n.7)—provide the answer and demonstrate that it is Plaintiff who is attempting to distort their plain meaning.

On Coty's second quarter 2019 earnings call, an analyst asked several questions, including: "We were expecting $225 million of savings in '19. Do you know *what was achieved in the first half*, and therefore, what we might expect to see in the second half?" (Ex. CC, Q2 2019 Earnings Call Tr., at 13 (emphasis added).) After Mr. Terisse responded to a separate question, Coty's senior vice president and group controller responded: "So just the answer on synergies. We were expecting about $225 million for the year. *And we are on track, so I would say roughly half*, but that's just to give you a sense. *That's how we were expecting it to work out*." (*Id.* (emphasis added).) Given the analyst's two-part question, a reasonable investor would understand that Coty was "roughly half" way to its annual synergies target—half way through the year—putting it "on track" to reach its goal. *See Omnicare*, 575 U.S. at 190 ("[A]n investor reads each statement

16

within . . . a document, whether of fact or of opinion, in light of all its surrounding text . . . .").

Therefore, Plaintiff fails to identify any false or misleading statement regarding Coty's synergies.

### D.  Statements Concerning Coty's Digital Marketing Efforts Were Not False or Misleading

Coty's statements about its digital marketing efforts were not false when made.  Coty's statements accurately disclosed the Company's goals and exact amounts that the Company was spending on digital marketing.  For example, Coty told investors: "we are now in the range of 30% in terms of digital spending as a percentage of total media," (Ex. U, Q3 2017 Earnings Call Tr., at 13); the Company was growing e-commerce "at a healthy above-the-market rate . . . although from a low base," (Ex. X, Q1 2018 Earnings Call Tr., at 10); "we don't expect our advertising investment to drastically go up versus the level that we mentioned in the past of 25%, 26%," (Ex. Y, Q2 2018 Earnings Call Tr., at 13); and "now over 30% of our media spending . . . is focused on digital," while advertising and consumer promotion spending was expected to "remain in the mid-20s percentage."  (Ex. AA, Q4 2018 Earnings Call Tr., at 12-13.)

Again, Plaintiff struggles to articulate "why and how" these statements were misleading. *Rombach*, 355 F.3d at 174.  Instead, Plaintiff argues that at the end of the Class Period, "Coty finally disclosed that digital advertising and e-commerce had never been a focus or priority" (Opp. at 8), and that "Coty's advertising had been at a level below industry practices *for years*, and that the Company only now intended to raise spending and shift spending to working media . . . ." (Opp. at 26-27.)  But these purported revelations are nowhere to be found in Coty's disclosures:

- During the July 1, 2019 Investor Call, Mr. Terisse discussed the Company's focus on "innovation" and "positive evolution of the mix and value," noting:  "This is going to be further helped by higher A&CP [advertising and consumer promotion], advertising, which we will drive to a level more in line with industry practices, also shifting our investment to

17

working media, both digital and traditional." (Ex. FF, July 1, 2019 Investor Call Tr., at 8.)

- During the August 28, 2019 Investor Call,[12] Mr. Terisse noted:

> On A&CP, we definitely aim at stepping up our level and start closing the gap we have with competition. And it will take time before we can do that, but we are definitely on that path. We started as soon as Q1, *having in mind that Q1 last year was a pretty low level. And therefore, the step-up is going to be important. . . . And . . . we obviously keep flexibility in the way we allocate that and in the way we use that. . . . With respect to gross margin, that's a bit of the same. . . . So from Q1, Q2 will be higher, and we expect all together improvements throughout the year.* But Q1 is going to be an important start, and it shows gross margin improvement . . . a very, very meaningful step-up in terms of A&CP.

(Ex. II, Q4 2019 Earnings Call Tr., at 14 (emphasis added); *compare id.*, *with* AC ¶ 156 (omitting an entire paragraph between "We started as soon as Q1," and "But Q1 is going to be an important start.")).

Neither of these statements when viewed in context supports Plaintiff's conclusion that Coty revealed it "had been at a level below industry practices *for years*" or that the Company "only now" intended to raise spending. (Opp. at 26-27.) *See In re FedEx Corp. Sec. Litig.*, No. 1:19-cv-05990 (RA), 2021 WL 396423, at *9 (S.D.N.Y. Feb. 4, 2021) ("[A]n examination of FedEx's statements in their full context illustrates the inadequacy of Plaintiff's fraud allegations."). Mr. Terisse stated that the Company will drive A&CP "more in line with industry practices" (Ex. FF, July 1, 2019 Investor Call Tr., at 8), not that the Company practices were below industry levels "for years." (Opp. at 27.) Further, even though the Complaint omits the relevant part, during the August 28, 2019 call, Mr. Terisse explicitly referred to the Company's spending as a "step-up," not a new endeavor, and compared it to previous years. (Ex. II, Q4 2019 Earnings Call Tr., at 14.)

In any event, even crediting Plaintiff's misguided interpretation, these statements still do not contradict Coty's disclosures. Coty provided investors with the spending and data related to

---

[12] The Opposition erroneously states that Mr. Terisse made this statement during the July 1, 2019 call. (Opp. at 27.)

its advertising and thus they were always aware of the Coty's advertising levels compared to the industry average. *See Nokia Oyj*, 423 F. Supp. 2d at 397 (noting that "investors are presumed to have the ability to be able to digest varying reports and data" and "disclosure requirements are not intended to attribute to investors a child-like simplicity"); *HEXO*, 2021 WL 878589, at *16 ("[The company] openly disclosed its sales numbers to the public, such that investors could have discerned for themselves whether . . . [d]efendants' projections were overly-confident."). Nor do the alleged spending levels contradict statements that Coty was "accelerating" or "advancing" its "end-to-end digital transformation, including e-commerce" and "working very hard on digital innovation," or that e-commerce was a "big focus." (Opp. at 26; Br. at 26.)

Finally, throughout the Class Period, Coty made clear that its shift from traditional media to digital was an ongoing effort and disclosed related risks, including that Coty might not be "successful" in its "digital transformation efforts," which would affect the Company's ability to "compete effectively." (Br. at 8-9.)

### E.    The PSLRA Safe-Harbor Protects Many of the Challenged Statements

Defendants identified a number of statements concerning the P&G Beauty Business integration that are forward-looking statements on their face and are protected by the PSLRA safe harbor and the bespeaks caution doctrine. (Br. at 33-39.) Plaintiff does not dispute that these statements were accompanied by meaningful cautionary language consisting of substantial and specific risk disclosures going to the very issues underlying the Complaint. (Opp. at 31-34.) The Opposition merely concludes that these statements are not protected by the safe harbor because they include "statements of present or historical fact." (*Id.* at 31.)

However, projections based on present facts are still forward-looking when they forecast future performance and do not include separately addressed then-present facts. *See Adient*, 2020 WL 1644018, at *19. "[W]hen the present-tense portion of mixed present and future statements

19

does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection."  *Id*.; *see also Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 390 (S.D.N.Y. 2020) ("[T]o take the view that an expression of present belief in a forward-looking statement is a present fact – and therefore not itself a forward looking statement – would work an end-run around the PSLRA's safe harbor provision."), *aff'd*, No. 20-1530-cv, 2021 WL 745310 (2d Cir. Feb. 26, 2021).

For example, Plaintiff takes issue with the statement that "the overall integration is progressing in line with our timetable" claiming that it "contains present-looking elements." (Opp. at 33.)  Plaintiff offers a convoluted explanation as to why that is so that boils down to the argument that the "present-looking element[]" is the existence of a "timetable" on which the integration is progressing.  (*Id*.)  However, that and the rest of the statements that Plaintiff attempts to present as guarantees of present facts (*id*. at 33-34),[13] are exactly the type of statement that the PSLRA and the Court's rationale in *Adient* seek to protect.  *See Tanaskovic v. Realogy Holdings Corp.*, No. 19-15053 (SRC), 2021 WL 211049, at *15 (D.N.J. Jan. 21, 2021) ("By protecting these forward-looking statements, Congress sought to 'enhance market efficiency by encouraging companies to disclose forward-looking information' to investors." (quoting S. Rep. No. 104–98, at 16 (1995))).  The essence of that statement is that the Company believes that the integration progress *will* be completed in line with the *projected* timetable.  Just like in *Adient*, here, "the present-tense portion of the statement," i.e., the existence of a timetable on which the current progress can be placed, "is too vague to be actionable apart from the future projection" that the integration will be completed *in the future*.  *Adient*, 2020 WL 1644018, at *18 ("Statements about

---

[13] Many of the statements Plaintiff contends are not "forward-looking" (Opp. at 33-34), also constitute statements of opinion or immaterial puffery.  (*See* AC ¶¶ 40, 42, 46-47, 57, 73-74, 81-82, 96, 142, 144; *infra* pp. 23-26.)

Adient's projected margin expansion and how the [c]ompany planned to achieve that goal are forward-looking . . . [A]t a minimum, [they] involve 'the plans and objectives of management for future operations' and 'future economic performance.'" (quoting 15 U.S.C. § 78u-5(i)(1))); *In re Supercom Inc. Sec. Litig.*, No. 15 CIV. 9650 (PGG), 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) (holding that the "present tense portion" of a statement "that [d]efendants had 'all the information in hand to support these numbers'" for their projected revenue and margins "[did] not provide any specific information about [the company's] current circumstances" and was therefore "too vague to be actionable apart from the future projection[s]").

Similarly, numerous courts have held that statements that a company's plans are "on track" are forward-looking statements protected by the PSLRA. *See, e.g.*, *Adient*, 2020 WL 1644018, at *19 ("Even statements about Adient being 'on track' with respect to its projected margin expansion are 'forward-looking' statements within the meaning of the PSLRA, and not statements of 'present fact,' as [p]laintiffs suggest.") (citing cases); *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840 (RJS), 2018 WL 2081859, at *12-13 (S.D.N.Y. Mar. 30, 2018) (finding statements that "we remain on track to deliver adjusted EBITDA in line with expectations" are protected by the PSLRA because they "project future results and incorporate language, such as the words 'expect' and 'expectation,' that signal the statements' reference to future results"), *aff'd*, 764 F. App'x 127 (2d Cir. 2019); *HEXO*, 2021 WL 878589, at *16 ("[The CEO] stated that he was 'confident' about reaching the Purchase Obligation and that [the company] was 'on track' to do so. Neither of these statements are guarantees.").[14] Additionally, statements about synergies "fall squarely within the

---

[14] Plaintiff's cites of *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010) and *Manavazian v. Atec Group*, 160 F. Supp. 2d 468 (E.D.N.Y. 2001) are unavailing. (Opp. at 33) The *Freudenberg* Court did not rule on whether the phrase "on track" is forward-looking—it merely listed statements that other courts have found to be *puffery*. *Freudenberg*, 712 F. Supp. 2d at 191. In *Manavazian*, the Court held that the statement that the company was "still on track" to maintain its revenue and growth earnings model was not puffery because "defendants knew that the industry's paradigm shift . . . would have a 'material negative impact' on the [c]ompany's . . . reported earnings."

PSLRA's definition of a forward-looking statement, as they 'contain[ ] a projection of revenues' and 'earnings (including earnings loss) per share,' and also constitute a statement of 'future economic performance.'" *In re Bemis Co. Sec. Litig.*, No. 19 Civ.. 3356 (JPC), 2021 WL 101559, at *7 (S.D.N.Y. Jan. 12, 2021) (quoting 15 U.S.C. § 78u-5(i)(1)).

Plaintiff also falls short under the safe harbor's other prongs. Plaintiff does not meaningfully dispute that Coty provided substantial and specific risk disclosures going to the very issues underlying the Complaint. The Opposition halfheartedly asserts that the risks warnings were both "general" and "hypothetical," but had also "materialized." (Opp. at 25.) Both cannot be true, but in any event, Plaintiff makes no effort to explain how Coty's specific disclosures warning investors of the risks associated with estimating the value of its acquisitions, goodwill and other intangible assets, and the challenges of the integration and its digital marketing efforts (Br. at 6-9) were "general." *See FedEx*, 2021 WL 396423, at *11 (statements were protected by safe harbor where disclosures specifically cautioned that "[t]he failure to integrate successfully the businesses and operations of [the two companies] in the expected time frame and at the expected cost may adversely affect our future results"). Second, the Opposition does not even argue that Plaintiff has met the actual knowledge standard. Crucially, Plaintiff's failure in either respect "is sufficient to confer safe harbor protection." *Adient*, 2020 WL 1644018, at *20.

Finally, Plaintiff argues that Coty's risk warnings themselves are actionable (Opp. at 25-26), but Plaintiff relies on cases where companies warned generally of regulatory or litigation risks while failing to disclose criminal conduct or the fact that investigations or lawsuits had actually commenced. *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 393-94, 400 (S.D.N.Y. 2005) (company failed to disclose that New York Stock Exchange opened

---

*Manavazian*, 160 F. Supp. 2d at 474, 481-82. That is, the defendants knew these statements were untrue because the paradigm shift they faced "hobbl[ed] the [c]ompany's basic health." *Id.* at 480. No such facts are present here.

22

investigation into specialists' illegal trading, and SEC investigation subsequently revealed that illegal trading began years earlier); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (product liability action already filed prior to risk disclosures), *aff'd*, 563 U.S. 27 (2011); *Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 WL 3360676, at *2-3, 10-11 (C.D. Cal. June 9, 2016) (internal investigation revealed product contamination and regulatory agency suspended sales of manufacturer's products prior to risk disclosures).  Outside of extreme circumstances like these, which are not present here, "cautionary statements of potential risk have only rarely been found to be actionable by themselves." *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360-63 (S.D.N.Y. 2008).  That is especially true in cases like here, where "the lengthy, forward-looking recitation of risks facing [the company] did not imply that none of these risks, at least to some extent, would affect [the company]'s [financials]." *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS), 2010 WL 1372709, at *7-8 & n.7 (S.D.N.Y. Mar. 31, 2010); *see also Mueller*, 466 F. Supp. 3d at 405-06.[15]

### F.   Many of the Challenged Statements Are Nonactionable Puffery or Sincerely Held Statements of Opinion

Plaintiff does not dispute and thus concedes that many of the challenged statements are nonactionable opinions under *Omnicare*.  (Br. at 41-42 & n.25.)  Therefore, Plaintiff's allegations regarding the Company's aspirations, including that "we believe we have enough funds for our future success and re-launches," (AC ¶ 76); "I believe [integration of the businesses] is well underway and on track," (*id*. ¶¶ 47, 82); "we . . . expect that these business integration related impacts will be largely over by the end of first half 2019," (*id*. ¶¶ 60, 101); "[w]ith a healthy synergy delivery already in 1Q19, these modifications [in our distribution center consolidation

---

[15] In Plaintiff's other cited cases, the courts did not indicate that they were treating risk warnings as actionable misstatements; rather, the courts held that the PSLRA safe harbor or bespeaks doctrine did not *insulate* the defendants' statements under the circumstances.  *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 295, 304 (S.D.N.Y. 2018); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008).

plan] should have no impact to our [synergies] commitment," (*id*. ¶¶ 62, 104); and "the integration [wa]s progressing as expected, with no major issues to date," (*id*. ¶¶ 40, 42, 73-74, 142); have been waived and should be rejected at least as statements of opinions under *Omnicare*. *See UBS*, 2012 WL 4471265, at *11, *18 n.18, *21 n.19, *23 n.22 (holding that where plaintiff failed to respond to arguments in its opposition brief, it "conceded the point[s] by silence"); *Cole*, 2018 WL 4680989, at *7 (concluding the same and collecting cases).

Plaintiff also fails to convincingly address Defendants' arguments that many of the challenged statements constitute immaterial, nonactionable "puffery" that "do not give rise to securities violations." *Rombach*, 355 F.3d at 174. Defendants identified at least twenty-four plainly immaterial statements of corporate optimism, including "on the integration of the P&G Beauty Business, we are making good progress," "I have a great deal of confidence that the management team we have put into place is the right one to develop this plan," and "our integration efforts are proceeding well and we remain on track with the synergy delivery." (Br. at 39-40 & n.24.) Defendants also cited extensive case law demonstrating that analogous statements are routinely dismissed as nonactionable puffery. (*See id*. at 39-41 (citing cases).) *See also Nokia*, 2021 WL 1199030, at *17 ("Nokia's statements touting the progress of the integration as 'complete' and 'successful' or that the cultural integration 'went beautifully' are 'too general to cause a reasonable investor to rely upon them.'").

Without addressing the actual statements or the majority of the authorities cited by Defendants, the Opposition concludes that, because Coty purchased P&G Beauty Business "for $11.5 billion," the acquisition "tripled Coty's total assets," and the challenged statements "implicate Coty's financial status, and eventually resulted in a $4 billion impairment," "[t]o call them 'puffery,' is incompatible with the cited law." (Opp. at 35.) As a threshold matter, Plaintiff's

24

assertions are plainly inaccurate.  The acquisition did not "triple" Coty's assets.[16]  Further, courts consistently reject statements touting a "corporat[ion's] 'excellence' and progress" as nonactionable puffery.  *Diebold*, 2021 WL 1226627, at *9 & nn.7-12 (holding that integration statements such as "we're off to a good start" with the integration and "continue to make progress," "we are pleased with the pace of our integration efforts," and "[w]e made significant progress in 2017," were puffery, among others).  The outcome has been the same regardless of the supposed "import" of the subject matter.  *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012) (explaining that "the 'puffery' designation . . . stems from the generic, indefinite nature of the statements at issue, not their scope," and holding that company's statements were puffery despite plaintiff's argument that statements were "directly related" to one of the company's core businesses); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (concluding that bank's statements constitute puffery and noting that "the importance of a bank's reputation for integrity" does not render "a bank's statements regarding its reputation" material).

Finally, Plaintiff argues that because Defendants allegedly "connect[ed] the success of the integration to their expansion and focus on digital marketing and e-commerce," quintessential expressions of puffery, such as describing e-commerce as a "big focus," are "actionable and not puffery." (*See* Opp. at 35-36.)  Plaintiff's argument finds no support in fact or law.  First, Plaintiff fails to point to *any* statement "connect[ing]" the success of the integration to Coty's digital marketing (an assertion that on its face makes no sense).  Further, statements about what the Company "'focused on,' what it is 'aiming' to do, and what its 'priorities' are" constitute

---

[16] Plaintiff erroneously concludes that the P&G acquisition "tripled Coty's assets" by comparing Coty's total assets in its first and second quarters of 2017.  (Opp. at 3 n.1.)  But as Coty's filings reveal, Coty engaged in other business during this period including the $530 million acquisition of another company, ghd.  (*See* Ex. D, Q2 2017 10-Q, at 12-13.)  Indeed, Coty reported in its second quarter 2017 10-Q: "The P&G Beauty Business accounted for 44% of our total assets as of December 31, 2016."  (*Id.* at 61.)

25

"aspirational generalizations which are 'too general to cause a reasonable investor to rely upon them' and which are 'precisely the type of "puffery"' that the Second Circuit has 'consistently held to be inactionable.'" *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539-GHW, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (quoting *ECA*, 553 F.3d at 206) ("[T]he challenged statements are accompanied by the types of qualifiers which render the statements even more in the nature of puffery—they concern [among others] what [the company] . . . is 'focused on' . . . .").[17]

### G.    Plaintiff Has Not Identified Any Actionable Omissions

Plaintiff claims that Coty "omitted material information about the state of the integration progress" (Opp. at 36), but fails to provide any explanation as to what "material information" was omitted. *See Countrywide*, 2010 WL 2473595, at *8 (rejecting omissions claim because, inter alia, "[p]laintiff does not explain why or how [the company's] disclosure was deficient"). This deficiency is particularly glaring here where Coty made repeated disclosures regarding the integration progress and Plaintiff fails to plead with particularity why or how these disclosures were false and misleading when made. (*See supra* pp. 2-10.) "It is indisputable that there can be no omission where the allegedly omitted facts are disclosed." *Countrywide*, 2010 WL 2473595, at *8; *see also Diebold*, 2021 WL 1226627, at *12 (rejecting plaintiff's argument that defendants

---

[17] *Galestan*, 348 F. Supp. 3d at 303, is distinguishable. In *Galestan*, the Court held that the company's statements amounted to more than "rosy predictions" where eleven former employees, including a vice president, a senior vice president, and a regional director, described the specific reports and metrics that the defendants received and had access to that contradicted their public statements, supporting plaintiff's allegations that defendants were "aware of material productivity and delinquency concerns relating to the new loans that contradicted their public representations." *Id.* at 287-90, 303. The company's statements about "early success with the rollout" of secured lending and its "popularity" with customers were more than "barebone references to corporate synergies" because they spoke to the specific integration initiative—the company's change in focus to secured lending—that allegedly caused productivity rates to decline because customers preferred unsecured loans. *Id.* at 290, 293, 303. Plaintiff's other cases are similarly distinguishable. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (finding sufficient evidence for jury to conclude that company's statement that its financial results were "well ahead" of analysts' estimates was the type of statement that could be relied on by investors); *Novak v. Kasaks*, 216 F.3d 300, 304, 315 (2d Cir. 2000) (finding defendants' statements actionable that described company's inventories as "under control," "in good shape," at "reasonable" or "expected" levels, with "no major or unusual markdowns . . . anticipated," while weekly reports distributed to defendants indicated that the company's outdated "Box and Hold" merchandise— products "unlikely to be sold at full price, if at all"—grew from 10 to 34 percent of total inventory during the class period). Unlike those cases, Plaintiff here does not point to any evidence that contradicts Defendants' statements.

failed to "disclose the full extent of the [c]ompany's integration problems," because "[d]efendants were not obligated to disclose every fact that an investor might want to know about [the company]'s integration" and "there is no dispute that the [c]ompany provided disclosures regarding its risks that were company-specific and related to the direct risks it uniquely faced"); *Nokia*, 2021 WL 1199030, at \*16 (rejecting argument that defendants "had a 'duty to disclose [] omitted facts'" because it "ignores the disclosures that Nokia made regarding the . . . integration").

## II.   PLAINTIFF FAILS TO PLEAD CONSCIOUS MISBEHAVIOR OR RECKLESSNESS

To allege Defendants acted with recklessness, Plaintiff "must *specifically identify* the reports or statements that are contradictory to the statements made, or must provide specific instances in which Defendants received information that was contrary to their public declarations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011); *see also ECA*, 553 F.3d at 199 ("the strength of the circumstantial allegations must be correspondingly greater if there is no motive"); *Diebold*, 2021 WL 1226627, at \*14 ("Plaintiff offers no allegations that there were any internal reports—or any other documents, analyses, or data for that matter—that suggested that the failure to take an impairment charge earlier was an incorrect application of accounting principles, much less an error so grievous that it . . . rose to the level of . . . fraud."). Here, there are no confidential witness allegations or even a single document, meeting or fact conveyed to the Individual Defendants to demonstrate the alleged falsity of any of their statements. Plaintiff is left trying to cobble together facts routinely rejected by courts.

Plaintiff's primary argument is that the "magnitude" of the eventual impairment is sufficient "alone" to support a "strong inference of Defendants' recklessness." (Opp. at 21; *see also id*. at 20, 22, 26.) First, Plaintiff utterly ignores that to demonstrate recklessness here, Plaintiff must at least allege "that the failure to take an impairment charge earlier was . . . an error so

27

grievous that it exceeded differences over accounting principles and rose to the level of fraud." *Loral Space*, 2004 WL 376442, at \*17.   But both the Complaint and the Opposition fail to plead anything to indicate that Defendants were aware that they were obligated under GAAP to test for and record an impairment earlier, yet consciously refused to do so.  *See Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 302 (S.D.N.Y. 2010) ("Given the flexibility in interpreting GAAP and financial reporting requirements, deference is afforded executives absent evidence of 'corresponding fraudulent intent.'"); *HEXO*, 2021 WL 878589, at \*20 ("[T]hough plaintiffs boldly argue that . . . [d]efendants committed fraud on the basis of their renewed guidance and inventory and impairment loss figures, plaintiffs have not alleged particular facts showing that any . . . [d]efendant was aware of contemporaneous information contradicting their disclosures.").

Second, "[b]ecause the size of an alleged fraud alone does not create an inference of scienter, Plaintiff's repeated allegation concerning the magnitude of the write-downs is insufficient to plead scienter." *Canadian Imperial Bank*, 694 F. Supp. 2d at 302.  Courts consistently reject such allegations as insufficient to raise a strong inference of scienter absent particularized factual allegations "from which a reader could infer Defendants intentionally or recklessly failed to take [additional] write-downs." *Id*.; *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at \*18 (S.D.N.Y. Oct. 25, 2017) ("[T]he magnitude and number of Iconix's accounting errors are not in themselves sufficient to raise a strong inference of scienter, and [p]laintiffs are required to proffer additional factual allegations of 'corresponding fraudulent intent.'"); *see also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) (rejecting argument that "the magnitude of PXRE's understatement of its loss estimates . . . [is] indicative of [d]efendants' scienter," where plaintiffs "alleg[ed] that [d]efendants were 'off by 80%,'" because

28

"the size of an alleged fraud alone does not create an inference of scienter"), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009); *Gen. Elec.*, 2020 WL 2306434, at *15 ("To plead scienter, the plaintiffs rely almost entirely on the size of the $22 billion write-down. . . . But the magnitude of an alleged fraud alone is not enough to support an inference of scienter."); *Pearson*, 2019 WL 10632904, at *13 (plaintiffs' allegations "fail[ed] to clear the recklessness bar" in case of goodwill impairments totaling over £3 billion); *Lucescu*, 2018 WL 1773134, at *12-13 (plaintiffs failed to plead recklessness in case of goodwill impairments totaling $2.4 billion).

Plaintiff's argument that scienter can be inferred because the integration of P&G Beauty Business was "core to Coty's success" (Opp. at 20; *see also id.* at 2, 3, 22), or Defendants "discuss[ed]" the integration often (*id.* at 20), faces the same hurdle.  Similar arguments have been repeatedly rejected by the courts.  For example, in *Adient*, the Court found that allegations that the business segment that would later lead to an impairment charge "was extremely important to the [c]ompany's success post spinoff" and "[d]efendants spoke frequently about how growth in the [the segment's] business would fuel the [c]ompany's margin expansion plans" provided no support for plaintiffs' scienter argument.  *Adient*, 2020 WL 1644018, at *29.  The Court also held that allegations that the segment was "core" to the company's business did not "independently establish scienter."   *Id.*; *Diebold*, 2021 WL 1226627, at *15 (the fact that "the merger undoubtedly concerned [the company]'s core operations" did not support an inference of scienter because "[e]ven assuming that is true," the "core operations doctrine can only be a buoy, not a life raft").[18]

---

[18] Similarly, Defendants' SOX certifications (*see* Opp. at 16 n.6) "add nothing substantial to the scienter calculus." *Diebold*, 2021 WL 1226627, at *14.  "SOX certifications are 'statement[s] of opinion,'" and Plaintiff fails to allege that the "Individual Defendants knew--at the time they signed their certifications--of any misrepresentations in [the Company]'s financial statements or deficiencies in the Company's internal controls." *Id.* at *12. "[P]ermitting [SOX] certifications to create an inference of scienter in every case where there was an accounting error ... would eviscerate the pleading requirements for scienter set forth in the PSLRA." *Id.* at *14.

Plaintiff's cited cases render no support to Plaintiff's scienter allegations. In *Omega*, the Court found that scienter was supported by the facts that (1) Omega knew the loan money would come right back to it, but defendants nevertheless chose to represent the numbers as "partial monthly payments" to make it seem as the tenant "was on the road to recovery," (2) multiple analysts indicated that the tenant's payments were key to Omega's future success, and (3) "[w]hile not dispositive," Omega previously disclosed the possibility of a loan to another tenant, so it was "somewhat suspect" that Omega chose not to disclose the loan that it had already made to this tenant. *Omega*, 968 F.3d at 215 & n.17.

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000), is similarly inapposite. In *Rothman*, the company entered into agreements with software developers in which it agreed to prepay the developers future royalties for titles in development. *Id.* at 84-85. The company had a stated policy in which it would assess future realization of royalty advances quarterly and "charge[] [the advances] to expense if it is not likely that the amounts will be recovered through sales of the related product." *Id.* Plaintiffs argued that the company failed to expense royalty advances it knew it would not recoup because most of the company's sales of a software product were realized in the first year after its release. *Id.* at 89. Plaintiffs' argument "turn[ed] not on [the company]'s overly optimistic predictions of sales before the fact, but on its failure to expense royalty advances *after* poor sales during the [c]lass [p]eriods were known." *Id.* at 90. The Court concluded that plaintiffs sufficiently pled recklessness because—given defendants' quarterly assessments of potential recoupment—"after a product's release in late 1995, [the company]'s refusal to expense royalty advances *could rise to the level of recklessness sometime after the beginning of the first quarter of 1997.*"[19] *Id.* at 91 (emphasis added). In other words, defendants were reckless once

---

[19] To put this into perspective, the company recorded over $69 million in capitalized royalty advances at the end of 1996 but recorded only $365,490 in net sales that year. *Rothman*, 220 F.3d at 85-86. An analyst calculated that, given operating and sales costs, the company needed to realize nearly $4 in sales to recoup every $1 of prepaid royalties. *Id.*

they knew that most of a title's sales had been accounted for, performed their quarterly assessment of royalty recoupment, and still chose not to write down royalty advances. *Id.*

Plaintiff's allegations do not come close to the particularized allegations in these cases, which were often accompanied by undisclosed documentary evidence that included metrics directly contradictory to previous disclosures.[20] Instead, Plaintiff here urges the Court to infer recklessness based on the dollar amount of the impairment *alone* without offering any specific information contradicting Defendants' statements. *See HEXO*, 2021 WL 878589, at *20 ("[T]he 'fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness.'" (quoting *Rothman*, 220 F.3d at 90)); *Diebold*, 2021 WL 1226627, at *14 ("Although [i]ndividual [d]efendants may have expressed undue optimism about [the integration plan]'s progress, that hardly rises to an 'extreme departure from the standards of ordinary care.'").

Plaintiff's reliance in *Zwick Partners*, 2018 WL 2933406, is also misplaced. The *Zwick* Court held that "[d]efendants had a significant *motive* to delay taking the impairments so they could secure $1.2 billion of financing needed for the spin off." *Id.* at *10. Here, the opposite is true: the fact that Coty took a $965 million impairment in February 2019 illustrates that it had no

---

[20] Plaintiff's cited cases are inapposite. *See Fla. State Bd. of Admin v. Green Tree Fin. Corp.*, 270 F.3d 645, 648-51 (8th Cir. 2001) (company failed to correct overvaluation of expected profits of securitized loan pools where actual prepayment rates far exceeded estimates); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1248-50 (N.D. Ill. 1997) (company failed to report proper amount of credit losses and subsequent audit required company to restate its financial statements, reducing its annual earnings by 91 percent); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 480-84, 488-89 (S.D.N.Y. 2004) (company failed to disclose significant decrease in demand and overstated earnings for numerous quarters, re-audit lowered retained earnings by 200 percent—from $185 million to an accumulated *deficit* of $178 million—bankrupting company, and Plaintiff omits from quoted language: "*When a company is forced to restate its previously issued financial statements*, the mere fact that the company had to make a large correction is some evidence of scienter." (emphasis added)); *Camelot Event Driven Fund v. Atla Mesa Res. Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at *7-8, 11-12 (S.D. Tex. Apr. 14, 2021) (production engineers detailed specific drilling techniques that defendants used, defying industry standards, to temporarily inflate oil production and number of wells, supporting allegation that defendants overstated earnings to obtain approval for merger; newly combined company wrote down 80 percent of its assets in first year of existence leading to its collapse into bankruptcy; and accountants identified sixteen material weaknesses in company's internal controls).

31

motive to delay a write-down. *See HEXO*, 2021 WL 878589, at \*20 ("In fact, that these disclosures occurred in 'dribs and drabs' suggests poor accounting and prognostication, not fraud.").

Finally, as with the falsity allegations, Plaintiff's attempt to plead scienter based on its distorted reading of Coty's synergies statements fails. (*See supra* pp. 16-17.) Plaintiff's conclusory statement that "Defendants knew the truth about the integration problems, and were, therefore minimally reckless in their synergy statements" (Opp. at 24), fails to satisfy the PSLRA's high burden.[21] *See Pope Invs. II LLC v. Deheng Law Firm*, No. 10 Civ. 6608 (LLS), 2011 WL 5837818, at \*6 (S.D.N.Y. Nov. 21, 2011) (Stanton, J.) ("[A]llegations 'that [d]efendants knew but concealed some things, or knew or were reckless in not knowing other things, are so broad and conclusory as to be meaningless."); *Diebold*, 2021 WL 1226627, at \*14 ("Plaintiff relies only on [the CEO]'s later opinions regarding the complexity of [the company]'s organizational structure and IT environment and posits that it is 'not plausible that [the individual defendants] ... were unaware' of those 'facts' at the time. That is simply not enough."); *HEXO*, 2021 WL 878589, at \*21 ("Ultimately, plaintiffs' allegations suggest that defendants were in a constant game of "Catch up" — acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more. This is insufficient to plead scienter.").[22]

---

[21] Plaintiff's similarly conclusory statements that Defendants "knew" that their statements regarding the Company's digital transformation efforts were misleading (Opp. at 27, 28) are also inadequate to plead scienter. *See Diebold*, 2021 WL 1226627, at \*14 ("[A] change in business strategy does not itself show that the old approach was plagued by fraud. Although [i]ndividual [d]efendants may have expressed undue optimism about [the integration plan]'s progress, that hardly rises to an 'extreme departure from the standards of ordinary care.'").

[22] Plaintiff's cited cases (Opp. at 24) highlight the deficiencies of her allegations and include specific, particularized facts demonstrating defendants' states of mind that are utterly absent here. *See Makor Issues & Rts. Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709-10 (7th Cir. 2008) (defendants allegedly engaged in fraudulent "channel stuffing" scheme—shipping more goods to distributors than they thought could be sold in order to book the revenues—and huge number of returns indicated that "the purpose of the stuffing was to conceal the disappointing demand . . . and th[at] purpose would have been formed or ratified at the highest level of management"); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 89-90 (2d Cir. 2016) (company failed to disclose potential liability related to manager's kickback scheme with subcontractor that led company to return $500 million and forfeit $40 million in unpaid receivables, and instead touted its "commitment to high standards of 'ethical performance and integrity'"). Here, Plaintiff alleges no such facts and asks the Court to infer recklessness based on the size of Coty's impairment charge alone. (*See* Opp. at 22.)

## III.  PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD BE DISMISSED

"In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 248–49 (S.D.N.Y. 2006) (Stanton, J.), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).  Because Plaintiff has not sufficiently alleged either a primary violation of Section 10(b) or that any Individual Defendant was a culpable participant in a primary violation, her control person claims should be dismissed.[23]  (Br. at 49.)

## IV.  THE REQUEST FOR LEAVE TO AMEND SHOULD BE DENIED

Plaintiff's perfunctory and futile request for leave to amend (Opp. at 38) should be denied and the Amended Complaint should be dismissed with prejudice.  *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 530 n.19 (S.D.N.Y. 2020) (denying leave to amend where request gave no "clue as to how the complaint's defects would be cured"); *Nokia*, 2021 WL 1199030, at *21 (denying leave to amend because "[g]iven Nokia's numerous and continuous disclosures regarding the . . . integration . . . , it is not plausible that the challenged statements were misleading to a reasonable investor"); *FedEx*, 2021 WL 396423, at *17 (denying leave to amend because "[w]hen assessed alongside FedEx's numerous and continuous disclosures . . . , it is not plausible that the statements in question were misleading to a reasonable investor").

## CONCLUSION

For the foregoing reasons and those in the Principal Brief, Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice and without leave to amend.

---

[23] Despite Plaintiff's asseverations that courts, including the Second Circuit and this Court, have "erred" in interpreting the Exchange Act (Opp. at 37 n.23), the law in this circuit is well-settled. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 818 F. App'x 48, 55-56 (2d Cir. 2020) ("[A] plaintiff must show . . . that the defendant was, in some meaningful sense, a culpable participant in the . . . fraud."); *Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653, 657 (2d Cir. 2015) (same); *Gurfein v. Ameritrade, Inc.*, 411 F. Supp. 2d 416, 427 (S.D.N.Y. 2006) (Stanton, J.) (same).

Dated:  New York, New York
        May 24, 2021

Respectfully submitted,

/s/ Scott D. Musoff
Jay B. Kasner
Scott D. Musoff
Thania Charmani
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax:    (212) 735-2000
scott.musoff@skadden.com
jay.kasner@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants Coty Inc., Lambertus Becht,
Patrice de Talhouët and Pierre-André Terisse*