ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: 46
DATE FILED: 8/3/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CRYSTAL GARRETT-EVANS, individually and on behalf of all others similarly situated,**

Plaintiffs,

- against -

**COTY INC., LAMBERTUS "BART" BECHT, CAMILLO PANE, PIERRE LAUBIES, PATRICE DE TALHOUËT, AND PIERRE-ANDRE TERISSE,**

Defendants.

20 Civ. 7277 (LLS)

**OPINION & ORDER**

In this putative securities class action, defendants Coty Inc., Lambertus "Bart" Becht, Patrice de Talhouët, and Pierre-Andre Terisse move to dismiss lead plaintiff Susan Nock's Amended Class Action Complaint (the "AC") under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4.

For the following reasons, the motion is granted.

**BACKGROUND**[1]

Defendant Coty, a beauty product company, acquired Procter & Gamble ("P&G")'s beauty business in October 2016. Coty struggled to integrate P&G's consumer beauty brands, and its business suffered over the next three years. In February 2019

[1] The facts in this opinion are taken from the AC and Coty's SEC filings in the relevant period.

the company recorded a nearly $1 billion impairment of the value of its goodwill and intangible assets primarily attributable to its consumer beauty division. In July 2019 Coty recorded another consumer beauty-related impairment of nearly $3 billion.

Crystal Garrett-Evans filed this case in September 2020. In January 2021, after being appointed lead plaintiff, Susan Nock filed the AC, which alleges that defendants violated Sections 10(b) and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t-1, and Rule 10b-5, 17 C.F.R. § 240.10b-5, by making statements about the acquisition and integration of the P&G businesses in Coty's earnings calls and SEC filings that omitted material facts necessary to make those statements not misleading.

The alleged omissions fall into three categories:

(1) Coty's integration of the P&G brands suffered from "pervasive and continuing" issues because Coty was not equipped to successfully integrate the P&G business and deliver anticipated synergies;

(2) Coty was not prepared to capitalize on the acquisition because its marketing and sales strategies and platforms were inadequate, outdated, and underfunded; and

(3) Defendants knew, before July 1, 2019, that the company would need to take the full nearly $4 billion impairment, and Coty's failure to timely take that impairment violated Generally Accepted Accounting Principles ("GAAP") and caused Coty to

understate operating and net loss and overstate goodwill and intangible assets on its balance sheet.

Defendants now move to dismiss the AC, arguing that plaintiffs fail to allege actionable omissions and scienter.

**DISCUSSION**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A complaint alleging a violation of Section 10(b) must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

> The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. Ganino, 228 F.3d at 168-69. Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2510 168 L.Ed.2d 179 (2007). For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (emphasis added).

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (alterations in original).

**The Integration Omissions**

Nock alleges that, when making statements about Coty's integration of the P&G businesses in its earnings calls and SEC filings between November 2016 and May 2019, defendants

> (a) Failed to disclose that Coty did not have adequate infrastructure to smoothly integrate and support the beauty business that it acquired from P&G, including an adequate supply chain, and that Coty would not be able to successfully integrate and deliver synergies from the acquisition;
>
> (b) Having discussed positively the integration of P&G, including "we are making good progress," Defendants were duty bound to disclose that integration issues existed, including supply chain issues, that they were pervasive and continuing, and not "short-term;"

(see, e.g., AC ¶ 80(a), (b)) and

> (c) Having discussed generally the risk that "there may be challenges as we integrate and rebuild the businesses," Defendants were duty bound to disclose that integration issues had already arisen before November 9, 2016, as Defendants admitted in February of 2017.

(see, e.g., id. 72(c)).

Defendants, however, began disclosing extant integration-related issues on November 9, 2016. For instance, in Coty's November 9, 2016 10-Q, Coty increased its expectation of the transaction's costs by $800 million.

> At the time of announcement of the Transactions in July 2015, we anticipated that we would incur charges of an aggregate of approximately $500 million and capital expenditures of approximately $400 million as a result of costs associated with the Transactions. We currently anticipate that we will incur a total of

> approximately $1.2 billion of operating expenses and capital expenditures of approximately $500 million.

Musoff Decl. Ex. F at 60. On that same day's earnings call, Coty's then-CEO, defendant Pane, discussed extant and expected integration-related issues further:

> The substantial changes within Coty over the last years, from carving out the Beauty Business from P&G to introducing a new organizational structure and changing the management teams in a number of categories and countries, have clearly impacted the organization. In the short term, this means some lumpiness quarter-to-quarter as everyone settles into their roles and the organization learns to run as one company.

. . .

> Turning to Consumer Beauty. It's clear that this is a division that is facing a number of challenges. These challenges include the positioning of some of the brands, the strength of the pipeline, the in-store execution, as well as the competitive pressure in the market. We have begun our work to address these issues, and I will have more information to provide on the next call as to the steps we are taking to regain momentum in this business.

Musoff Decl. Ex. S at 6. Defendant Becht also discussed the consumer beauty business's challenges on that call, and was careful to note that those challenges may not be resolved in the short term:

> I also would like to offer to you that in the first quarter, for sure, and potentially in the second quarter, there has been some rationalization of wholesale inventories taking place, which clearly also is going to gradually abate. So the #1 challenge remains basically on the Consumer Beauty business, and this will take longer. We might see some improvement, but there is a lot of things which need to be tackled. And we already mentioned we have several large brands.

> And Camillo already alluded to this. We -- clearly, we have challenges on Cover Girl, Max Factor and Sally Hansen, all of which need to be addressed, and we're in the process of doing that. So net-net, I think professional [sic: Coty's professional beauty products division] should see good momentum, and continued good momentum. I think on luxury, we should see improving momentum. Consumer Beauty will be the biggest challenge, and I think that will take longer. We might see some improved results in the second half, but it will take longer to address that.

Id. at 10.

> Yes, but you are seeing -- basically, the declines are pretty much across the board, across the 3 main buckets in terms of Fragrances, Color Cosmetics and Body Care. There is really not one excluded. So clearly -- and I think that's what you would expect when there is massive distraction happening. So again, fiscal '17, I just want to reiterate. Fiscal '17 is going to be a year of transition.

Id. at 13.

Defendants continued disclosing Coty's issues integrating the P&G assets into its consumer beauty business as those problems arose throughout the class period, and did not shy away from describing those problems as long-term:

> Consistent with our comments on the last earnings call, Q2 was a challenging quarter. The business was impacted by significantly higher-than-anticipated inventory levels in the market on the acquired P&G Beauty Business, competitive pressure in the Consumer Beauty division and the distraction associated with the merger integration efforts.

Feb. 9, 2017 Form 8-K, Musoff Decl. Ex. T at 2.

> Consumer Beauty is still facing severe headwinds. So we just point out the fact that you should not derive from Q3 what's going to happen in Q4. And you should expect some weakening in terms of top line, but we're not going to say more on this.

May 10, 2017 Earnings Call, Musoff Decl. Ex. U at 9.

> But Consumer Beauty will take time. And we're not going to talk here about how long it's going to take to turn around this business for all the reasons that I mentioned before. One of them is still the distribution losses that we just described and -- but also because the strategic actions that we have put in place will bear fruit at a later stage. And I'm referring, of course, to the repositioning of some of the brands, to the changes on the innovation process and the core strengthening of our pipeline and, of course, the digital transformation and the revamping of the in-store execution. These are really significant undertaking that will not be able to bring fruit in the short term. And this is why Consumer Beauty will take time.

Id. at 11.

> And regarding Consumer Beauty, this is more of a longer term, as we discussed, it's a journey. But we are on the right path. We are really working on the relaunch of several brands or most brands in Consumer Beauty, we already discussed this in the past.

Aug. 22, 2017 Earnings Call, Musoff Decl. Ex. W at 10.

> Consumer Beauty net revenue declined 8% on an organic basis and this remains a key focus for us. The decline was driven by declines in some of our brands, particularly retail hair, combined with continued weakness in the global mass beauty market. Although I'm not happy with the Consumer Beauty division performance to-date, I'm starting to see signs of a stabilizing business.

Nov. 9, 2017 Earnings Call, Musoff Decl. Ex. X at 5.

> But as I said, Consumer Beauty will take time for a full recovery. This is clearly the largest division we have. We have faced some challenges. We continue to face some challenges, and that's why we're going to continue to implement all our actions to implement the recovery.

Id. at 16.

> So though Q2 has shown improvement for Consumer Beauty, it will still take time for full recovery of the Consumer Beauty business, and results are likely to be uneven from quarter-to-quarter.

Feb. 8, 2018 Earnings Call, Musoff Decl. Ex. Y at 6.

> In Consumer Beauty, net revenues declined minus 4.4% on an organic basis with the backdrop of a challenged mass beauty market and competitive pressure, but with several pockets of strong results, including encouraging performance improvement from some of our key brand's relaunches.
>
> As I've said before, it will still take time for the full recovery of the Consumer Beauty division, although we are seeing signs of stabilization improvement.

May 9, 2018 Earnings Call, Musoff Decl. Ex. Z at 5.

> However, it is clear that the recovery is taking longer than expected.

Aug. 21, 2018 Form 8-K, Musoff Ex. P at 5.

* * * *

Lead Plaintiff Nock contends that despite these disclosures,

> Defendants' statements about the P&G Beauty Business integration, however, were materially false for failing to disclose the magnitude of the difficulties integrating the P&G Beauty Business to investors, and made with scienter. Recently, in Omega, 968 F.3d 204, reversing dismissal, the Second Circuit found factually analogous statements by the defendant company actionably incomplete for disclosing problems but failing to reveal the magnitude of those problems, pleading both falsity and scienter.

Pl.'s Opp'n at 16.

In Setzer v. Omega Healthcare Invs., Inc., 968 F.3d 204 (2d Cir. 2020), the Second Circuit found that where defendant real estate investment trust told investors that one of its tenants was struggling but able to make partial rent payments, defendant had a duty to disclose a loan it made to the tenant, without which the tenant could not have made even those partial payments:

> A review of Defendants' statements makes clear that, without disclosing the existence of the Loan, Defendants' statements regarding Orianna's rent payments gave a false impression of the financial health of one of Omega's largest assets.
>
> On May 4, 2017, Defendants told analysts and investors that, as of March 31, 2017, Orianna was "45 days past due" on its rental payments. J.A. 301. Defendants later indicated that, as of June 30, 2017, Orianna was "approximately 90 days past due on rent payments," but that it was "currently making partial monthly rent payments." Id. at 590. By failing to disclose that the Loan accounted for all (or most) of Orianna's "partial monthly rent payments," Defendants effectively communicated that, notwithstanding any disclosures regarding Orianna's performance issues, Orianna could pay more than half of its rent from its earnings. The omission concealed the extent of Orianna's solvency problems: Orianna could not pay rent without borrowing from its landlord. Under the facts as alleged, because in July 2017 Omega had stated that Orianna was making "partial monthly payments," Omega was duty-bound to disclose that its loan was the source of Orianna's rent payments.

Omega, 968 F.3d at 214 (footnotes omitted).

Nock argues that

> The Circuit Court's ruling that falsity was adequately alleged because investors would have wanted to know that Orianna could not pay any rent on its own finds its analogy

> here in investors wanting to know that the integration was going far worse than revealed (and would result in an enormous impairment) and that the cause of Coty's financial problems all related to problems integrating the P&G Beauty Business assets.

Pl.'s Opp'n at 20.

But unlike the undisclosed loan in Omega, Nock alleges no specific omission that makes defendants' statements about Coty's integration of the P&G businesses false or misleading. Plaintiffs consistently updated investors with integration-related problems and the negative financial effects those problems were having on the overall business.

Accordingly, Nock has failed to plausibly allege the integration omissions.

**The Marketing and Sales Statements**

Nock also alleges that, when making statements about Coty improving its digital and e-commerce marketing and sales capabilities in its earnings calls and SEC filings throughout the class period between November 2016 and May 2019, defendants

> Failed to disclose that Coty was not in position to capitalize on the new brands it acquired in the P&G acquisition because its digital marketing and sales efforts were inadequate, it was largely relying on outdated marketing and selling strategies like promotions, and it was not spending the money required to get its marketing and sales efforts in-line with industry practices.

See, e.g., AC ¶77(c).

Nock's allegation boils down to an argument that Coty's

marketing strategy was outdated and underfunded.

Defendants, however, repeatedly disclosed how much the company spent on marketing and that they thought it was adequate because digital marketing had a greater return on investment.

For instance, on Coty's February 9, 2017 earnings call (Musoff Decl. Ex. A at 12-13, 14-15), defendants Pane and de Talhouët had the following exchanges:

> **Lauren Rae Lieberman**
> *Barclays Bank PLC, Research Division*
>
> Great. I want to talk a little bit, I guess, about reinvestment needs in the business. You were talking about restaging on Cover Girl and Max Factor. And also if you could clarify if that was a fiscal '17 or '18 plan for those 2 brands. But if these have been orphaned brands, I would think there is something to be said for reinvestment needs. So does spending go up kind of versus maybe what you had expected in the first year or 2? Or is there no change in that thought process on incremental spending?
>
> **Camillo Pane**
> *Former CEO & Director*
>
> Lauren, thanks for the question. First, the plan to relaunch Cover Girl and Max Factor are for fiscal 2018. I think this was the part of your question. Regarding the investment, I'm actually convinced that we have enough funds to relaunch the brands, not just these 2, but also the other brands. One thing that I'd like to point out is the fact that, actually, the P&G brands were spending substantially higher level of marketing versus what we were spending in the Coty legacy. So the combination of the funds that we have in the new company, around approximately the 26% as a percent of net revenues, in my opinion, are actually enough or more than enough to relaunch the brands and because the lot of things that we need to do are truly in terms of the way we connect with consumers. And one of the key shifts is going to be really going from

traditional TV, traditional media to digital engagement. And that -- as you know, moving that actually creates a lot of efficiencies. So it's not just a matter of spending more, but it's a matter of spending better and connecting better with the consumers, making sure that we speak to them in the right way, where they are. And a lot of times, they are not necessarily watching TV, but they are on different digital platform.

. . .

**Dara Warren Mohsenian**
*Morgan Stanley, Research Division*

Okay. And with those relaunches and some of those plans, I'm still surprised you guys aren't planning to boost advertising spending, and obviously, you touched on it earlier in this call. But I guess can you just take me through your thought process there and what gives you confidence that you really can revitalize this portfolio without spending more, particularly given you've got this huge synergy bucket from P&G? It's just -- it seems like an odd decision not to spend more behind the business to drive a reintegration.

**Camillo Pane**
*Former CEO & Director*

I -- Dara, I think actually that one of the key things we need to do is also to look at the investment strategy and readjust the investments among the different brands. So there will be some brands, the one that has a higher growth potential, that will receive more investments, and some others that eventually will receive -- be less. So we're in the process of exactly doing this, and I think it's a very important financial discipline to look at also return on investment. Regarding on your question on spending more overall, I want to go back to my previous answer, which is that when you start shifting the traditional media to digital, you actually have way more money to play with and to invest to be able to reach more consumers. Consumers are truly spending a disproportion amount of time on social media, on social platforms, and I believe that some of our

brands have not played the right role in the social engagement. And by shifting the investment, actually, we will achieve not only the consumers that we want to achieve, but also in the right place and the right time, and the overall connection with the brand will improve. And this is clearly part of the logic of why I answered before that we believe we have enough funds for our future success and relaunches.

**Patrice de Talhouët**
*Former Executive VP & Global CFO*

Yes. And so based on that, Dara, the other point that when you look at our Q2 results, our operating margin has been impacted, also, by all the level of A&CP pre-commitment that we received. And as a result, once again, it's not a question of size of the bucket. It's a question of how you use the bucket in a much more efficient way, which is exactly what Camillo has emphasized.

On Coty's May 10, 2017 earnings call (Musoff Decl. Ex. U at 12-13), defendant Pane stated what percentage of its media budget Coty was spending on digital marketing and how they expected that digital marketing to work:

So overall, as total company, we are now in the range of 30% in terms of digital spending as a percentage of total media. But on some of the brands, on the color cosmetic brands, we're actually above 50% because clearly, we are spending where consumers are now spending their time, which I think is very important. In terms of the way we are approaching the digital transformation, so the end-to-end approach, let's say, we're doing a couple of things which are different versus how we did it in the past. First of all, we have now a trend lab, where we're trying to understand better consumer insight, consumer trend. We do this 24/7, so we're able to really provide a much stronger level of insight and trends to the marketers. And that really leads to several things. So one of them, it leads to creating better content. And better content, the results of the right content for the right consumers so that we can target better. But also, the

right content for the right platform because clearly, consumer spend and different behavior on the different platform.

On Coty's August 21, 2018 Earnings Call (Musoff Decl. Ex. AA at 12-13, Pane again answered questions about the company's digital marketing spending:

**Faiza Alwy**
*Deutsche Bank AG, Research Division*
So I wanted to pick up, Camillo, on the investment in brands. So it looks like the A&P spending in the year and in the quarter was below last year and below what you talked about historically, sort of around the 25% to 26% of sales. So could you give us some color on the year-over-year decline in the quarter specifically? And also as we think about your outlook for next year, so what are you embedding for marketing spending for fiscal '19?

**Camillo Pane**
*Former CEO & Director*
Thanks, Faiza. Look, in terms of the decline for '18, it's fair to say that some of the new businesses that we've been now consolidated into -- for 2018, such as ghd, naturally have a lower level of A&CP spend, which clearly reduces the ratio on a year-to-year basis. We're also -- because we're doing other brand relaunches on COVERGIRL and Clairol, as you can imagine we have to allocate -- we had to allocate more resources into in-store investments. And of course, this type investments don't flow into the A&CP line. And the third point I think it's our continuous effort to invest more on digital media, which is typically more cost-effective than traditional media. We do have now over 30% of our media spending that is focused on digital and in some brands we're actually over 50%. So these 3 trends clearly, I think, explain I would say, fully the decline that you've seen in the ratio in 2018. Looking at the future, I think based on the strategic plans that we have across brands and division, we would expect A&CP to generally remain in the mid-20s percentage. But I would not get really too, let's say, obsessed about this percentage because there's always room for increases or decreases because

> we will continue to move digital -- money towards the digital media. And at the same time, we will consider higher investment to support. So this sort of dynamic is something that we will manage on a quarterly and annual basis as we see fit.

Nock does not plausibly allege that defendants withheld from investors information about Coty's marketing program.

**The Second Impairment**

Nock then alleges that "Coty's financial statements for the second and third quarter of fiscal year 2019, filed on February 8, 2019, and May 8, 2019, were materially false because in each quarter Coty failed to take the $3 billion impairment it would eventually announce on July 1, 2019." AC ¶ 122. Nock contends that

> Coty incorrectly stated that the $2.87 billion additional impairment was caused by factors, including the development of its turnaround plan, which only developed during the fourth quarter of fiscal year 2019. An analysis of the Company's disclosures, however, reveals that these factors existed as early as December 31, 2018, the end of the second quarter of 2019. For example, it appears Coty recognized the need for, and was engaged in, turnaround efforts before the end of Q2 2019, but the projections it utilized during its Q2 2019 interim impairment test did not adequately reflect the costs of these turnaround efforts or their impact on the projected cash flows, namely lowered revenue growth and reduced margin expectations.

Id. ¶ 197.

An allegation that defendants delayed a goodwill impairment does not, on its own, rise to the level of securities fraud.

> Goodwill estimates are opinion statements: they "depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact ... [and] will vary depending on the particular methodology and assumptions used." Fait v. Regions Pin. Corp., 655 F.3d 105, 110-11 (2d Cir. 2011). Plaintiffs allege only that the goodwill impairment test, and the corresponding write-down, should have occurred earlier. This demonstrates nothing more than disagreement with Pearson's accounting methodology. But the securities laws do not allow fraud-by-hindsight claims. See Novak, 216 F.3d at 309. Accordingly, after-the-fact "allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 53 (2d. Cir. 1995).

Finger v. Pearson PLC, No. 17 CIV. 1422 (RJS), 2019 WL 10632904, at *12 (S.D.N.Y. Sept. 16, 2019).

Coty's August 28, 2019 10-K, which states the company's reasons for taking the second impairment, belies Nock's argument that Coty should have taken its entire nearly $4 billion impairment in February 2019 because, at that point, it was aware of the factors it would go on to cite as reasons for the July 2019 impairment:

> The cash flows associated with our Consumer Beauty reporting unit were adversely affected by factors that developed during the fourth quarter of fiscal 2019 including fourth quarter net revenue results and market share trends that were below expectations, continued net revenue and profitability declines for Younique in excess of management's expectations, and the development of our Turnaround Plan to stabilize operations and improve profitability. The Turnaround Plan impacted the projected cash flows associated with the Consumer Beauty reporting unit by lowering revenue growth and, in the near term, margin expectations.

> Such changes in our estimated forecasts were based on a top down review of the business which resulted in decisions to simplify the product range as well as identify priority brand-country combinations and invest behind such combinations at scale, which will initially lower net revenues and profits. The Turnaround Plan also considered the latest market data including continued negative category trends in the color cosmetics, hair color and mass fragrance categories that were below expectations and indicated a longer required recovery period. Additionally, the forecast was updated to include the costs of the Turnaround Plan. Overall, these factors negatively impacted the cash flows of the Consumer Beauty reporting unit and resulted in a decrease in our assumed terminal growth rate, which also adversely affected the fair values.

Musoff Decl. GG at 49; AC ¶ 178.

This paragraph plainly states that three factors leading to the second impairment "developed during the fourth quarter of fiscal 2019" - "fourth quarter net revenue results and market share trends that were below expectations, continued net revenue and profitability declines for Younique in excess of management's expectations, and the development of our Turnaround Plan to stabilize operations and improve profitability." Id. Plaintiffs do not plausibly allege that defendants knew that revenue, profitability, and market share results would come in below defendants' expectations. And Nock's argument that "Coty undertook turnaround efforts before the end of Q2 2019" does not account for the difference between "turnaround efforts," which Coty was engaged in throughout the class period, and the formal "Turnaround Plan," which Coty announced on July 1, 2019, see

July 1, 2019 Form 8-K, Musoff Decl. Ex. EE at 1-5 (Turnaround Plan press release), 6-27 (Turnaround Plan investor presentation slides).

Nock also contends that

> Coty violated GAAP by failing to record an additional $2.87 billion impairment in its Q2 2019 10-Q. Moreover, having failed to record the appropriate impairment in its Q2 2019 10-Q, Coty also failed to perform an interim goodwill impairment test and record an additional $2.87 billion impairment in its Q3 2019 10-Q.

Id. ¶ 184.

But as the Second Circuit has cautioned, "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996).

Nock does not state facts justifying the inference that defendants delayed the second impairment with conscious recklessness or fraudulent intent. The AC and the relevant SEC filings show rather that Coty's continued underperformance after the February 2019 impairment led the company to develop a formal Turnaround Plan that included recording the second impairment.

Accordingly, Nock has failed to allege plausibly a 10b-5 claim for Coty's failure take the full nearly $4 billion impairment earlier than July 2019.

**CONCLUSION**

As the AC fails to allege plausibly any actionable omissions, defendants' motion to dismiss the AC (Dkt. No. 37) is granted.

The Clerk will enter judgment dismissing the Amended Class Action Complaint with costs and disbursements to defendant according to law.

So ordered.

Dated: August 3, 2021
New York, New York

Louis L. Stanton

LOUIS L. STANTON
U.S.D.J.